UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------

A.G. and L.G., on behalf of N.G.,

Plaintiffs-Appellants,

--against--

**08 Civ. 1576 (LAK)**

Thomas R. Frieden, As Commissioner of
the New York City Department of Health & Mental Hygiene,

Defendants.

---------------------------------------------------------------------------

**PLAINTIFFS-APPELLANTS' MEMORANDUM OF LAW IN
SUPPORT OF MOTION FOR MODIFIED *DE NOVO* REVIEW**

Mayerson & Associates
Attorneys for Plaintiffs-Appellants
330 West 38th Street, Suite 600
New York, New York  10018
(212) 265-7200

# TABLE OF CONTENTS

TABLE OF CONTENTS………………………………………………………………..i

TABLE OF AUTHORITIES……………………………………………………….iii

PRELIMINARY STATEMENT……………………………………………….....1

ARGUMENT………………………………………………………………………...4

    I.  The ALJ's January 16, 2008 Decision Should Be Reversed ………………….....4

       A. The Applicable Standard of Review………………………………………4

       B. Defendant's Obligation to Provide N.G. With A FAPE…………………..5

          I.      The IFSP offered by defendant's Early Intervention Official was inappropriate, as it was impermissibly "predetermined," procedurally deficient, and substantively deficient. It also deprived N.G.'s parents of their independent entitlements under the IDEA statute……………………………………...……8

          II.     The impermissibly pre-determined IFSP offered to N.G. by defendant's Early Intervention Official denied N.G. procedural protections, was not tailored to N.G.'s individual needs, and deprived N.G.'s parents of their right to meaningfully participate in the IFSP development process………………..……….9

          III.    The November 14 IFSP, in addition to being "predetermined," was otherwise procedurally deficient, and thus inappropriate...…14

          IV.    The November 14 IFSP did not address N.G.'s unique needs and was not "reasonably calculated" to confer a meaningful and adequate benefit……………………………..……………15

             i. The IFSP was not individually tailored to address N.G.'s unique needs…………………………………16

          V.      The Defendant's IFSP was not "reasonably calculated" to confer a meaningful educational benefit upon N.G………..…17

          VI.    The unilateral program implemented by the Plaintiffs amply met the less stringent *Frank G.* standard for appropriateness and reimbursability……………..……………19

VII.    The evidence at the trial amply established that N.G.'s unilateral program (under Prong I) *was* individually tailored to meet his unique needs…………………………………..21

VIII.   The evidence adduced at the hearing amply established that N.G.'s unilateral placement was likely to produce progress and that it had actually done so………………………...22

IX.     The equities favor the Plaintiffs, who have been reasonable, involved, cooperative, and professional in their efforts to secure appropriate services for N.G……………………………...23

CONCLUSION…………………………………………………………………………..24

# TABLE OF AUTHORITIES

**Cases**

Board of Educ. v. Rowley, 458 U.S. 176, 206 (1982)…………………..……..4,9,14,19,20

Burlington Sch. Comm. v. Dept. of Educ., 471 U.S. 359 (1985)..…………… 1,4,5,6,9,19

Cerra v. Pawling Central Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005)…………………4

Deal v. Hamilton County Bd. of Education, 392 F.3d 840 (6th Cir. 2004)

      (rehearing *en banc* denied 4/1/05); *cert. denied* (2005)……………..5,7,11,12, 14

Evans v. Board of Educ., 930 F.Supp. 83, 93 (S.D.N.Y. 1996)…………………………..5

Florence County School District Four v. Carter, 510 U.S. 7 (1993)…………...…......1,6,9

Frank G. v. Board of Educ. of Hyde Park, 459 F.3d (2d Cir. 2006)……...…...6,8,18,19,20

Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 112 (2d. Cir. 2007)……..4,6,20,21

Honig v. Doe, 484 U.S. 305, 311 (1998)……………………………….……………..14

J.B. v. Killingly Board of Educ., 990 F.Supp. 57, 67 (D.Conn. 1997)……………………5

Knable v. Bexley City School Dist., 238 F.3d 755 (6th Cir. 2001)………………………..4

M.S. v. Yonkers Bd. of Educ., 231 F.3d 96, 102 (2d Cir. 2000)………………………4,19

Mrs. B. v. Milford Board of Education, 103 F.3d 1114 (2d Cir. 1997)……………...4,5,20

Muller *ex rel.* Muller v. Comm. on Special Educ., 145 F.3d 95, 105

      (2d Cir. 1998)………………………………………………………….……19

Oberti v. Board of Educ., 995 F.2d 1204 (3d Cir. 1993)…….…………………………..16

Schaffer v. Weast, 546 U.S. 49 (2005)………………………………………………….2,8

S.H. o/b/o I.H. v. State-Operated School District of the City of Newark,

      336 F.3d 260, 264 (3d. Cir. 2003)………………………………………………16

Spielberg ex rel. Spielberg v. Henrico County Public Schools,

    853 F. 2d 256 (4th Cir. 1998)……………………………………….…...…..7

Still v. DeBuono, 101 F.3d 888, 891-892 (2d Cir. 1996)………………………...5,6,9

T.P. and S.P., o/b/o S.P. v. Mamaroneck U. FSD, 2007 U.S. Dist.

    LEXIS 35288 (S.D.N.Y. 2007)………………………... ………………7,10,11,12

Walczack v. Florida Union Free Sch. Dist., 142 F.3d 119, 130

    (2d Cir. 1998)……………………………………………………………4,14,16,20

Warren G. v. Cumberland County Sch. Dist., 190 F.3d 80, 86 (3d Cir. 1999)…...……..20

Winkelman v. Parma City Sch. District, 127 S.Ct. 1994 (2007) …………………....7,8,14

W.G. v. Board of Trustees of Target Range School District No. 23,

    960 F.2d 1479, 1484   (9th Cir. 1992)……………...………..………...….…..7,12

**Statutes**

20 U.S.C. § 1415(i)(2)(B)……………………………………………………………4

20 U.S.C. § 1433……………………………...……………………………………...5

# PRELIMINARY STATEMENT

This action presents a modified *de novo* appeal, after trial, from the January 16, 2008 Order and Decision of Administrative Law Judge Kimberly O'Brien. After a six day trial, the ALJ dismissed plaintiff N.G.'s petition, and held that defendant had offered plaintiff N.G. a "free and appropriate public education" (FAPE) and that therefore, N.G.'s parents (A.G. and L.G.) were not entitled to recover any *Burlington-Carter* reimbursement relief.[1]

Plaintiffs-appellants brought the underlying administrative due process proceeding in an effort to remedy defendant's procedural and substantive failure to provide N.G. with a FAPE during the relatively brief period when N.G., then under the age of three, was eligible to receive services under New York State's Early Intervention program.  That program is administered in New York City by the New York City Department of Health and Mental Hygiene ("NYC Department of Health") and otherwise throughout the State by the New York State Department of Health.

As shown below in greater detail, N.G. is a young boy diagnosed with a serious autism spectrum disorder who required an intensive and comprehensive program of early intervention services. N.G. was entitled to receive an individualized and appropriate program under Early Intervention, and his parents also had independent statutory entitlements to, *inter alia*, meaningful participation in the development of N.G.'s Individualized Family Services Plan ("IFSP").

While the ALJ ruled in defendant's favor on Prong I, the ALJ made clear in her decision that she would likely have ruled for N.G. on Prong II, had she reached that issue.  The ALJ acknowledged at page 11 of her Decision that "….N.G. has an intensive plan in place where

---

[1] Reference is made to the seminal authorities of <u>Burlington School Committee v. Mass. Dept. of Educ.</u>, 471 U.S. 359 (1985) and <u>Florence County Sch. Dist. Four v. Carter</u>, 510 U.S. 7 (1993).

N.G. has realized significant benefit."  Accordingly, even the ALJ strongly suggested that N.G.

met his burden to establish the Prong II appropriateness of his unilateral (private) program.

**The ALJ's Highly Unusual Rulings
On The Very Last Day of Hearing**

Under <u>Schaffer v. Weast</u>, 546 U.S. 49 (2005), the burden of proof was on plaintiffs-

appellants during the trial to establish that there was a material FAPE violation (Prong I).

Plaintiffs-appellants went first, and they put in their case-in-chief over the first few days of the

hearing.[2]

The record shows that on the sixth and very last day of hearing, defendant's counsel, as part

of defendant's case, put into evidence an extensive log entitled "service-coordination notes" (R-

15) ostensibly detailing telephone and other communications with N.G.'s parents. T. 1783-1784.

Although this was a document ostensibly prepared by defendant and its administrative

functionaries, no witness with personal knowledge of the entries was made available for cross-

examination.

Inexplicably, the ALJ failed and *refused* to allow N.G.'s mother to take the witness stand to

*rebut* this entirely new evidence. Tr. p. 1867. This was manifestly unfair, particularly since

defendant's counsel had never before sought to introduce such evidence, and additionally since

plaintiffs-appellants' counsel might have objected to the admission of this evidence on "five

day" disclosure grounds but, in the spirit of cooperation, did not do so. Tr. p. 1783-84.

In this connection, New York State's "Manual for Administrative Law Judges and Hearing

Officers" provides:  "After both parties have put on their case, the party who went first has a

"rebuttal" opportunity.  Rebuttal is generally limited to denying some affirmative fact that the

---

[2] Shortly thereafter, the New York Legislature enacted legislation that (after October 15, 2007) *restored* the Prong I
burden of proof to where it was pre-*Schaffer*.  Other states, including New Jersey, are now following suit.

other party has attempted to prove."[3] This is precisely what plaintiffs-appellants attempted to do. The ALJ thus denied N.G. and his parents the right of rebuttal and the fundamental right of cross-examination.

On the last day of hearing, the ALJ did something else that was highly unusual for anyone sitting in a judicial capacity. During the *cross-examination* of defendant's witness, Dr. Prashil Govind, by N.G.'s counsel, the ALJ ordered N.G.'s counsel to not ask any "leading" questions. Tr. p. 1728-29.   The record shows, however, that the ALJ permitted defendant's counsel free reign to utilize leading questions when she was cross-examining N.G.'s witnesses. Tr. 1095-1099. Aside from the obvious fact that the use of leading questions is perfectly acceptable during cross-examination, the ALJ's disparate treatment strongly suggests a lack of impartiality on her part.  At the very least, it raises serious questions about the ALJ's ability to properly apply the accepted and applicable standards, on the merits.

As the authorities hereinafter set forth demonstrate, the ALJ's January 16, 2008 Order should be reversed, and N.G. and his parents should be awarded the reimbursement relief that was denied by the ALJ.

---

[3] Selected excerpts from the Manual for Administrative Law Judges are annexed to the Mayerson Affidavit as Exhibit B.

**ARGUMENT**

**THE ALJ'S JANUARY 16, 2008
DECISION SHOULD BE REVERSED**

**A.  The Applicable Standard of Review**

When a federal court reviews the findings and conclusions reached in an IDEIA-based state administrative proceeding of this type, it should base its decision on the preponderance of the evidence, after independently reviewing the full administrative record and, at a party's request, any additional evidence presented. 20 U.S.C. § 1415(i)(2)(B); M.S. v. Yonkers Bd. of Educ., 231 F.3d 96, 102 (2d Cir. 2000).

Typically, this Court is applying a "due weight" standard to the fact-findings of the hearing officer. Bd. Of Educ. of the Hendrick Hudson Sch. Dist. v. Rowley, 458 U.S. 176, 206 (1982); Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 129 (2d Cir. 1998).  This approach, however, does not entail the equivalent of a "rubber stamp." The Second Circuit, in Gagliardo v. Arlington Central School District, 489 F.3d 105 (2d Cir. 2007), held that the district court should engage in an *independent* review of the administrative record and make a determination based on a "preponderance of the evidence," quoting Mrs. B. v. Milford Bd. of Educ., 103 F.3d 1114, 1120 (2d Cir. 1997).

Sch. Comm. of Burlington, Mass. v. Dept. of Educ. of Mass., 736 F.2d 773, 791 (1st Cir. 1984), *aff'd on other grounds*, 471 U.S. 359 (1985), makes clear that after careful consideration of the hearing officer's findings on each material issue, "the court is free to accept or reject the findings in part or in whole." Id. at 792.  See also Cerra v. Pawling Central Sch. Dist., 427 F.3d 186, 191 (2d Cir. 2005); Knable v. Bexley City School Dist., 238 F.3d 755 (6th Cir. 2001).  This Court thus has broad power under 20 U.S.C. Sec. 1415 to "grant such relief as the court determines is appropriate."

Significantly, where as here, the underlying decision being appealed from is either controverted by the evidence or not supported by the record, the reviewing court need not accord due weight to fact-finding. Evans v. Board of Educ., 930 F.Supp. 83, 93 (S.D.N.Y. 1996). Similarly, it is axiomatic that where the underlying decision ignores or fails to make fact-findings as to a particular claim or issue, there is no "finding" to accord any deference to.

Moreover, it is well settled that conclusions of law and mixed questions of law and fact receive pure *de novo* review by this Court. Finally, this Court is not required to give any weight to conclusions of law concerning the "proper interpretation of the federal statute and its requirements." J.B. v. Killingly Board of Educ., 990 F.Supp. 57, 67 (D.Conn. 1997) (*quoting* Mrs. B. v. Milford Board of Educ., 103 F.3d 1114, 1221 (2d Cir. 1997)); Deal, 392 F.3d 840 (6th Cir. 2004).

### B.  Defendant's Obligation To Provide N.G. With a FAPE

States receiving financial assistance under IDEA are required to establish "a statewide, comprehensive, coordinated, multidisciplinary, interagency system to provide early intervention services for infants and toddlers with disabilities and their families." 20 U.S.C. § 1433.

Parents who conclude that the early intervention services offered to their children do not appropriately address their child's unique needs are authorized to unilaterally establish appropriate services and seek reimbursement for the costs of services. School Comm. of Burlington v. Dept. of Educ. of Mass., 471 U.S. 359, 369-370 (1985); See also Still v. DeBuono, 101 F.3d 888, 891-892 (2d Cir. 1996).[4]

---

[4] In the case at bar, plaintiffs-appellants rejected defendant-appellee's recommended program of services not because of their personal beliefs, but because defendant-appellee's recommendations were inadequate in relation to what experts had recommended for N.G. in their evaluation reports. Unfortunately, the record shows, and defendant fairly admitted at trial, that defendant, apparently because of custom or policy, did not even share and meaningfully consider plaintiffs-appellants' private evaluation reports.

The viability of reimbursement claims is determined according to the three-pronged Burlington/Carter test for reimbursement relief.  Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1993); Burlington, 471 U.S. at 369-370; See also Frank G. v. Bd. of Educ., 459 F.3d 356 (2d Cir. 2006); Gagliardo v. Arlington CSD, 489 F.3d 105 (2d Cir. 2007); DeBuono, 101 F.3d at 891.

To successfully sustain a reimbursement claim, this three-part test requires (a) a finding that the program proposed by the Early Intervention Official was procedurally and/or substantively inappropriate (Prong I), (b) a finding that the services secured by N.G.'s parents were "appropriate" under the somewhat less stringent Prong II standard set forth by the Second Circuit in Frank G. (Prong II), and (c) a finding under Prong III that equitable considerations would not preclude or diminish the reimbursement award that otherwise would be made. Id.

The evidence adduced during a six-day trial amply established that the program of services offered to N.G. by defendant's Early Intervention Official was both procedurally and substantively defective and that, as a result, N.G. was deprived of a FAPE. (Prong I)  We are asking this Court to reverse the ALJ on this important threshold determination.

 From a *procedural* perspective, the evidence shows that, *inter alia*, the IFSP meeting and process was violative of IDEA by reason of impermissible predetermination and custom and policy that apparently *precluded* any genuine and meaningful consideration of the important private evaluation reports that N.G.'s parents had shared with the IFSP team for consideration. These private evaluation reports discussed N.G.'s unique deficits in detail, and they also made recommendations going to the issue of what service levels would be appropriate and necessary for N.G.

Defendant admitted that it follows a policy of not ever considering private evaluation reports when determining a child's *eligibility* for services. Even assuming, *arguendo* only, that such a policy would be permissible at the eligibility determination stage (and we urge that it is not), the evidence shows that defendant quickly ran out of excuses. Even *after* defendant declared N.G. eligible, defendant *still* failed to give any consideration to the private evaluations that N.G.'s parents had provided to defendant for that purpose.

Defendant's failure to share and give meaningful consideration to the private evaluations and recommendations supplied by N.G.'s parents not only deprived N.G. of a FAPE, it also deprived N.G.'s *parents* of "meaningful" participation in the IFSP development process.

The Supreme Court has made clear that parents have independent statutory entitlements under IDEA that correspond to their children's entitlements. <u>Winkelman v. Parma City School Dist.</u>, 127 S.Ct. 1994 (2007). <u>See also</u> <u>Deal v. Hamilton Co. Dept. of Educ.</u>, 392 F.3d 840 (6th Cir. 2004) (rehearing *en banc* denied 4/1/05); *cert. denied* (2005);[5] <u>T.P. v. Mamaroneck Union Free School Dist.</u>, 2007 U.S. Dist. LEXIS 35288 (S.D.N.Y. 2007); <u>Spielberg v. Henrico County Pub. Schools</u>, 853 F.2d 256 (4th Cir. 1988); <u>W.G. v. Board of Trustees</u>, 960 F.2d 1479 (9th Cir. 1992).

There were other related procedural failures detailed in N.G.'s request for hearing.

From a *substantive* perspective, the evidence showed, *inter alia*, that while N.G.'s parents agreed to accept certain services from defendant on a without prejudice basis, defendant was not ready, willing and able to implement such services. Accordingly, even without defendant's

---

[5] <u>Deal</u>, in particular, is instructive for the Sixth Circuit's recognition that the fact that a parent is physically present at the educational planning meeting and allowed to ask questions does not remove the taint of impermissible predetermination where, as here, there is evidence of such conduct. The issue turns on whether or not there was "meaningful" participation in the development of the educational plan. In the case at bar, we urge that defendant prevented N.G.'s parents' meaningful participation by its admitted failure (if not refusal) to give any genuine consideration to N.G.'s private evaluation reports. We submit that defendant had a predetermined and preordained agenda to follow, and that is precisely what defendant did.

impermissible predetermination conduct in the development of N.G.'s IFSP, this IFSP fulfillment failure justified N.G.'s parents' actions to step into the breach and provide N.G. with the services he needed.   Between the procedural and substantive failures, there was ample evidence to support a Prong I finding in favor of N.G. and his parents.

The evidence established that the unilateral program secured by N.G.'s parents appropriately addressed N.G.'s individual needs and promoted N.G.'s progress. N.G.'s services amply met the "reasonably calculated" test set forth in Frank G.

Finally, as to Prong III, the evidence established that N.G.'s parents were involved, cooperative, and reasonable. There were no "equitable circumstances" that would warrant precluding or diminishing a reimbursement award.

N.G. and his parents accepted and amply met the burden of proof on Prong I in accordance with the Supreme Court's decision in Schaffer v. Weast, 546 U.S. 49, 56 (U.S. 2005).[6] Plaintiffs' counsel stipulated on the record that such burden would *remain* on plaintiffs. Thus, the burden issue was not affected by then recent legislation in New York that had restored the Prong I burden situation to where it was pre-*Schaffer.* We respectfully urge that plaintiffs amply met their evidentiary burden, and should have been awarded the reimbursement relief that was being requested.

---

[6] The plaintiff-appellants accepted the burden of proof as established in Schaffer v. Weast, 546 U.S. 49, 56 (U.S. 2005), mindful that the New York Legislature was then enacting new legislation to shift the burden back.

I.      The IFSP offered by defendant's Early Intervention Official was inappropriate, as it was impermissibly "predetermined," procedurally deficient, and substantively deficient. It also deprived N.G.'s parents of their independent entitlements under the IDEA statute.

The Prong I inquiry considers (a) whether *procedural* protections guaranteed to N.G. and his parents[7] by IDEA were materially violated and (b) whether, substantively, the services offered by the Early Intervention Official were individually tailored to meet the unique needs of N.G. Board of Ed. of Hendrick Hudson Central School Dist., Westchester Cty. v. Rowley, 458 U.S. 176, 205, (1982). A finding that the Early Intervention Official proposed a plan that fails *either* of these inquiries necessitates a finding that Prong I favors N.G. and his parents. Carter, 510 U.S. 7 (1993); Burlington, 471 U.S. at 369-370. See DeBuono, 101 F.3d at 891.

Here, the November 14 IFSP fails *both* inquiries, as it was impermissibly predetermined, procedurally deficient, *and* substantively deficient. It deprived N.G. of a FAPE, and it also deprived N.G.'s parents of bona fide and *meaningful* participation and involvement in the IFSP development process.

II.     The impermissibly pre-determined IFSP offered to N.G. by defendant's Early Intervention Official denied N.G. procedural protections, was not tailored to N.G.'s individual needs, and deprived N.G's parents of their right to meaningfully participate in the IFSP development process.

Predetermination conduct may consist of policies or practices that preclude genuine and meaningful consideration of parental requests. Or, it may actually involve direct predetermination of services, or service levels. Ultimately, impermissible predetermination is conduct that may preclude individualization of the IFSP, deprive the child of a FAPE, or deprive the child's parents of meaningful participation in the IFSP development process.

---

[7] The United States Supreme Court held in Winkelman v. Parma City Sch. Dist., 127 S. Ct. 1994, 2000 (U.S. 2007) that parents have their own statutory entitlements under IDEA that correspond to their children's entitlements.

In the present case, substantial evidence presented during the hearing established the defendant's Early Intervention Program did not approach N.G.'s specific IFSP with an open mind. Defendant followed its custom and policy of not sharing or considering private evaluations at the IFSP meeting. Instead, defendant simply proceeded to offer N.G. a "standard package" of services, frequencies, and intensities to children with autism. [8]

N.G.'s mother testified that defendant's Ms. Placido informed her (N.G's mother) of the precise levels of ABA and speech services that N.G. would be offered *days before* the IFSP meeting. Tr. p. 878. At that time, Ms. Placido somehow knew that N.G. would receive 20 hours of ABA, 5 hours of speech, and "some occupational therapy," as such a combination is a "pretty *standard* package." Tr. p. 878.[9] It is important to note that when Ms. Placido predicted the future, she did not have access to the pertinent evaluations at the time.[10] The court in T.P. expressly holds that such a prediction, when proven true, is powerful evidence that predetermination has occurred. T.P. and S.P., o.b.o. S.P. v. Mamaroneck U. FSD, 2007 U.S. Dist. LEXIS 35288 (S.D.N.Y. 2007).[11]

Whether or not Ms. Placido's pre-IFSP communication with the N.G.'s family predicting N.G.'s services is itself considered enough of a "smoking gun" for purposes of the "predetermination" issue (and we urge that it is more than sufficient), the remainder of Ms.

---

[8] Witnesses for the defendant countered the notion of pre-determination with an emphasis on the ability of each IFSP program to be changed over time i.e. the idea that the IFSP could always be fixed. While it is true that IFSP programs are to some degree malleable, this does not alter the requirement that the agency approach the initial IFSP meeting with an open mind. This is especially true in this case, where defendant's obligation to offer any IFSP (Early Intervention) services terminates when the child turns three.

[9] Ms. Placido said that she did not remember having discussed services ( Tr. 846). N.G.'s mother, however, who only was involved in just her own case, is "one hundred percent certain" that the conversation occurred. Tr. 878. In fact, N.G.'s mother communicated the "package" of services (to be offered by defendant) to Dr. McCarton, prior to the IFSP. Tr. p. 879.

[10] The evidence showed that Ms. Placido did not *need* to see the evaluations. She did not need the evaluations to tell N.G.'s family what N.G. would be offered because of custom, policy, and impermissible predetermination.

[11] The T.P decision was rendered by United States District Court Judge Charles Brieant, who passed away last week.

Placido's testimony further supports the conclusion that the Early Intervention program is systematically predetermined.

Ms. Placido testified that the *highest* number of hours she had seen offered among the *seventy* IFSP meetings she had attended was 20 hours. Tr. p. 816-817. In addition, Ms. Placido testified that children are offered team meetings, *usually*, one sixty minute session per month, while parent training is *generally* included at a rate of one hour per week. Tr. p. 820. Further, Ms. Placido has never seen provision for more than five days of ABA services per week. Tr. p. 822. This evidence suggests that, as a policy, certain intensities, frequencies and levels of services are "standard" and some are not even available. From both a procedural and substantive perspective, there clearly are a number of internal policies and self-imposed limitations on services and levels of service that served to *preclude* the true individualization of N.G.'s IFSP.

While no two children with autism present the same way, the totality of the evidence strongly suggested that the vast majority of children on the autism spectrum[12] who enter defendant's Early Intervention Program in Manhattan receive similar "packages" of services, and that the frequency and intensity of services is constructively capped.

It is important to note that the decisional law establishes that the predetermination of even one key programmatic element is impermissible. T.P., 2007 U.S. Dist. LEXIS 35288. *See also* Deal, supra.

The lack of informed individualization appears to be a systemic problem in defendant's Early Intervention Program. Ms. Placido, for instance, testified that it is not unusual for IFSP meetings to *fail* to include a single (agency) attendee who has actually met the child. Tr. p. 847-48.

---

[12] Children who, of course, fall at various points on the autism *spectrum* would be expected to require varying types, frequencies and intensities of services.

Dr. Gong, an important witness also employed by the defendant, testified that, though she admittedly is not an autism expert, she was able to determine that N.G.'s offered services were appropriate solely by reading N.G.'s file and *comparing* it to other cases that gave her "an idea of what is in the *ballpark* of what should be appropriate." Tr. p. 1611. Accordingly, Dr. Gong did not focus on what N.G., the individual student, required to meet his unique needs and deficits. Rather, Dr. Gong concluded that N.G.'s offered services were appropriate because they were in the "ballpark" of what defendant apparently provides or offers in "other" cases.

The evidence is compelling that defendant failed, if not refused, to share and meaningfully consider private evaluation reports that N.G.'s parents had secured from Cecilia McCarton, M.D. and other sources. When one ignores the parent's private evaluation reports, and relies upon "standard packages," "ballparks," or persons who conduct or attend IFSP meetings who have never even seen the child, the *genuine* individualization of services at the Early Intervention program is not happening. It certainly did not happen in N.G.'s case.

Predetermination occurs when the responsible agency does not provide *actual consideration of parental* input. <u>Deal</u>, 392 F.3d at 858; <u>T.P.</u>, 2007 U.S. Dist. LEXIS 35288. The court in <u>Deal</u> expressly held that an accusation of predetermination cannot be successfully countered by mere evidence that parents were physically present or allowed to speak at the meeting or that parents were "listened to" during a meeting. <u>Id.</u> Parental participation "must be more than mere form; it must be meaningful." <u>Id.</u>, citing <u>W.G. v. Board of Trustees of Target Range School Dist. No. 23</u>, 960 F.2d 1479, 1485 (9th Cir. 1992).

This is the exact scenario that the N.G.'s family found itself in. Though the IFSP team may contend that it listened to N.G.'s parents' concerns, the evidence showed that N.G.'s parents concerns and input were not given genuine and *meaningful* consideration during the IFSP

process. Defendant's private reports submitted in connection with the IFSP process were <u>not</u> genuinely considered even *after* N.G's eligibility was established.  The plaintiffs were specifically told that these private reports would NOT be considered.  Plaintiff-appelants' physical "participation" at N.G.'s IFSP meeting thus cannot be considered meaningful.

The evaluations that plaintiffs provided in an attempt to inform the discussion, and provide N.G. with truly individualized services, were *dismissed* outright at the meeting by Ms. Aiello. Tr. p. 344.  Whatever were the procedures in determining initial "eligibility," once N.G.'s eligibility was established (as it was in this case), plaintiff's private evaluations and recommendations should have been meaningfully considered, shared, and discussed *before* N.G's IFSP was finalized and offered.  Unfortunately, this is not what happened. N.G's private evaluations and recommendations were not given consideration.

While witnesses present at N.G's IFSP uniformly acknowledged that plaintiffs' position was that defendant's program was not sufficient to meet N.G.'s needs (Tr. p. 338-39) and that weekend hours would be necessary to ensure consistency (Tr. p. 321), <u>N.G. was offered the precise program and *levels* of services that Ms. Placido had communicated to the G. family **prior to N.G's IFSP meeting.**</u>  Plaintiffs, who had not been meaningfully "heard," made a notation on the IFSP to indicate their dissatisfaction.  Tr. p. 896.

<u>Ms. Arias admitted that she informed the plaintiffs that the IFSP team could not even *consider* the hours, direct services, and frequencies recommended by the outside evaluators. Tr. p. 340-41.</u>  This exclusion of critical material was apparently based on a misunderstood regulation that ostensibly prohibits outside evaluations from being used to determine a child's initial *eligibility*. Tr. p. 344-350

During the hearing, witnesses for the Early Intervention Official attempted to counter the evidence of pre-determination by arguing that the granting of plaintiff's request to conduct a physical therapy *evaluation* (at the IFSP) was evidence of meaningful participation. This, however, was nothing more than giving the plaintiffs "ice in winter."

N.G.'s need for physical therapy was minimal, in relation to his ABA services, and other services. Granting plaintiffs (at the IFSP meeting) the "right" to have a PT evaluation hardly rebuts the clear showing of predetermination as to the other program and service level components. Moreover, in <u>Deal</u>, the court held that the issue is not whether parents are physically present at an IFSP and "allowed" to say things. Rather, to counteract evidence of impermissible predetermination, an agency or school district must prove that the parents were provided a <u>meaningful</u> opportunity to influence *operative portions* of the IFSP. <u>Deal</u>, 392 F.3d at 859.

The weight of the evidence adduced during the hearing thus supports the conclusion that defendant's Early Intervention program impermissibly predetermined the services and service *levels* that it would offer to N.G. Such predetermination should be considered a deprivation of plaintiffs' entitlement to meaningful participation in the IFSP process and N.G.'s entitlement to an individualized program and FAPE that would address his unique needs. <u>Winkelman</u>, 127 S. Ct. at 2000. It also deprived N.G.'s parents of their right to meaningful participation.

III.    <u>The November 14 IFSP, in addition to being "predetermined," was otherwise procedurally deficient, and thus inappropriate.</u>

The Supreme Court has consistently held that in enacting the IDEA statue, Congress was very much concerned with the integrity of the *procedures* governing the creation of IFSP and IEP plans. <u>See</u> <u>Rowley</u>, 458 U.S. 176, 205 (1982) (holding that "the importance Congress

attached to these procedural safeguards cannot be gainsaid"). In fact, the Supreme Court has held that adherence to the procedural safeguards is both integrally linked to and equally important as substantive compliance with IDEA. See id. Material violations of the procedural safeguards put forth in both IDEA and the implementing regulations thus straightforwardly invalidate a questioned plan. Id. at 206. The Supreme Court has also held that the document establishing a service plan under IDEA (such as an IEP or IFSP) should be considered the "primary vehicle" of IDEA implementation, and significant flaws in its form or content of this can likewise invalidate the plan. Honig v. Doe, 484 U.S. 305, 311 (1988).

The November 14 IFSP was fraught with additional procedural violations. The most glaring of these violations was defendant's improper exclusion of the private evaluations developed by Dr. McCarton and Dr. Lucas. The testimony of Ms. Arias shows that she may have mistakenly concluded that the evaluations *could not* be legally used during the meeting, but Ms. Arias' "intent" is not controlling. The exclusion of N.G.'s private evaluations had a far-reaching and negative impact on the development of his IFSP. Plaintiffs were deprived of "meaningful" participation and input at N.G.'s IFSP. Tr. p. 344-45.

Another procedural defect was the failure of the Early Intervention program to perform the very necessary evaluations and assessments that should have been done *prior* to the IFSP meeting, to assess N.G.'s then present levels of performance. It has been acknowledged that the IFSP Team lacked any evaluation of N.G.'s gross motor skills when developing his IESP.

Additionally, the IFSP team was aware that N.G. had interfering behaviors, but no Functional Behavioral Assessment ("FBA") had been planned or administered. Tr. p. 1501. Ms. Dombrowski acknowledged the weight of this error, saying that the lack of such an assessment could result in the creation of the wrong plan for N.G. Tr. p. 1504. The lack of such

assessments and evaluations is compounded by the fact that no IFSP team member had first-hand knowledge of N.G.

IV.    The November 14 IFSP did not address N.G's unique needs and was not "reasonably calculated" to confer a meaningful and adequate benefit.

The Prong I substantive inquiry considers whether the service plan (a) provides services individually tailored to address a child's needs *and* (b) is "reasonably calculated to enable the child to receive educational benefits." Walczak v. Florida Union Free Sch. Dist., 142 F.3d 119, 122 (2d Cir. 1998). Accordingly, an appropriate program begins with a plan that accurately reflects the results of evaluations to identify the child's needs, provides for the use of appropriate services to address the child's special needs, and establishes annual goals and short-term instructional objectives which are related to the child's deficits. S.H. o/b/o I.H. v. State-Operated School District of the City of Newark, 336 F.3d 260, 264 (3d. Cir. 2003).

The November 14 IFSP provides services that do not adequately or appropriately address N.G's individual needs, and it is thus *substantively* inappropriate. Walczak, 142 F.3d at 122 (2d Cir. 1998); Oberti v. Board of Educ., 995 F.2d 1204 (3d Cir. 1993).

i.    The IFSP was not individually tailored to address N.G.'s unique needs.

The services provided in the November 14 IFSP were not properly reflective of the results of N.G.'s evaluations and the IFSP, thus, in late 2006, N.G. was evaluated three times and assessed once. The results of the evaluations provide extensive and corroborating evidence of a child who was exhibiting severe symptoms of autism and who was disconnected from the world.

Though the particular evaluations differed slightly in their findings, the testimony adduced at the hearing expressly established that the IFSP team was at least aware of N.G.'s lack of communication skills, lack of eye contact, stereotypical gesturing, feeding issues, a lack of an awareness of danger and body control issues, and interfering behaviors including tantrums when

taken from something what he wants. Tr. p. 1282, 1508, 1519-20.  N.G.'s symptoms appeared to put him on the *severe* side of the spectrum.  Tr. p. 617.

Yet, in light of all of these recognized serious deficits, the November 14 IFSP: (a) provided a bare-bones and inadequate ABA level, (b) made a recommendation for minimal occupational therapy services without any evaluation of N.G.'s gross motor deficits, (c) completely failed to address N.G.'s feeding and "danger" issues, (d) ignored N.G.'s interfering behaviors, (e) provided a plan with only five days of ABA coverage with lot of "down time," (f) recommended "bilingual" speech therapy when it was not necessary or desired (N.G.'s mother, for example, does not speak in any language but English), and (g) provided *ad hoc* and entirely inadequate parent training and counseling.

 The IFSP program that was offered was not individually tailored for N.G.—rather, it was framed to conform to defendant's perception of a generic "standard" that would fit anyone.

Defendant's program also, in many ways, was designed contrary to the recommendations of highly respected experts that the program be an "intense," seven-day program that addressed N.G.'s deficits across all domains. <u>See</u> <u>e.g.</u> Tr. p. 510, 678, 684.  Dr. McCarton's testimony indicated her belief that it is fundamental for those developing a program to have familiarity with the child and to have seen the child for the program to be appropriate. Tr. p. 693. Defendant's IFSP was created by personnel who had not even met N.G.

V.    <u>The Defendant's IFSP was not "reasonably calculated" to confer a meaningful educational benefit upon N.G.</u>

The November 14 IFSP also does not provide for the use of appropriate or sufficient services to address N.G.'s identified deficits.  The IFSP lacks the requisite intensity, consistency, flexibility of an *effective* program; that is, one that would be "reasonably calculated" to be effective.

The November 14 IFSP includes 20 hours per week of ABA services provided over 5 days per week. Yet, Dr. McCarton, who evaluated N.G. personally and is highly respected in the field, testified that in November, 2006 N.G. needed *more hours.* Tr. p. 686.

Dr. McCarton expressly addressed respondent's notion that the program could be adjusted, by testifying that, regardless of "adjustment" possibilities, 20 hours were far too few. Tr. p. 722.[13] Likewise, Dr. Clark indicated that she thought that N.G. was "in big trouble" and needed "an intensive program…as quickly as possible" and that, for N.G., Defendant's recommendation of a 20-hour per week program by respondent was "a lesson in futility." Tr. p. 510.

Consideration of the calculated benefit of the services also should not overlook the age and brain development considerations that influenced both Dr. Clark's and Dr. McCarton's recommendations. Dr. McCarton testified that a "good program" for a young child with autism should have *increased intensity* because of brain "plasticity" that fades with age. Tr. p. 678. Dr. Clark backed this notion in her testimony, stating that the program ought to be more intensive at a younger age, as there is a "window" of opportunity for great strides until the age of five. Tr. p. 572-73. It should also be noted that the experts involved in N.G.'s plan indicated that the 40 hours per week of ABA that N.G. was then receiving was *not* optimal, simply "reasonably calculated." Tr. p. 551. Defendant's offer of only 20 hours per week of ABA paled in comparison, and was inadequate.[14]

---

[13] Even the 1998 DOH Recommendations expressly note that service levels must be determined *individually*, based on the individual needs of the child at issue. The DOH 1998 recommendations hardly set forth a rigid recipe or safe harbor as to any ABA service level that would be considered adequate for any individual child. Twenty hours per week is the absolute, bare bones minimum ABA service level that the 1998 recommendations make for even the *highest* functioning child having an autism spectrum disorder, even a child without interfering behaviors.

[14] We note and acknowledge, however, that N.G.'s family had been providing somewhat more *direct* ABA time per week than N.G.'s private evaluations had recommended. To the extent that the ALJ finds for N.G. on Prong I, we maintain that this somewhat higher level of direct ABA per week nevertheless is efficacious and appropriate for N.G. under the less stringent Prong II reimbursement standards. See Frank G.

The calculated benefit of defendant's IFSP also needs to be considered in conjunction with the IFSP's ability to change and adapt over time. In fact, program flexibility is a critical aspect of the design of a plan. Tr. p. 696. It is for this reason that Dr. McCarton called the team meeting and parental training sessions, which are both means of making "on the fly" corrections, the "tent poles" that provide the foundation for a program. Tr. p. 884. While the unilateral plan adopted by the Plaintiffs contained *weekly* team meetings involving all of the therapists (enabling regular and continuous adjustment of the plan and getting everyone on the same page), the IFSP plan called for (only) *monthly* meetings of merely one hour and lacked clarity on whether the therapists would be paid for attending.

It was the opinion of Dr. McCarton that it is "not appropriate" to have a program without a *weekly* team meeting. Tr. p. 699. The IFSP's ability to effectively change and adapt was also negatively impacted by the *six month*[15] review process to which it was subject and its lack of any defined amount of hands-on time for the program supervisor to spend with N.G. Tr. p. 735-736. Without such direct and regular opportunities for redirection and hands-on supervisory contact, given the frequent changes in N.G.'s needs and behaviors, N.G.'s educational vehicle would run off the road. Tr. p. 543-544, 735-36. As Dr. McCarton explained, such deficiencies are *not* reasonably calculated to confer a meaningful educational benefit upon N.G. Tr. p. 770, 772.

VI.   The unilateral program implemented by the Plaintiffs amply met the less stringent *Frank G.* standard for appropriateness and reimbursability.

It is well established that the parents of a child who has been denied appropriate services under IDEA "may remove the child to an appropriate" program and are entitled to

---

[15] This kind of time frame is especially unhelpful, given the fact that the Early Intervention program is as limited in time as it is. By the time that a "problem" is discovered, the child has already transitioned or is about to be transitioned to the New York City DOE's CPSE.

reimbursement for the costs of the unilateral program. <u>M.S. v. Yonkers Bd. of Educ.</u>, 231 F.3d 96, 102 (2d. Cir. 2000), *citing to* <u>Burlington</u>, 471 U.S. at 369-70.  Reimbursement is awarded upon somewhat less stringent proof that the unilateral placement and program is "reasonably calculated to enable the child to receive educational benefits." <u>Rowley</u>, 458 U.S. at 207; <u>Frank G</u>, 459 F.3d at 364; <u>Muller ex rel. Muller v. Comm. on Special Educ.</u>, 145 F.3d 95, 105 (2d Cir. 1998).

The Second Circuit has expressly held that the burden underlying the Prong II requirement placed upon parents is *more relaxed* than the burden placed upon local education agencies attempting to prove the appropriateness of placements and programs.  In <u>Frank G.</u>, the court cited well-established precedent in other circuits when holding that the parents' burden under the "reasonably calculated" test imposed upon them is to show that the placement and program "must be likely to produce progress, not regression." <u>Frank G.</u>, 459 F.3d at 364; <u>Walczak</u>, 142 F.3d at 122; and <u>Mrs. B. v. Milford Bd. of Educ.</u>, 103 F.3d 1114, 1121 (2d. Cir. 1997).

To determine whether a parent-secured program is likely to produce progress, courts look at the totality of the circumstances, including, for instance, evidence of educational and/or behavioral improvements. <u>Frank G.</u>, 459 F. 3d at 365.

The Second Circuit has expressly noted that the test requires proof that the placement is "reasonably appropriate," not that the placement is "perfect" or that it neatly satisfies "least restrictive environment." <u>Frank G.</u>, 459 F.3d at 364, quoting <u>Warren G. v. Cumberland County Sch. Dist.</u>, 190 F.3d 80, 84 (3d Cir. 1999).    Where, as here, there is a FAPE failure, parents (even parents under the gun of a *Schaffer* burden) do <u>not</u> have to meet the same burden on Prong II as the local educational agency needs to meet on Prong I.

Recently, the Second Circuit further clarified the parents' more relaxed burden under Prong II. In Gagliardo v. Arlington Cent. Sch. Dist., 489 F.3d 105, 115 (2d Cir. 2007), the Second Circuit upheld the Frank G. relaxed Prong II standard, but also clarified that, to be "appropriate," the unilateral placement must be both likely to produce progress *and* provide services "specifically designed to meet the unique needs of a handicapped child." See also Frank G., 459 F.3d at 365, quoting Rowley, 458 U.S. at 188-89. This clarification had the effect of sharpening the Frank G. test by distinguishing between the type of amenities and program elements that any parent would covet for their child from the type of individualized instruction and programmatic elements that would be likely to help the needs of a particular child with a disability. Gagliardo, 489 F.3d at 115.

VII.    The evidence adduced at the trial amply established that N.G.'S's unilateral program (under Prong II) *was* individually tailored to meet his unique needs.

The testimonial and documentary evidence presented by N.G. and his parents amply established that N.G.'s unilateral program was individually tailored to address N.G.'s unique needs. The unilateral program was based on a two-part initial evaluation conducted by Dr. McCarton and Christine Williams, who Dr. McCarton considers the "most incredible assessor in New York City." Tr. p. 668-70. The program was further informed by administration of the ABLLS assessment by Ms. Frankel and Dr. Clark, two experienced and highly respected behaviorists and providers.

The ABLLS assessment identified that N.G. "had deficits in every domain." Tr. p. 89, 529. Based on their assessment results, Dr. Clark and Ms. Frankel designed for N.G. a intense program, including 40 hours of ABA spread across 7 days, and specifically designed to counteract N.G.'s tendency to practice negative behaviors during so called "down time." Tr. p.

91.   The intensity of the program also was a response to N.G.'s young age and the relative "plasticity" of N.G.'s brain. Tr. p. 572, 678.

The program responded to N.G.'s need to gain attending skills and develop a social emotional connection. Tr. p. 90, 529.  It also included a strong community-based piece so that N.G. could learn to generalize the skills he gained. Tr. p. 108.  Perhaps most importantly, N.G.'s unilateral program was designed with weekly team meetings and parent training and counseling so that the program could be continuously adjusted to provide for N.G.'s changing needs and to help provide structure even during "down time."  Tr. p. 108-09, 117, 134.

VIII.   <u>The evidence adduced at the hearing amply established that N.G.'s unilateral placement was likely to produce progress and that it had actually done so.</u>

N.G.'s unilateral program was calculated to produce results when it was first implemented in December, 2006.  In addition to having the appropriate design elements, the unilateral program's likelihood of success is linked to its intensity, structure, the quality of the staff and providers, its contingent and consistent nature, its frequent team meetings, and its seven day component. Tr. p. 201-02.

The evidence adduced during the hearing establishes that N.G.'s private program *did result* in N.G. making substantial gains.  Dr. Clark stated that "all signs are positive…[and N.G.] is responding very well to [the] intense level of intervention." Tr. p. 541.  Ms. Frankel cited improvements in N.G.'s attending skills, the frequency and duration of eye contact, and the acquisition of the beginnings of incidental learning. Tr. p. 131-33.  Ms. Leyden has seen "remarkable progress," as N.G. can now sit in a chair ad a read a book and look at them…and, to some degree, make it known what he is trying to tell [the adult]." Tr. p. 303-04. Ms. Sandor observed gains in N.G.'s ability to sit at length, improved eye gaze, and significant

improvements in functional language. Tr. p. 441. N.G.'s progress was in part measured by the team's ability to "back off" intrusive prompting with N. Tr. p. 570.

Dr. Clark observed that N.G. "is much more present in the world." Tr. p. 562. Dr. McCarton testified that in five months, N.G. had become more engaged, had improved his expressive and receptive language skills, and was much more present. Tr. p. 701-03. In the opinion of Dr. McCarton, the unilateral program had "an enormous role" in N.G.'s progress. Tr. p. 704.

IX.    The equities favor the Plaintiffs, who have been reasonable, involved, cooperative, and professional in their efforts to secure appropriate services for N.G.

By all accounts, N.G.'s parents faced with the tremendous challenge to care for a son with autism, have conducted themselves throughout the IFSP eligibility and IFSP process in a "cooperative" and "professional" manner. Tr. p. 841.

Plaintiff's were universally described as both intelligent and integrally involved in their son's care and therapy during the hearing. Tr. p. 557. Multiple witnesses indicated that N.G.'s parents have always followed through on the requests of therapists and others involved in N.G.'s program. N.G.'s parents are, in short, parents who have re-arranged their lives and home to care for N.G. They are involved in N.G.'s program in every possible way. Tr. p. 937-38.

N.G.'s parents also wanted the Early Intervention program to work and took steps to try to do just that. Tr. p. 910. In advance of the IFSP meeting, relations were cordial between the plaintiffs and Ms. Placido. Tr. p. 841. Even after Ms. Placido communicated (prior to the IFSP) that plaintiffs would be offered far *fewer* hours of ABA than was being recommended by N.G.'s private evaluators, given N.G.'s needs, N.G.'s parents nevertheless were optimistic and anticipated a collaborative discussion at the IFSP meeting. Tr. p. 892-93. At the time, plaintiffs

were unaware that they were about to be told that N.G.'s private evaluations could not even be considered.

While in attendance at the IFSP meeting and struggling to be heard, N.G.'s parents were reasonable, cooperative, professional, and courteous, according to Ms. Dombrowksi. Tr. p. 1458-59.

Though plaintiffs were profoundly disappointed with the conduct at N.G.'s IFSP meeting, they conditionally *signed* the acceptance form so that services could begin. Tr. p. 912. Finally, realizing that a private program would not work without an effective supervisor, weekly meetings, and parental training, plaintiffs decided to build their own supplemental program, on notice to defendant. Tr. p. 1009, 1011-12. N.G.'s parents have throughout the entire process sought alternative means of resolution before asserting their due process rights. N.G.'s parents even initiated an unsuccessful mediation session. Tr. p. 910-11. They were at all times willing to compromise with defendant. They still are.

## CONCLUSION

For the foregoing reasons, this Court should reverse the ALJ's January 16, 2008 Decision and award N.G.'s parents the reimbursement relief that the ALJ refused.

Dated:  New York, New York
        July 30, 2008

                               Mayerson & Associates
                               Attorneys for Defendants-Appellants


                               ***s/ Gary S. Mayerson***

                               Gary S. Mayerson (GSM 8413)
                               330 West 38th Street, Suite 600
                               New York, New York  10018
                               (212) 265-7200