**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------------------

A.G. and L.G., on behalf of N.G.,

      Plaintiffs-Appellants,                            08 Civ. 1576 (LAK)

        --against--                           **AFFIDAVIT OF**
                                              **GARY S. MAYERSON**
                                              **ON MODIFIED**
                                              **DE NOVO REVIEW**

Thomas R. Frieden, As Commissioner of
the New York City Department  of Health & Mental Hygiene,

                  Defendants.

----------------------------------------------------------------------------

STATE OF NEW YORK
COUNTY OF NEW YORK

GARY S. MAYERSON, being duly sworn, deposes and says:

    1.   My law firm, Mayerson & Associates, is counsel to plaintiff-appellant N.G. and

his parents, A.G. and L.G., in support of their appeal from the January 16, 2008 Decision

of Administrative Law Judge Kimberly O'Brien (Exhibit A).  I respectfully submit this

affidavit and the accompanying memorandum of law in support of plaintiffs-appellants'

request for a modified *de novo* review pursuant to 20 U.S.C. Sec. 1415.[1]

    2.    N.G. is a young boy diagnosed with a serious autism spectrum disorder, whose

---

[1] Pursuant to 20 U.S.C. Sec. 1415, the scope of this Court's review is to conduct an independent, modified *de novo* review of all of the underlying evidence adduced at the administrative level.  The underlying administrative record consists of transcripts and the parties' documentary exhibits.  Defendant's counsel and I are working collaboratively to "certify" the underlying reviewable record, for submission to this Court.

family had made application for services through New York State's Early Intervention program—a program servicing disabled children from "birth to three."[2]

3.    ALJ O'Brien had ruled that the New York Department of Health and Mental Hygiene ("NYC Department of Health") had offered N.G. a free and appropriate public education ("FAPE") and that, therefore, plaintiffs were not entitled to any reimbursement relief for N.G.'s unilateral program of services. Plaintiffs-appellants contend that ALJ O'Brien's January 16, 2008 Decision should be reversed and that this Court should award plaintiffs-appellants the reimbursement relief that had been denied by the ALJ.

4.    As shown in the accompanying memorandum of law, the requirement to provide a FAPE invokes important procedural, as well as substantive safeguards for the affected child. Most recently, the United States Supreme Court has recognized that parents have independent entitlements under IDEA that correspond to their children's entitlements.

5.    One of those entitlements is *meaningful* and full participation in the process leading up to the development of the educational plan. We urge that N.G. and his parents were deprived of meaningful and full participation in the development of N.G.'s "Individualized Family Services Plan," otherwise known as an IFSP. We urge that the development of N.G.'s IFSP was violated by impermissible policy, custom and "predetermination," all of which precluded the genuine individualization of N.G.'s IFSP. Substantively, defendant offered N.G. an inadequate program that was not tailored to meet N.G.'s needs.

---

[2] N.G. has since transitioned to receiving his services from the New York City Department of Education, We are pleased to report that the transition from Early Intervention to the NYC Department of Education's program was entirely uneventful, with no request for any hearing. Accordingly, the unfortunate problems described in this action and on this motion are for a relatively isolated and discrete time frame.

6.     We urge that the ALJ did not properly apply the applicable decisional law and statutory authority. To compound matters, the ALJ also failed to comply with the standards set forth in the manual that New York State provides to ALJ's and other hearing officers (excerpts annexed hereto as Exhibit B).  Finally, on the very last day of the hearing, the ALJ displayed what appeared to be rank favoritism or bias for the defendant.

7.     Under Schaffer v. Weast, 546 U.S. 49 (2005), the burden of proof was on plaintiffs-appellants during the trial to prove that there was a material FAPE violation. The record shows that after allowing defendant (on the very last day of hearing) to put in an extensive log entitled "service-coordination notes" (R-15) ostensibly detailing telephone and other communications with N.G.'s parents, the ALJ failed and refused to allow N.G.'s mother to take the witness stand to *rebut* this new evidence. Tr. p. 1867. Although this service coordination log was a document prepared by defendant, no witness with personal knowledge of the entries was made available by defendant for cross-examination. Tr. p. 1777, 79-80. This was manifestly unfair, particularly since defendant's counsel had never before sought to introduce this evidence, and additionally since plaintiffs-appellants' counsel could have objected to the admission of this evidence on "five day" disclosure grounds but did not do so, believing that the ALJ would permit rebuttal testimony on that issue. Tr. p. 1783-84.

8.     It is difficult to explain to parents how the defendant agency can put in an extensive log on the last day without calling an authenticating witness, but that they are then foreclosed from offering any testimony to explain or rebut any of the entries.

9.     On the last day of hearing, the ALJ did something else that was highly unusual

for anyone sitting in a judicial capacity.  During the *cross-examination* of defendant's witness, Dr. Prashil Govind, by N.G.'s counsel, the ALJ ordered N.G.'s counsel to not ask any "leading" questions. Tr. p. 1728-29.  The record shows, however, that the ALJ permitted defendant's counsel free reign as to utilizing leading questions when she was cross-examining N.G.'s witnesses. Tr. p. 1095-1099. Aside from the obvious fact that the use of leading questions is perfectly acceptable during cross-examination, we are concerned that the ALJ's disparate treatment is indicative of a lack of impartiality on her part.

10.   In the balance of this affidavit, I will provide this Court with references to the salient evidence to demonstrate that (a) defendant failed, both procedurally and substantively, to provide N.G. with a FAPE and that N.G. amply met the test for *Burlington-Carter* reimbursement relief and (b) the ALJ's Decision should be reversed.

## THE EVIDENCE

### The July 16, 2007 Testimony of Tamar Frankel, M.A.

11.   Ms. Frankel has a Master's degree in Applied Behavioral Analysis (ABA) from Columbia University and is a Board Certified Behavior Analyst. Tr. p. 67-8.  Ms. Frankel has been providing services to children on the autism spectrum for four years. Tr. p. 69. Ms. Frankel has worked with children in a range of settings from self-contained classrooms to full inclusion. Tr. p. 69-70.  Ms. Frankel has worked both as a provider and as a program supervisor. Tr. p. 74.  Ms. Frankel also has worked at the McCarton School. Tr. p. 74.

12.   Ms. Frankel testified that it is important for an ABA program to be "intensive"

early on, as a child has only seven years in which he or she is able to make "huge gains." Tr. p. 70-1.  During the very start of the ABA program, practitioners "really want to make it as intensive as possible." Tr. p. 71.  Practitioners use assessment of the child's responsiveness to therapies (the rate of acquisition) to determine the intensiveness of the program. Tr. p. 72-3.

13.    Ms. Frankel testified that part of her supervisory role is to ensure that there is a proper level of reinforcement, and that there is consistency in service delivery. Tr. p. 76-7.  Reinforcement is a very important part of an ABA program, as it provides motivation for the child. Tr. p. 77. In regard to N.G., there was an effort to ensure that N.G. was "errorless" due to N.G.'s tendency to repeat inappropriate responses.  Tr. p. 78-9.

14.    Ms. Frankel did an observation and evaluation of N.G. Tr. p.82.  In addition to observing N.G. in his environment, Ms. Frankel and Dr. Debra Clark administered the Assessment of Basic Language Learning Skills (ABLLS). Tr. p. 82-3. The ABLLS assessment is important to evaluate the skill levels of the child and determine the appropriate curriculum. Tr. p. 86.  The ABLLS assessment provides information about the skills that a child should have. Tr. p.86-7.  Administration of the ABLLS took two people approximately two weeks to complete. Tr. p. 88.  In Ms. Frankel's expert opinion, formalized assessment is a necessary component of the creation of a service plan. Tr. p. 214.

15.    The assessment revealed that N.G. "had deficits in every domain." Tr. p. 89. Ms. Frankel and Dr. Clark determined that N.G. needed assistance with the skills that would allow him to learn, including attending skills, eye contact, responding to simple directions, imitation skills, etc. Tr. p. 90.  Ms. Frankel, in conjunction with her

colleagues, also determined that N.G. needed "as much [intensity] as possible" when it came to N.G.'s program. Tr. p. 91.  Downtime also had to be limited, as N.G. would spend downtime practicing inappropriate behaviors. Tr. p. 91.  Though it is not realistic to eliminate "down time," such time should continue to be structured, and the team worked with N.G.'s parents to ensure that it was structured. Tr. p. 218.

16.    The program that was designed for N.G. took long-term objectives and broke them down into appropriate steps (i.e., pre-requisites for learning) for N.G. Tr. p. 96.  The program also had significant data collection associated with it, including collection of trial-by-trial, probe, anecdotal, and frequency data. Tr. p. 97-100.   The data is critical, as it allows for an awareness of problems and obstacles to progress. Tr. p. 102.

17.    At times, programs will not be effective because, primarily, the child lacks the pre-requisite skills needed to progress. Tr. p. 103-4.

18.    Children with autism, including N.G., have great difficulty generalizing their skills. Tr. p. 105. Skills are not considered mastered in the program until they are generalized. Tr. p. 104-5. N.G. had particular difficulty with generalizing in the community.  Tr. p. 105-6.  N.G. needed a strong community-based element to his program because he "was not transferring skills on his own." Tr. p. 108.  He could not, for example, identify fruits that he was familiar with at home when in the grocery store. Tr. p. 106.

19.    Team meetings are mandatory in the programs implemented by Ms. Frankel and her colleagues. Tr. p. 108-9. These meetings are critical to the effort both to alter the program in line with N.G.'s emerging needs and to provide consistency among service providers. Tr. p. 109.   At the meetings, protocols are changed and modeled, based on

N.G.'s changing behaviors. Tr. p. 117.  The team also communicates throughout the week to address other observed behaviors. Tr. p. 117-18.  Part of Ms. Frankel's job is supervisory, and she observes the various providers and provides feedback to them. Tr. p. 111.

20.  Ms. Frankel provides direct services for between 2 and 4 hours per week and performs supervisory tasks for 5 to 8 hours.  Tr. p. 112.

21.  N.G. is very echolalic and has many interfering motor behaviors, including toe-walking. Tr. p. 113.  N.G. also shrieks and sings in a dysfunctional and inappropriate manner.  Tr. p. 113.  The singing is particularly problematic because of its frequency and the fact that, while singing, N.G. "tunes everything else out [in his environment]." Tr. p. 114-15.  In other words, he is then not available for learning. N.G.'s behaviors change "quite constantly." Tr. p. 115.  Dr. Clark provides excellent behavior modification advice and develops effective ways to deal with N.G.'s behaviors. Tr. p. 119.  N.G. also does not have appropriate play skills, and teaching such play skills to N.G. is very difficult. Tr. p. 277.

22.  Programs like N.G.'s in which children with autism are challenged tend to elicit "escape behaviors," and N.G.'s program includes interventions to deal with those kinds of behaviors. Tr. p. 116.

23.  N.G. is receiving 41 hours of ABA per week.  Tr. p. 121.  The number of hours was determined after assessing N.G., and it was based on the recognized need to prevent a lot of "down time" that would allow N.G. to practice *inappropriate* behaviors.  Tr. p. 122-23.  When N.G. has been allowed to have "down time," he has engaged in inappropriate behaviors.  Tr. p. 123.  The program includes weekend hours, as a lack of

weekend services would cause a setback in the programming each week. Tr. p. 138-39. In Ms. Frankel's opinion, weekend hours are "necessary" in a program for a child like N.G. Tr. p. 139.  A program without weekend hours might only be effective for an older child with more stable skills. Tr. p. 270.

24.    Ms. Frankel believes that N.G. might be a candidate for inclusion at a later time, but first must get his interfering behaviors under control. Tr. p. 124-25.  It is not surprising to Ms. Frankel, based on her experience working with children like N.G., that N.G. is not yet ready for inclusion. The fact that N.G. is not ready should not be understood as indicative of a deficiency in N.G.'s program. Tr. p. 127.

25.    All of the team members working with N.G. are "excellent" and have extensive experience. Tr. p. 129-30.

26.    N.G.'s primary deficits are in the areas of attending skills, eye contact, social and communication skills.  Tr. p. 127.

27.    Ms. Frankel believes that the program includes 2 to 4 hours of parental training per week. Tr. p. 119.  Without home coordination and parent training, "it is very difficult for a child to maintain skills."  Tr. p. 134.  Both parents participate in the program and attend parent training and counseling.  Tr. p. 134-35.  In addition, N.G.'s mother attends the team meetings, and N.G.'s father works with providers. Tr. p. 135.  N.G.'s parents communicate with Ms. Frankel and Dr. Clark by phone throughout the week to ask questions and get further feedback. Tr. p. 136.

28.    Since the start of Ms. Frankel's work with N.G., N.G. has made significant gains. Tr. p. 131, 245.  N.G. has improved his attending skills, and N.G. is now able to sit in a chair for up to half an hour. Tr. p. 131.  At the start of the program, N.G. was able to

remain seated for only 15 seconds.  Tr. p. 131.  N.G. has also improved the frequency and duration of his eye contact.  Tr. p. 132.  N.G. can now sustain eye contact. Tr. p. 132.

29.    At the start of the program, incidental learning was not even a possibility. Tr. p. 133.  N.G. now pays attention to others and will correctly use the terms he hears others use. Tr. p. 133.

30.    Ms. Frankel charges N.G.'s parents $80.00 per hour during the work week and $90.00 per hour during the weekends.  Tr. p. 137.   A significant component of N.G.'s program has been work on his communication skills.  Tr. p. 140.  N.G. has deficits in his communication skills and has trouble imitating other people. Tr. p. 141-42.   Ms. Sandor and Ms. Rappaport are N.G.'s speech providers.  Ms. Frankel is in communication with them about N.G.'s progress. Tr. p.142-43.  This communication promotes consistency in approach across all providers. Tr. p. 143.

31.    Ms. Frankel also communicates with N.G.'s occupational therapists. Tr. p.158.  This communication allows the team to incorporate the occupational therapy techniques into their work, as well as enable the occupational therapists to incorporate the team's protocols into their sessions. Tr. p. 158-59.  This consistency ensures that N.G. does not have opportunities to practice his negative behaviors. Tr. p. 160.  The occupational therapists also attend the monthly provider collaborative meetings. Tr. p. 263.

32.    The team addresses N.G.'s feeding issues as well. Tr. p. 161.

33.    Considering all factors, and based on her experience in the field, Ms. Frankel is confident that N.G.'s program is effective and appropriate. Tr. p. 201, 279.  Specifically, the program's effectiveness is based on its intensity, structure, the quality of providers,

the contingent and consistent nature, its team meetings, and its weekend component.  Tr. p. 201-02.

34.   Ms. Frankel "could not imagine" N.G. making significant progress without a hands-on behavioral consultant overseeing N.G.'s program. Tr. p. 282-83.[3]

35.   Ms. Frankel has worked with N.G.'s parents and has found them to be intelligent and committed. Tr. p. 254, 284.  N.G.'s parents have never failed or refused to take any action that they were asked to take in regard to N.G.'s program. Tr. p. 283.

36.   N.G.'s communication deficits distinguish him from the symptoms of ADHD. Tr. p. 275.

**The July 16, 2007 Testimony of Marissa Leyden, M.A.**

37.   Ms. Leyden has a Master's degree in clinical psychology from Teacher's College at Columbia University, a certification in Special Education, and five years of experience working with children with autism. Tr. p. 292. Ms. Leyden has worked with 20 to 30 children with autism. Tr. p. 292.  Ms. Leyden also has been trained in ABA. Tr. p. 292.

38.   Ms. Leyden is a co-leader of N.G.'s team, and she provides direct service to N.G., creates programs, provides parent training, and directs team meetings. Tr. p. 292-93.  Several therapists report to Ms. Leyden.  Ms. Leyden also works closely with Dr. Deborah Clark, who is a "very, very important" contributor to the program.  Dr. Clark is able to provide her extensive experience to the team and has provided solutions to problems encountered in N.G.'s program. Tr. p. 298-300.

39.   Ms. Leyden provides approximately seven hours of services to N.G. per week,

---

[3] This was Dr. Clark's role.

and she spends up to four hours per week supervising the program and providing parent training and counseling. Tr. p. 302. She charges for her time at the rate of $85.00 per hour. Tr. p. 303.

40. Parent training is meant to help parents structure "down time," not to train parents to render therapeutic service hours as if they were professional service providers. Tr. p. 294. N.G.'s parents have been "involved" parents and have followed through on recommendations. Tr. p. 294.

41. Team meetings generally last two hours. Tr. p. 297. N.G.'s parents are typically in attendance during team meetings. Tr. p. 295.

42. N.G. "must have" weekend hours in his program because of N.G.'s need for constant structure. Tr. p. 300-01. N.G. receives six hours of services per day on the weekend. Tr. p. 306. The remainder of N.G.'s time is structured on the weekends, and N.G. attends swimming and music classes. Tr. p. 306.[4] Without constant structure, N.G. "deteriorates to a very low-functioning level." Tr. p. 301. Non-structured time for N.G. will likely result in "a child who scripts to himself, doesn't initiate interact[ion] with others, doesn't seek out others at all, [and] doesn't make eye contact." Tr. p. 302.

43. Ms. Leyden has been administering the ABLLS assessment for over four years, and she helped to administer N.G.'s assessment and subsequent update. Tr. p. 295-96. Ms. Leyden believes the ABLLS is a reliable tool and intends to continue to use it periodically to assess N.G.'s progress. Tr. p. 296.

44. N.G. has made "remarkable progress" in his private program. Tr. p. 302. N.G. was a "child who didn't make eye contact, didn't have any interest in people,

---

[4] No claim for reimbursement was ever made by plaintiffs for such weekend activities (swimming and music).

[and]…couldn't sit in a chair," to a child who "can sit in a chair and read a book with an adult and look at them,…and, to some degree, make it known what he is trying to tell [the adult]." Tr. p. 303-04.

45.    The team is an "excellent" group of professionals. Tr. p. 304.

**The July 16, 2007 Testimony of Evelyn Arias**

46.    Ms. Arias is an Early Intervention Official Designee working for the New York City Early Intervention Program. Tr. p. 308.  In her role, Ms. Arias contributes to the preparation for IFSP meetings and attends the IFSP plan meetings.  Tr. p. 309.  At the time of N.G.'s meeting, Ms. Arias had been performing her job for 13 months. Tr. p. 309.

47.    Ms. Arias had no information that N.G.'s family ever refused any requests to have N.G. evaluated. Tr. p. 310.

48.    The service coordinator (Ms. Placido) handles the bulk of the preparation for and coordination of the IFSP meeting, and she handles the identification of an evaluator. Tr. p. 313-15.

49.    Ms. Arias was filling in at the Manhattan office during the week that N.G. had his IFSP meeting. Tr. p. 315.  Ms. Arias had been informed of the meeting the Friday before. Tr. p. 316. Ms. Arias has no evidence that any of the officials at the meeting had met N.G. before the IFSP meeting. Tr. p. 317-18, 320-21.

50.    TheraCare was the agency that conducted the evaluation of N.G., and was the agency thereafter "selected" to provide the services included in the program. Tr. p. 319.

51.    At the IFSP meeting, N.G.'s parents requested consideration for "weekend" hours in order to "provide consistency." Tr. p. 321.  No one from the defendant had conducted an assessment to determine whether N.G. would regress without weekend

hours in advance of the IFSP meeting. Tr. p. 322. If N.G.'s parents wanted weekend hours, it is something that they would have had to take up with individual therapists, under the scenario employed by the New York City Early Intervention Program. Tr. p. 322-23.

52. The program offered included 25 direct service hours per week, including weekend hours that "might" have been scheduled. Tr. p. 326-27. There is generally no indication in the official program offered about the number of hours spent by the supervisor on oversight activities. Tr. p. 328.

53. The representative from TheraCare signed in as both the evaluator and the program supervisor. Tr. p. 331.

54. Weekend supervisory hours were not discussed at the meeting – they would have to be taken up by the parents, the supervisor, and the therapists after the IFSP meeting. Tr. p. 332.

55. The plan offered by the Early Intervention Official included monthly team meetings lasting one hour. Tr. p. 334. Ms. Arias said she is not aware of an instance when weekly team meetings were suggested as part of a child's program. Tr. p. 337.

56. At the IFSP meeting, N.G.'s parents requested more hours than those which were being offered, and they produced evaluations suggesting that N.G. needed more hours. Tr. p. 338-39.

57. Defendant's ABA supervisor, however, decided that the program offered to N.G. was appropriate. Tr. p. 337-38. Ms. Arias informed N.G.'s parents at the IFSP meeting that they usually do not get specific requests for service levels, and that they

could not consider the hours, the direct services, and the frequencies being requested.  Tr. p. 340-41.

58.    The actual planning of the therapy, including days, times, and types of therapies offered is not discussed at the IFSP meeting, but is left to the parents, therapists, and supervisor to determine outside of the meeting. Tr. p. 342.

**The July 30, 2007 Testimony of Julie Sandor, M.A., SLP-CCC**

59.    Ms. Sandor is a speech therapist with a Master's degree in speech language pathology and a certificate of clinical competence from  ASHA.  Tr. p. 429.  Ms. Sandor has been a speech language pathologist for 25 years and has worked with hundreds of children, including children with autism. Tr. p. 429-430.

60.    Ms. Sandor provides N.G. with speech therapy in two, one-hour sessions per week. Tr. p. 431.  N.G. also receives two sessions of speech therapy from Ms. Rappaport, a "well known" speech pathologist who is "absolutely superb" at speech therapy.  Tr. p. 431, 434.  Ms. Sandor communicates with Ms. Rappaport regularly so that the speech sessions complement one another. Tr. p. 435.  They are able to provide consistency of approach because their philosophies are the same, they both stay current on the literature in the field, and they communicate regularly with one another. Tr. p. 450.

61.    When Ms. Sandor first began to work with N.G., N.G. was "extremely language disordered," he toe-walked around the room, had no relatedness, made no eye contact, and continuously sang songs.  Tr. p. 435.  N.G. had no usable language. Tr. p. 436.

62.    Ms. Sandor and Ms. Rapport chose to work on N.G.'s attention skills, and

determined that N.G. was extremely echolalic.  Tr. p. 437.  Ms. Sandor and Ms.

Rappaport used N.G.'s tendency toward echolalia to promote appropriate imitation. Tr. p.

438.

63.   N.G. "has exhibited really wonderful progress" since the start of the program.

Tr. p. 441.  Specifically, N.G. can now sit at the table for nearly a full hour, his eye gaze

has improved, and his functional language has improved considerably. Tr. p. 441.  N.G.

is also now able to request things, and even commented recently on Ms. Sandor's outfit.

Tr. p. 441.   N.G. "is a very bright child" that has made steady progress. Tr. p. 443-44.

64.   N.G. still has deficits, including his lack of conversational skills. Tr. p. 444.  His

reciprocal language is emerging, though it is not yet functional. Tr. p. 459.

65.   Ms. Sandor has had the opportunity to work with Dr. Clark in the past and has

found her work to be "superb." Tr. p. 446.

66.   N.G. should be receiving speech every day, and at least five hours per week, but

the program with four hours per week has resulted in meaningful progress. Tr. p. 447,

467.  Though Ms. Sandor does not agree with all aspects of the McCarton School report,

Ms. Sandor does agree with the recommendation of five hours of speech language

therapy per week. Tr. p. 490.

67.   Ms. Sandor charges $170 per hour, which is "quite low" in the New York

market. Tr. p. 448.

68.   One-to-one speech therapy employing techniques of ABA is appropriate for

N.G. Tr. p. 475.

69.   Parents play an important role in the treatment plan of a child with autism,

though it is their level of commitment, and not their education level, that dictates the impact that parents will have on the plan. Tr. p. 483-84.  N.G.'s parents are intelligent and committed parents. Tr. p. 485.  N.G.'s parents are also an "involved family" and there has never been an instance in which they did not do something they were asked to do. Tr. p. 491.  No parent, however involved or intelligent, can replace the work of a speech language therapist. Tr. p. 492.

70.  N.G.'s private program is "excellent". Tr. p. 492-93.

**The July 30, 2007 Testimony of Dr. Deborah Clark**

71.  Dr. Clark has been working with children with developmental disabilities for eighteen years.  She holds a Master's degree in developmental psychology, and a Ph.D. in cognitive psychology from Columbia University. Tr. p. 498-99.  Dr. Clark has worked with children on the autism spectrum for fifteen years, including children in "inclusion" settings. Tr. p. 499-500.  Dr. Clark also has extensive training in the principles of ABA. Tr. p. 499-500.  Dr. Clark was also recruited to start the first publicly funded school for children with autism, the Central Park Early Learning Center. Tr. p. 502.  Dr. Clark also spent years designing programs for children with autism. Tr. p. 504.

72.  All children with autism, a spectrum disorder, must have an individualized program. Tr. p. 505.

73.  N.G.'s parents contacted Dr. Clark regarding N.G., and they arranged an observation of N.G.  Tr. p. 508-510.  The initial communication between N.G.'s parents and Dr. Clark included only a request for her opinion regarding an appropriate program for N.G.  There was no commitment to hire Dr. Clark at that time. Tr. p. 509.

74.  After Dr. Clark's first observation of N.G., Dr. Clark believed that N.G. was "in

big trouble," and that N.G. needed "an intensive program…as quickly as possible." Tr. p. 510.  N.G. presented with echolalia, an inability to attend for more than five seconds, almost no eye contact, and an inability to follow one step commands.  Tr. p. 614.  His echolalia put N.G. on the "severe side" of the spectrum. Tr. p. 617.  Though his behaviors are in line with those that children with autism generally present, the notion of the spectrum is very important. Tr. p. 619.

75.    After Dr. Clark's first observation of N.G., Dr. Clark knew that, like all children on the autism spectrum, N.G. should undergo an ABLLS assessment. Tr. p. 512, 515. The ABLLS is widely used in the field, and it is used to assess many children with autism. Tr. p. 519.  There is no comprehensive assessment instrument, of which Dr. Clark is aware, that provides more information about an autistic child.  Tr. p. 520.

76.    The ABLLS assessment helps provide detailed baselines for children with autism, and it is important because often the symptoms of autism disorders mask cognitive and communication ability.  Tr. p. 512.  The ABLLS assessment provides valuable information concerning a child's true strengths and deficits. Tr. p. 515.   The ABLLS provides useful information that can be used to address the "Swiss cheese" deficits observed in children with autism. Tr. p. 531.  Administration of the assessment should take two to three weeks. Tr. p. 518.

77.    The assessment results indicated that N.G. was operating at "a very, very decreased level across all domains," no communicative language, and "almost no social, emotional connection." Tr. p. 529. Based on the ABLLS assessment results and Dr. Clark's knowledge of the Lovaas study, a 40 hour per week program was recommended.

Tr. p. 537. This service level is not ideal, and Dr. Clark would prefer to have five to seven *more* hours per week for work with N.G. outside of the home. Tr. p. 538.

78.   Dr. Clark had seen Dr. McCarton's recommendation and knew that it was intended to be adjusted, in either direction, after administration of the ABLLS assessment. Tr. p. 516.

79.   After the assessment of N.G., Dr. Clark provided the names of service providers to N.G.'s parents. Tr. p. 521. There is no requirement that parents use the providers supplied by Dr. Clark – the decision is solely that of the parents. Tr. p. 522. After the assessment period and the recommendation of providers, N.G.'s parents decided to employ Dr. Clark as a consultant. Tr. p. 523. Dr. Clark and N.G.'s parents worked together to set up the team. Tr. p. 524. N.G.'s parents hired Tammy Frankel and Marissa Leyden. Tr. p. 524. Dr. Clark believes that both of these teachers are "very strong, talented teachers." Tr. p. 524.

80.   Dr. Clark believes that her role on the team is very important, as it offers "a broader, deeper outlook" on N.G.'s program. Tr. p. 525. The teachers draw on Dr. Clark's extensive experience to help guide daily interactions with N.G. Tr. p. 526.

81.   N.G. needed a seven-day, twelve-month program. Tr. p. 540. The McCarton evaluation was correct in its baseline assessment of N.G.'s needs, as well as its statement that N.G.'s program would need to be adjusted due to further evaluation and consideration of N.G.'s changing needs. Tr. p. 539-541.

82.   Dr. Clark stated that "all signs are positive…[and N.G.] is responding very well to this intense level of intervention." Tr. p. 541.

83.   A twenty or twenty-five hour program "would not have in any way addressed

his level of deficits…[nor would N.G.] be learning at this type of acquisition rate." Tr. p. 542.  N.G. is the type of child "that needs 40 hours" per week.  Tr. p. 543.  Intensity and quality of services are critical considerations of a program for a child with N.G.'s needs. Tr. p. 542.[5]

84.   Dr. Clark works with N.G. directly for between two to six hours per week, and she believes that at least two hours of direct services by a program consultant is critical. Tr. p. 543-44.  This direct service time allows Dr. Clark to determine whether the program is accurate. Tr. p. 544.

85.   Dr. Clark will not run a program without the type of teaching clinic recommended by Dr. McCarton. Tr. p. 545.  The teaching clinic is an important aspect of the program's consistency of service delivery. Tr. p. 546.  Dr. Clark has not seen a child with autism be able to organize his or her environment without consistency of services. Tr. p. 547.  The teaching clinic includes all of the service providers and N.G.'s parents, and it provides Dr. Clark with an opportunity to observe each therapist interact with N.G. and correct any problems in his or her approach. Tr. p. 549-550.

86.   Dr. Clark also communicates with the program's related service providers to provide guidance to them several times per week. Tr. p. 552.  These communications also provide important information to Dr. Clark and help to properly adjust N.G.'s program. Tr. p. 553.

87.   Forty hours is not ideal or optimal; even *more* hours should be provided. Tr. p. 551.

88.   N.G. has echolalia and repetitive movements that impede his learning. Tr. p.

---

[5] A 20-hour program was, however, the kind of program that defendant offered to N.G.

552. The team is constantly finding ways to engage N.G. in his environment and not allow him to live "in his head." Tr. p. 552.

89.   N.G.'s parents are involved, intelligent, and have always done what has been asked of them. Tr. p. 557.  Parent training is an important aspect of a program. Tr. p. 558. Parents are important parts of the program, but parents cannot be expected to act as therapists. Tr. p. 559.  Dr. Clark tells parents that they do not have to do what she does, but they must not undo it. Tr. p. 559.

90.   N.G.'s behaviors have "decreased in frequency," N.G. is much more easily redirected, and N.G. is "much more present in the world" since the start of the program. Tr. p. 562.

91.   Generalization has been built into the program from the start, and the design of the program supports N.G.'s generalization by changing his environments. Tr. p. 567-68. N.G. is showing signs that he is able to generalize some skills. Tr. p. 570. N.G.'s progress may also be measured by the team's ability to back off intrusive prompting with N.G. Tr. p. 570.

92.   The younger the child, the more intensive the program ought to be, due to brain plasticity and the small window of opportunity that exists when great strides may be made. Tr. p. 572-73.

93.   Dr. Clark believes that "all of the prognostic signs are good for [N.G.] to be in some sort of inclusion setting" in the future. Tr. p. 574.

94.   The team working with N.G. is composed of "strong, knowledgeable" teachers with an awareness of the importance of the team concept to such a program. Tr. p. 576-77.

95.    Dr. Clark charges $185 per hour for her services, which is the market rate. Tr. p. 577-78.

96.    The Early Intervention Program was not offering an adequate number of hours for N.G., and it was not providing a working team clinic. Tr. p. 606-07.  In fact, recommending 20 hours for N.G. "was a lesson in futility." Tr. p. 619.  In addition, N.G.'s mother was having trouble getting people to start services. Tr. p. 612.

97.    It is improper to glean quotes from web sites for application to N.G. Tr. p. 626.

98.    Substantial progress could not be made in a five day program because N.G. had a tendency to practice his intrusive behaviors. Tr. p. 637.  There was a great likelihood that in such a program N.G. would be in a worse place on Monday than he was on Friday. Tr. p. 637.

99.    The program had a built in "ramp up" stage, and the hours were increased in response to N.G.'s ability to maintain them. Tr. p. 647.

100.    The progress made by N.G. should be considered "significant progress." Tr. p. 50.

**The July 30, 2007 Testimony of Cecelia McCarton, M.D.**

101.    Dr. McCarton is a developmental pediatrician with her own practice, the McCarton Center for Developmental Pediatrics, and a school for children with autism, the McCarton School. Tr. p. 654-55. The McCarton "Center" and the McCarton "School" are separate entities. Tr. p. 655.  Dr. McCarton has been practicing in the field of developmental pediatrics since 1975. Tr. p. 656.  Dr. McCarton has worked with *thousands* of children with autism. Tr. p. 665.

102.  Christine Williams, who by Dr. McCarton's account is "the most incredible assessor in New York City," conducted a developmental assessment of N.G. Tr. p. 668-70.  A second, more unstructured session was also utilized to allow Dr. McCarton to further evaluate N.G. Tr. p. 674.  During the evaluation, N.G. was unable to follow commands. Tr. p. 682.  N.G. also exhibited no eye contact, stereotypic behaviors, and little awareness of language. Tr. p. 682.

103.  A seven day program was recommended because N.G.'s program must be consistent. Tr. p. 684.  A seven day program is generally appropriate for a child of N.G.'s age, as their need for naps, etc. throughout the day result in there not being enough hours in the day to accomplish all that needs to be accomplished. Tr. p. 685.

104.  The recommended plan indicated that the hours would need to be adjusted, as the actual providers working with N.G. would have be in a better position to determine whether N.G. needed more hours. Tr. p. 686.  There were clear indications, however, that N.G. needed more than the minimum 20 hours per week. Tr. p. 686.  N.G. needed more than a twenty hour program in order to meet his needs. Tr. p. 722.

105.  There is much more brain "plasticity" at a young age, and a good program will take advantage of that by giving the child everything it possibly can at the earlier age. Tr. p. 678.  A child's program generally includes between 20 and 40 hours of services per week, while some severe children may receive even more than forty hours of services per week. Tr. p. 680.  The hours included in a program are generally stable for at least one year, though they may be altered subsequently.  Tr. p. 681.

106.  Parent training is a piece of all programs developed by the McCarton School. Tr. p. 657.  Parents are not expected to be therapists, but they are trained so that they can

help with the generalization process. Tr. p. 658-59. Parents, no matter how intelligent, are not trained in the methodology and do not have the skills or experience necessary to be an effective therapist. Tr. p. 660.

107.   N.G.'s parents are involved parents who were providing multiple environments to N.G. to stimulate him. Tr. p. 689.

108.   The ABLLS assessment is used so that the program developed can be highly individualized. Tr. p. 662. It should be undertaken by any team that is developing a program for N.G. Tr. p. 691. The programs they develop are not straight from a book. Tr. p. 662.

109.   Dr. McCarton believes that "it is critically important for the supervisor to spend [direct service] time with the child," as such time enables the supervisor to appropriately adjust the program. Tr. p. 692.

110.   It is important for those developing a program to have familiarity with the child and to have seen the child. Tr. p. 693. Dr. Clark is an "excellent, excellent, excellent supervisor and professional." Tr. p. 696. A program "really [has] to have weekly teaching clinics because you have to continuously review the data, see where the child is, and adjust your program." Tr. p. 696. It is "not appropriate" to have a program without weekly teaching clinics. Tr. p. 699. The related service providers working with N.G. are all of high quality. Tr. p. 705-06.

111.   When Dr. McCarton observed N.G. five months after the initial evaluation, N.G. was much more engaging, his language and receptive skills had improved considerably, his expressive language skills were improved, though robotic, and N.G. was much more present. Tr. p. 701-03. In her opinion, the program had "an enormous

role" in N.G.'s progress. Tr. p. 704.   The 40 hour per week program is the appropriate

program for N.G. Tr. p. 707.  The goal is to fade out services over time, and likely not

before two years into the program. Tr. p. 708-09.

112.   The program offered by the Early Intervention Official is lacking because it

does not include *team meetings*. Tr. p. 734.  Without hands-on time, N.G. would be a

"paper child" and the supervisor would likely be unable to appropriately alter the

program. Tr. p. 735-36.  In addition, monthly meetings would not be adequate, and such a

meeting schedule would not be reasonably calculated to provide a meaningful

educational benefit for N.G.  Tr. p. 770, 772.

113.   One must look at the individual child to determine what services would be

expected to produce meaningful progress. Tr. p. 775.

114.   "It is a stretch" to suggest that the similar behavioral modification approaches

would be used to address ADHD and autism. Tr. p. 760.

115.   The Lovaas study is twenty years old, and much has been learned since then

about the treatment of children with autism. Tr. p. 761.  The use of *positive*

reinforcement, which has replaced the "aversives" used in the Lovaas study, requires a lot

of time to implement. Tr. p. 763.

116.   Teaching parents the skills needed to promote generalization is difficult, and

the McCarton School provides a minimum of two hours per week for parent training. Tr.

p. 763-64.

**The August 6, 2007 Testimony of Elizabeth Placido, MHRA Service Coordinator**

117.   Ms. Placido has been a service coordinator for MHRA for three-and-a-half

years. Tr. p. 801-02.  Ms. Placido has been involved in approximately seventy IFSPs. Tr.

p. 804.  The job of service coordinator is guided by the Service Coordination Guidelines,

which are put out by the Early Intervention Program. Tr. p. 806.  Ms. Placido had not

read the guidelines between September, 2006 and the date of the hearing. Tr. p. 809.

118.   All of the cases proceed the same way for evaluation after the initial referral.

Tr. p. 811.  Ms. Placido asked for consent for evaluation and received such consent. Tr. p.

812-13.  After the evaluations were complete, Ms. Placido was in contact with

TheraCare, and she inquired about whether they had ABA, speech, and occupational

therapy service time available for N.G. Tr. p. 836.  When TheraCare offered their

services to Ms. Placido for N.G., Ms. Placido made an agency referral. Tr. p. 839.

119.   The highest number of hours that Ms. Placido has seen a child receive is twenty

hours. Tr. p. 816-17.  The range Ms. Placido has seen has been between 10 and 20 hours.

Tr. p. 817-18.  Ms. Placido claimed she has never seen a parent request more hours than

those that are allotted. Tr. p. 818.

120.   Parent training and counseling is a separate item on the IFSP if it is included in

the program. Tr. p. 819.  Ms. Placido has seen provision for as little as two, thirty-minute

parent training sessions or one, sixty-minute session. Tr. p. 820.

121.   Team meetings are usually one sixty minute session per month. Tr. p. 820.

122.   The therapy schedule, including the provision of weekend hours, is a matter that

is worked out between the provider and the parent. Tr. p. 821.

123.   The highest number of days that Ms. Placido has seen written onto an IFSP is

five days. Tr. p. 822.[6]

---

[6] In other words, whether or not a child needs services on the weekends, that support apparently is not
available.

124.  The highest number of speech therapy that Ms. Placido has seen is five, sixty-minute sessions per week. Tr. p. 826.  Ms. Placido has never heard of an "ABA speech provider." Tr. p. 826.

125.  Ms. Placido did not request that the person who actually evaluated N.G. be present at the IFSP meeting, she merely asked that the agency send a representative. Tr. p. 840.

126.  N.G.'s mother was cordial and professional during all phone contact with Ms. Placido prior to the IFSP meeting. Tr. p. 841.  Ms. Placido "believes" that she told N.G.'s mother that she would no longer be acting as service coordinator after the IFSP meeting during a November 9 phone call, even though the log reflects no such conversation. Tr. p. 842-43.  Ms. Placido does not remember discussing the intensity of services with N.G.'s mother prior to the IFSP meeting. Tr. p. 846.

127.  There is no formal transition process when the case is handed off – the file is merely sent to the referral agency. Tr. p. 847.  In N.G.'s case, Ms. Placido referred the case to TheraCare prior to the IFSP meeting. Tr. p. 858.  TheraCare provided the name of the ongoing coordinator and the person's verification number. Tr. p. 858.  This information is necessary so that the paperwork can be finalized at the IFSP meeting. Tr. p. 858.  The parent has no role in choosing the service coordinator. Tr. p. 860.

128.  It is not rare that the IFSP meeting includes no one who has actually seen the child in question. Tr. p. 847-48.

129.  Ms. Placido received the private evaluations from N.G.'s mother prior to the IFSP meeting and placed them in N.G.'s file. Tr. p. 855-56.

**The August 6 Testimony of L.G. (N.G.'s mother)**

130.  Up until the age of two, N.G. had a "full schedule" of "mommy and me" activities. Tr. p. 865-66.  As N.G. approached the age of two, N.G.'s mother began to notice behaviors unlike the rest of the children in such activities. Tr. p. 866-67.  N.G. also began to not make eye contact. Tr. p. 867.

131.  N.G.'s regular pediatrician stated that N.G.'s development was delayed, and that N.G. may be autistic during a routine checkup. Tr. p. 868.  The pediatrician recommended that N.G.'s mother contact Early Intervention and she did so the same day. Tr. p. 868.  The pediatrician also referred N.G. for second opinions. Tr. p. 868.  N.G.'s mother began trying to make an appointment for a second opinion with both Dr. Lazarus and Dr. McCarton on the same day.  Tr. p. 982.  Dr. Lazarus confirmed the autism diagnosis. Tr. p. 871.  Dr. McCarton would later confirm the same diagnosis. Tr. p. 982.

132.  N.G.'s mother had contact with Ms. Placido between the initial phone call and the IFSP meeting. Tr. p. 869.  Their communications were "professional" and "nice." Tr. p. 869.  N.G.'s mother was asked to sign consent forms and did so for all of the forms. Tr. p. 870.

133.  Ms. Placido came to the house and saw N.G. Tr. p. 870.  After seeing N.G., Ms. Placido explained the assessments that N.G. would receive. Tr. p. 870.

134.  The Department of Mental Health did not refer N.G. to any medical doctors, or developmental pediatricians, for evaluation. Tr. p. 872.  TheraCare undertook an assessment of N.G., but their report did not indicate any recommended service levels. Tr. p. 1090.  The private evaluation of N.G. undertaken by Dr. Lazarus used the ADOS assessment and found a more severe degree of autism than that found in the TheraCare

evaluation, which did not include the ADOS assessment. Tr. p. 1093.  N.G.'s mother

informed Ms. Placido that N.G. was to be evaluated by a developmental pediatrician, and

Ms. Placido did not object. Tr. p. 872.  Ms. Placido also did not offer a developmental

pediatrician to undertake such evaluations. Tr. p. 873.

135.  N.G.'s mother provided the evaluations from the developmental pediatrician to

Ms. Placido, who said she would provide them for the IFSP meeting. Tr. p. 873-74.

N.G.'s mother also provided copies of the evaluations at the IFSP meeting. Tr. p. 876.

There was no developmental pediatrician at the IFSP meeting from either TheraCare or

the Early Intervention Program. Tr. p. 874.

136.  Prior to N.G.'s IFSP meeting, Ms. Placido relayed, over the phone, to N.G.'s

mother, the package of services that N.G. would receive. Tr. p. 878.  Ms. Placido told

N.G.'s mother that N.G. would receive approximately 20 hours of ABA, 5 hours of

speech, and "some" occupational therapy. Tr. p. 878.  N.G.'s mother was told that this

was a "pretty standard package." Tr. p. 878.  Ms. Placido did not indicate that there

would be any weekly allotment for clinic team meetings or parent training. Tr. p. 883,

885. N.G.'s mother is "a hundred percent" sure that this conversation happened, as N.G.

was her only child and [securing his services] was her only responsibility at the time. Tr.

p. 878.

137.  N.G.'s mother communicated a request for the program that was being

recommended by Dr. McCarton during the meeting that they had prior to the IFSP

meeting. Tr. p. 879.  N.G.'s mother inquired about the differential in services between the

proposed Early Intervention program (20 hours) and Dr. McCarton's recommended 30

hours.  Tr. p. 879.  Dr. McCarton informed N.G.'s mother that the IFSP was a

collaborative process and that the IFSP team should consider both of the independent evaluations. Tr. p. 880.

138.  During the meeting that N.G.'s mother had with Dr. McCarton prior to the IFSP Meeting, a number of options were discussed.  Dr. McCarton recommended that an ABLLS evaluation be conducted. Tr. p. 880.  N.G.'s mother was told that if the IFSP meeting did not result in the recommended hour allotment, N.G.'s parents could implement a private program. Tr. p. 881. Dr. McCarton also recommended a weekly team meeting. Tr. p. 881-82.  In addition, N.G.'s mother discussed effective service coordination with Dr. McCarton.  Tr. p. 882.  Dr. McCarton also indicated that the seven-day, full-year program was important because of the need for consistency and continuity for the program to be effective. Tr. p. 888.

139.  Dr. McCarton discussed the importance of weekly team meetings and weekly parent training meetings, calling them "tent poles" that provide the "proper foundation" for a program. Tr. p. 884.

140.   Monthly team meetings were included in the Early Intervention program recommendation.  Tr. p. 886.  The service providers from TheraCare told N.G.'s mother that they do not get paid for attending the monthly team meetings, and that the hours would therefore have to come out of N.G.'s direct service time. Tr. p. 887.

141.  Both N.G.'s mother and her husband attended the IFSP meeting. Tr. p. 893. Prior to the meeting, they had been assured that there would be opportunity to discuss the program that had been recommended and make changes. Tr. p. 892-93.

142.  Ms. Placido had told N.G.'s mother that she would be present at the IFSP

meeting, but she did not attend. Tr. p. 874.  N.G.'s mother had been assured that there would be a member of the TheraCare evaluation team present, but there was no member of the evaluation team present. Tr. p. 894-95.   There was no one present at the IFSP meeting, outside of N.G.'s mother and Ms. Arias, who had ever seen N.G. Tr. p. 894.

143.  N.G.'s parents expressed their *dissatisfaction* with the program in writing on the IFSP consent form. Tr. p. 896.  N.G.'s mother and her husband were satisfied with the speech component of the program, and they were satisfied to use the Early Intervention providers for speech therapy. Tr. p. 897.  They also were satisfied with the year-long element of the program. Tr. p. 899.  They were dissatisfied with the five day program, but were told that this was the "standard package." Tr. p. 900.  N.G.'s parents also were dissatisfied with the parent training and counseling offered and the lack of direct service time for the program supervisor. Tr. p. 903-04, 909.  The plan included one sixty-minute session per month that was primarily a team meeting, but would allow the parents to attend and be "trained." Tr. p. 1085-86.  The plan was not reasonably calculated for what N.G.'s parents understood N.G.'s needs to be.

144.  After the IFSP meeting, N.G.'s parents decided that they would need to build a program that would meet N.G.'s needs, as the program offered lacked of parental training and weekly team meetings, and was thus unable to be effective and consistent or adjust to N.G.'s needs. Tr. p. 1009, 1011-12.  N.G.'s parents considered different approaches to this program building, including a combination of the Early Intervention program and private services. Tr. p. 1015.  N.G.'s parents also had no faith in the recommendations that were made by the IFSP team, as no one on the team had ever even seen N.G. Tr. p. 1010.

145.  N.G.'s parents were hopeful going into the IFSP meeting, and even after the IFSP were hopeful that mediation would resolve the problems with the program. Tr. p. 910-911.  N.G.'s parents engaged in an unsuccessful mediation with the Early Intervention Program. Tr. p. 922.  N.G.'s parents left the IFSP meeting very disappointed, and they wrote a letter on November 17 to Ms. Arias expressing their disappointment. Tr. p. 911-912.  The letter notified the Early Intervention Program that N.G.'s parents planned to look for outside (private) service providers to bring the program up to an acceptable level. Tr. p. 912.

146.  N.G.'s mother subsequently looked for private providers. Tr. p. 913.  N.G.'s parents requested mediation and/or a hearing in May, 2007.  Tr. p. 1031.

147.  Without any form of weekly team meetings or parent training, N.G.'s parents felt that they could not have an effective program. Tr. p. 1083.  They therefore sought a coordinator to organize and structure an approach to N.G.'s treatment.  The initial search for a program supervisor stretched more than one month, during which time many candidates were interviewed. Tr. p. 917.  During that month, no alterations to the program were offered by the Early Intervention Program. Tr. p. 917. N.G.'s mother also worked with TheraCare during that time to see if an appropriate schedule could be worked out, but the family did not hear anything. Tr. p. 918.

148.  N.G.'s parents also implemented a program of speech therapy with TheraCare, and they used the speech therapy as a base for the rest of the program. Tr. p. 939, 1035. One of the speech therapists was not effective, and was actually "undoing" all the work that had been done to establish consistency and positive reinforcement. Tr. p. 939-943.

149.  N.G.'s mother brought this ineffectiveness to the attention of the coordinator,

Jessica Thomas, and was told that someone would contact her. Tr. p. 944.  No one contacted N.G.'s mother or resolved the situation, despite repeated attempts to contact TheraCare. Tr. p. 944-47.  In the meantime, N.G.'s parents chose to respond to this ineffectiveness by securing the services of Ms. Sandor once per week. Tr. p. 1077.

150.  In January, the other speech therapist missed sessions and informed N.G.'s parents that she had no time to make them up. Tr. p. 948.  In February, the same speech therapist provide N.G.'s parents notice that she would be leaving TheraCare. Tr. p. 948. N.G.'s mother had ongoing scheduling difficulties with TheraCare in regard to both speech and occupational therapy. Tr. p. 947-953.   For months, N.G. did not receive the allotted speech therapy. Tr. p. 955.  N.G.'s mother tried very hard to fix the speech problems that were occurring with TheraCare. Tr. p. 1060.

151.  N.G.'s parents had to deal with three successive TheraCare supervisors. Tr. p. 967.  When each supervisor was replaced, he or she called the house to inform the parents, but did not request a call back. Tr. p. 1047, 1053.  N.G.'s mother was never told that she would have the option to select a new supervisor. Tr. p. 1051-52. Communication during this period was complicated by the final stages of N.G.'s mother's pregnancy. Tr. p. 1050.  Further, N.G.'s mother did not bring her concerns to the Early Intervention Program because she had been told that Ms. Placido no longer worked on her case, and that her service coordinator would be an employee of TheraCare. Tr. p. 1081.

152.  TheraCare took over one month to schedule the rest of the program, and when they did schedule it, none of the times coordinated with the established speech schedule. Tr. p. 1044.  There were ongoing scheduling issues with TheraCare in January and

February. Tr. p. 1047-1050. N.G.'s mother altered N.G.'s schedule to try to accommodate the TheraCare providers. Tr. p. 1050.   TheraCare has not provided a level of consistency for N.G.'s parents. Tr. p. 968.

153.   TheraCare informed N.G.'s parents via email (admitted as evidence, N27) that it would not support a seven day program, and that they believed that a five day program was sufficient. Tr. p. 993.  TheraCare, however, had previously promised to work on a seven day schedule. Tr. p. 1023.  The Early Intervention program did not put into action any efforts to secure a seven day program, and no Early Intervention provider offered any consistent schedule of weekend hours that would enable a seven day program. Tr. p. 1087-88.

154.   TheraCare indicated that any parental training opportunities would be conducted on an *ad hoc* basis. Tr. p. 1019.

155.   After sending the November 17 letter, N.G.'s parents sought OT therapists and ultimately set up OT therapy with the McCarton Center. Tr. p. 960. N.G.'s parents had not contacted any providers before the IFSP meeting. Tr. p.1073.  Since the start of OT therapy, N.G. has made major gains. Tr. p. 961.  N.G. has developed the fine motor skills necessary to feed himself and has built up his muscle mass so that he can walk up steps and kick a ball. Tr. p. 961.  Work in the sensory gym has also completely altered N.G.'s sensory system, and he now tolerates new textures and things. Tr. p. 962.

156.   N.G. also has made progress with his speech therapy. Tr. p. 963.  N.G. is now able to express himself, make requests, fulfill one step commands, and is learning the meaning of "yes" and "no." Tr. p. 963-64.  N.G.'s parents communicate with the speech

providers and participate in the sessions, so that they may learn the skills to reinforce the therapy sessions. Tr. p. 964-65.

157.   N.G.'s parents are working to get N.G. the services that he needs now, during The period of greatest brain plasticity, so that N.G. can participate in a meaningful way in the world. Tr. p. 966.

158.   N.G.'s parents chose Dr. Clark to be the supervisor based on a number of considerations. Tr. p. 918-19.  Dr. Clark had indicated that she would be able to fulfill at least the program that Dr. McCarton recommended, including the ABA hours, the team meetings, and the parent training component. Tr. p. 920.  Dr. Clark insisted on a commitment to the program and the training from N.G.'s parents. Tr. p. 920-21.

159.   Dr. Clark has made herself and the therapists available at all times, and N.G.'s parents have called the team to get feedback, including advice on how to redirect behaviors such as biting, hitting and swiping. Tr. p. 924-27.  Team meetings occur "like clockwork" every week, and they last two hours. N.G.'s mother is present for the team meetings and gains much from them.  Tr. p. 929-30.  In addition, there are regular parent-training sessions. Tr. p. 931.  Service providers have been let go due to concerns about dependability, consistency, and inexperience with a child of N.G.'s age. Tr. p. 932.

160.   The parent training component has been "invaluable," and has taught them everything from how to hug N.G. in ways that do not reinforce behaviors to establishing a feeding schedule to an elimination of music and other things that promote negative behavior in N.G. Tr. p. 933-34.  The ABA therapy is "counter-intuitive" to parents, and there isn't an element of N.G.'s life that they have not had to rethink. Tr. p. 933-34.

161.   N.G.'s parents are involved in N.G.'s program in every conceivable way and

have re-arranged their home and lives around the program. Tr. p. 937-38.  N.G.'s parents

have never refused to do anything that a therapist has asked them to do. Tr. p. 938.

162.  At the IFSP, when N.G.'s parents expressed their concern about the number of

weekly hours in the offered program, they were "repeatedly" told that the speech therapy

should be counted as ABA services as well (increasing the number of hours), and "ABA"

was written next to speech therapy. Tr. p. 902-03.   N.G.'s parents did not "buy" this

explanation. Tr. p. 903.

163.  Ms. Arias stated at the meeting that it was the agency policy not to consider

outside reports or evaluations. Tr. p. 900.  None of the IFSP team members challenged

this statement, and N.G.'s mother was shocked to hear the policy. Tr. p. 906-08.  The

services that emerged from the IFSP meeting were exactly those that had been outlined

by Ms. Placido prior to the meeting. Tr. p. 901.

164.  In November of 2006, N.G.'s behaviors included "bouncing off the walls," an

inability to stay focused, no response to his name, no eye contact, constant singing,

inability to feed himself, toe-walking, stumbling and falling, and no sense of danger. Tr.

p. 904-05.

165.  N.G.'s mother and father were told that, to receive any services at all

(even if they did not agree with the amount), they had to "check" that they accepted the

program. Tr. p. 898.

166.   N.G.'s mother does not speak Spanish, though his father is able to do so. Tr.

p. 864.

**The September 24, 2007 Testimony of Panagiotis Rekoutis, M.A.**

167.    Mr. Rekoutis is the Director of occupational therapy at the McCarton Center and the Director of the Occupational Therapy Department at the McCarton School. Tr. p. 1115.  Mr. Rekoutis supervises 16 therapists in this capacity. Tr. p. 1116.

168.    Mr. Rekoutis has a Master's degree in occupational therapy from New York University and is completing his doctoral work in occupational therapy. Tr. p. 1117.  Mr. Rekoutis is licensed by the New York State Department of Education. Tr. p. 1117.  Mr. Rekoutis also has 13 years of experience working in the field of occupational therapy. Tr. p. 1117.

169.    When Mr. Rekoutis first worked with N.G., N.G. had "a big sensory component that needed to be addressed." Tr. p. 1124.  Specifically, N.G. presented with delayed equilibrium reactions, visual depth perception issues, an inability to follow even the most mundane directions, distractibility, withdrawal when challenged, fine motor skill deficits, and tactic and oral motor defensiveness. Tr. p. 1125-26.  N.G. exhibited a willingness to attempt activities after he was comfortable with them, which is a good sign of future development. Tr. p. 1127.

170.    N.G. continues to need attention in the areas of adaptive living skills, as evidenced by his inability to remove his shoes and socks. Tr. p. 1136.  The New York City Early Intervention program evaluation stating that N.G. can remove his shoes and socks is not accurate.  Tr. p. 1137.  The Early Intervention program evaluation's statement that N.G. could climb on people and furniture was also not accurate. Tr. p. 1210.   It is important to remember that when OTs are evaluating a child, they are considering the quality of the action, not jut the ability to perform a task. Tr. p. 1211.

171.   The OT evaluation has other problems, including its lack of gross motor evaluation. Tr. p. 1143-44.  The report also mistakes what is being measured, and therefore, inaccurately reports findings. Tr. p. 1145.  The report is correct in its determination that N.G. had very poor performance and was in the lowest percentile of children in regard to the relevant skills. Tr. p. 1146-47.

172.   After working with N.G. for a short period, Mr. Rekoutis worked to add a fifth session of OT per week, to allow for the proper frequency of exposure to particular activities, and to address all of N.G.'s deficits. Tr. p. 1128.    The addition of the fifth session per week was the result of the OT opinion after working with N.G. for six months, and the addition was not influenced by a parent request for more sessions. Tr. p. 1196.  Despite the inherent difficulties of scheduling services during the summer, the OT team was able to maintain four, forty-five-minute sessions throughout those months. Tr. p. 1207.  The team arranges for coverage during the winter holidays, so that services are not interrupted. Tr. p. 1213.

173.   In all, then, the OT team recommended five, forty-five-minute sessions, as such a schedule best fits N.G.'s individual needs. Tr. p.1128, 1131.  This time period allowed for the introduction of both gross and fine-motor skills development. Tr. p. 1129. A thirty-minute session is too short for N.G., and even with the best OT, this session length would not be appropriate for N.G. Tr. p.1134.  Forty-five-minute sessions would be appropriate for N.G. even at the age of 20-21 months, when he was first evaluated. Tr. p. 1186.  An hour long session would likely cause him to fatigue. Tr. p. 1130-31. The intensity of the sessions is important, so that significant progress can be made towards the goal of inclusion. Tr. p. 1188-89.

174.    The OT therapists have seen a lot of changes in N.G., including an improved ability to walk, an increased motivation to jump, fine-motor skills development in the form of coloring and work with scissors, and an improved ability to follow one-step instructions. Tr. p. 1131-1133.  N.G.'s fine-motor skills, particularly his ability to cut paper with scissors, are very much improved. Tr. p. 1167.  N.G. has also improved his feeding skills. Tr. p. 1168.

175.    The OT providers are in communication with the other team members so that approaches and strategies can be generalized. Tr. p. 1153.  The OTs also attend inter-disciplinary team meetings. Tr. p. 1153-54.  These meetings are held less frequently than the ABA team clinics. Tr. p. 1205.  The team has, for example, worked together to cut down on background noise and music that distracts N.G. during his treatment. Tr. p. 1156-57.

176.    All three OTs working with N.G. provide a high quality of services. Tr. p. 1204.

177.    The sensory gym allows N.G. to learn movement skills that he could not learn on a normal playground. Tr. p. 1157.  Use of the gym has allowed N.G. to walk better and provided a better sense of balance. Tr. p. 1159.  N.G. also has an improved sense of where his body is in space. Tr. p. 1160.

178.    N.G. has exhibited slow progress in regard to his tactile defensiveness, and more significant progress in terms of his oral defensiveness. Tr. p. 1161.

**The September 24, 2007 and October 2, 2007 Testimony of Cheryl Dombrowski, M.A.**

179.    Ms. Dombrowski is the ABA and education supervisor at the Manhattan branch

of TheraCare. Tr. p. 1216-17. She holds a Master's degree in Early Childhood

Education and Special Education for Early Childhood and has worked in the field since

1996. Tr. p.1218.

180. TheraCare is a quality provider. Tr. p. 1231.

181. N.G.'s mother contacted TheraCare and Ms. Dombrowski directly. Tr. p. 1232.

Ms. Dombrowski and N.G.'s mother had an initial conversation regarding the services

that TheraCare provides. Tr. p.1234. During that conversation, Ms. Dombrowski

informed N.G.'s mother of resources that she might consult to gather more information

about treatment and treatment approaches. Tr. p. 1235-36.

182. TheraCare conducted evaluations of N.G., which found that N.G. had a strength

in rote counting and weaknesses that included a lack of communicative intent, a lack of

eye contact, and repetitive actions. Tr. p. 1278-80. The evaluations resulted in

recommendations of ABA therapy, bilingual speech therapy, and occupational therapy.

Tr. p.1282.

183. Ms. Dombrowski stated "it appeared from the evaluation" that N.G.'s feeding

issues were restricted to textures, but that she had no first hand knowledge. Tr. p.1291.

184. At the IFSP meeting, N.G.'s parents stated the changes they wanted to be made

to the existing program. Tr. p.1295. N.G.'s parents also indicated their belief that the

services offered did not meet N.G.'s needs when they signed the IFSP. Tr. p.1298. There

were disagreements over the frequency of services at the IFSP meeting. Tr. p. 1299. The

program offered included 20 hours of ABA, three 30 minute sessions of OT, five hours of

speech therapy, one family training session per week, and one joint family training and

team meeting per month. Tr. p.1299.  The IFSP indicates that the ABA services are to be provided five days per week. Tr. p.1486.

185.   It was understood at the time of the IFSP that N.G. had interfering behaviors. Tr. p.1501. It is important to conduct a functional behavioral assessment for children with interfering behaviors, so that the function of each behavior can be determined and appropriately addressed. Tr. p. 1502, 1504.  Failure to conduct a functional behavioral assessment can result in the creation of the wrong plan. Tr. p.1504.  To Ms. Dombrowski's knowledge, no functional behavioral assessment was conducted prior to the IFSP meeting. Tr. p.1502.

186.   There was at least some discussion of feeding issues at the IFSP meeting. Tr. p. 1508.  TheraCare can address feeding issues in their ABA work if the issue is behavioral. Tr. p.1510.

187.   The IFSP indicated knowledge of N.G.'s issue with his awareness of danger. Tr. p.1519.  This would be an appropriate matter to address in the IFSP. Tr. p. 1519. It appears to have not been discussed in any way.   The IFSP also stated that N.G. becomes upset when he is taken from something he wants. Tr. p.1519.  This also would be appropriate to address. Tr. p.1520.

188.   To increase services after the initial program is set-up, TheraCare would have to file a justification form and attach a progress report. Tr. p.1300. The hours could not be adjusted without such paperwork. Tr. p. 1300-01.  The increase in services being "a good idea" is not enough to meet the standard for a programmatic increase. Tr. p.1302.

189.   TheraCare would typically have done an ABLLS assessment on N.G., but had not done one and did not have one scheduled.  They would have also likely utilized a preference assessment. Tr. p.1304.

190.   Ms. Dombrowski supervised 40 children at the time of her work with N.G., but did not work directly with any of them. Tr. p. 1312-1313.  There was no set basis for working directly with any of the children. Tr. p.1314.  Rather, the teachers fulfill the full number of hours. Tr. p.1315.  Ms. Dombrowski could fulfill some hours, but there was no provision for her to do so in the IFSP. Tr. p. 1411-12.  This function would not be billable. Tr. p.1412.

191.   At the IFSP meeting, it was mentioned that N.G.'s parents had supplied the Lucas and McCarton assessments, but there was no discussion at length regarding those assessments. Tr. p.1425.   Ms. Dombrowski was not provided a copy of either report at the IFSP meeting, and she neither requested to be shown nor was shown the original copy of either report. Tr. p.1428.

192.   Ms. Dombrowski was aware of the statutory requirement that an IFSP plan include the frequency, intensity, and method of service delivery. Tr. p. 1435.

193.   The IFSP indicates that there will be one hour of special ABA family training, but it does not indicate who will provide that family training. Tr. p. 1449-50.

194.   Ms. Dombrowski does not know when an initial schedule was proposed by TheraCare, and she does not know whether N.G.'s parents were told that the scheduling would take at least as long as their previously made vacation plans. Tr. p.  1452.

195.  N.G.'s family was cooperative, professional, and courteous at the IFSP

meeting.  Tr. p. 1458.  N.G.'s parents did not do anything unreasonable at the IFSP meeting. Tr. p. 1459.

196.  The most hours of ABA received by any child in the Manhattan branch of TheraCare is twenty hours. Tr. p. 1460.   Children in Early Intervention might, however, need more than twenty hours of ABA, based on the severity of their needs. Tr. p. 1465.

197.   Ms. Dombrowski is not sure that she has ever heard of speech therapists being referred to as ABA speech therapists. Tr. p. 1336.

198.  Parents are not expected to adopt the role of a therapist. Tr. p. 1342.

199.   If a child is engaging in a behavior that is reinforced during down-time, then the likelihood of that behavior occurring thereafter increases. Tr. p. 1365.  Ms. Dombrowski has seen instances in which children used down time to engage in and practice dysfunctional behaviors. Tr. p. 1367.  Ms. Dombrowski has seen instances in which unstructured weekends have been problems for a child. Tr. p. 1369.

200.  TheraCare did not send any members of the evaluation team to the IFSP meeting because of "scheduling difficulties." Tr. p. 1237, 1466.  It is normal that there be an effort to ensure that those conducting evaluations are at the IFSP meeting. Tr. p. 1476.  Ms. Dombrowski felt "comfortable" representing TheraCare, even though she had never had direct contact with N.G. Tr. p. 1238, 1241.  When asked, Ms. Dombrowski stated that she doesn't know whether the meeting should have been postponed because no one who had actually observed N.G. was available to represent TheraCare. Tr. p. 1245.  Ms. Dombrowski has never attended a IFSP meeting where a medical doctor was present. Tr. p. 1475.  It is beneficial, however, to have those who have experience with the child

present, rather than just have their writing. Tr. p. 1476. It is important to have someone present who has had experience with the child, beyond just the parents. Tr. p. 1477.

201.  While Ms. Dombrowski acknowledges that children may require more frequent meetings than once per month, Ms. Dombrowski cannot recall an IFSP meeting in which meetings more frequent than once per month were provided. Tr. p. 1482.

202.  TheraCare devised a schedule for N.G. that was to begin on November 28, 2006. Tr. p. 1247. The original schedule included three ABA providers and two speech therapists. Tr. p. 1247.

203.  N.G.'s mother had discussed the recommendation that she had received that N.G. be provided weekend hours prior to the IFSP meeting. Tr. p. 1257. According to Ms. Dombrowski, she offered to check on whether TheraCare had ay providers who would be available on the weekends. Tr. p. 1257. Upon receipt of the schedule, N.G.'s mother indicated that she was "surprised" that the schedule did not include any weekend hours. Tr. p. 1253-54. TheraCare will, at times, provide weekend hours when there is concern about regression. Tr. p. 1256.

204.  Ms. Dombrowski has seen instances in which a child with a 30 hour per week ABA program was eventually mainstreamed. Tr. p. 1373. ABA was the core intervention chosen by the IFSP team. Tr. p. 1376.

205.  The OT report used by the IFSP team did not address gross-motor skills at all. Tr. p. 1379. The only way that gross-motor skills were addressed at the meeting was a recommendation that a physical therapy (as opposed to an occupational therapy) evaluation be conducted. Tr. p. 1380.

206.  The number of hours that each service will be provided is generally set at the

IFSP meeting. Tr. p. 1241. It was Ms. Dombrowski's understanding that Ms. Bulkley would be providing parent training at least once per week. Tr. p. 1391.

207. Ms. Dombrowski has worked with children who received team meetings weekly, and in her opinion, the benefit of such frequency is the ability to monitor progress on a more frequent basis to ensure that the proper procedures are being used, as well as the ability to ensure that regression is being prevented. Tr. p. 1394-95. The only danger of more frequent team meetings might be parental dependence on the team to make decisions, yet the team would encourage the parents to run all ideas by them to ensure that the mistakes are not repeated. Tr. p.1398-99. The philosophy of TheraCare is one that encourages parents to not be dependent on the team, but acknowledges that all things must be passed through the team. Tr. p.1398-99.

208. There is no assessment tool, of which Ms. Dombrowski is aware, that is more reliable or comprehensive. Tr. p.1471.

209. There was no defined time that Ms. Dombrowski, as supervisor, would be involved in N.G.'s case, and the time she did spend in this capacity was not billable. Tr. p. 1395-96. Ms. Dombrowski and the lead teacher would have the responsibility for writing N.G.'s ABA programs. Tr. p.1396.

210. The Lovaas study provided 40 hours of 1:1 ABA per week to a group of children for approximately two years. Tr. p.1370. N.G. has only been in his ABA program for less than one year. Tr. p.1371. The follow up study to the Lovaas study found that the group of children with autism that had been provided 40 hours per week of ABA services were the ones who retained the benefit. Tr. p.1382.

**The October 2, 2007 testimony of Dr. Jeanette Gong**

211.   Dr. Gong has been the Director of the Manhattan branch of the Early Intervention Program since April 2006. Tr. p.1537.  Dr. Gong "is not an autism expert" and is not aware of the ongoing research. Tr. p.1609.

212.   In general, the providers who meet with a child during their involvement in Early Intervention are the service coordinator, the ongoing service coordinator, the evaluators, and the therapists. Tr. p.1560.

213.   The Early Intervention agency audits providers by reviewing their files to determine whether they have fulfilled the legal requirements placed on it. Tr. p.1562.

214.   The decision regarding the hours of services is made at the IFSP meeting. Tr. p. 1564.

215.   The guidelines produced by the State recommend that children with autism receive between 18 and 40 hours of ABA therapy. Tr. p.1553.

216.   Dr. Gong reviewed N.G.'s file after receiving a letter regarding it in late November.  Tr. p.1595.  Dr. Gong reviewed N.G.'s file and "felt" that the services offered were "adequate." Tr. p.1596.  Dr. Gong's assessment that the program was adequate was based on experience with Early Intervention that "sort of" provide "an idea of what is in the ballpark of what should be appropriate." Tr. p.1611.

217.   Dr. Gong did not know whether the evaluations of Dr. Lucas and Dr. McCarton were used during the IFSP meeting, but Dr. Gong did reference them in her review. Tr. p. 1598.  In Dr. Gong's opinion, the parental presence may be sufficient to overcome the failure to use outside evaluations at an IFSP meeting.  Tr. p.1597.[7]

---

[7] In Deal, the Sixth Circuit held that a parent's mere physical presence and exercise of the right to ask questions did not, without more, constitute meaningful parental participation.

218.  It is important for everyone's concerns regarding the child to be considered at the IFSP meeting. Tr. p.1597.  Yet, <u>Dr. Gong admitted that "usually outside evaluations are not used to determine the frequency or duration of services." Tr. p.1601.</u>

219.  Dr. Gong testified that outside evaluations cannot be used for evaluation purposes. Tr. p. 1600.  N.G., however, was found eligible for services. Tr. p.1600.

**The October 25, 2007 Testimony of Dr. Prashil Govind**.

220.  Dr. Govind is the medical director of the Early Intervention Program. Tr. p. 1660.  Dr. Govind does not consider himself an expert on autism. Tr. p.1671.  Dr. Govind does not treat children with autism or PDD. Tr. p.1697.  He does "try" to keep up on the literature surrounding developmental disorders. Tr. p.1712.  Dr. Govind has never run an intensive ABA program. Tr. p.1731.  Dr.  Govind has not published on the topic of autism. Tr. p.1731.  Dr. Govind has never worked in a school for children with autism. Tr. p.1740.  Dr. Govind has never met nor assessed N.G. Tr. p.1720.  Yet, Dr. Govind opined that the services outlined at the IFSP were appropriate. Tr. p.1710.

221.  Dr. Govind does not think that team meetings are always a necessary component of IFSP plans. Tr. p.1742.  Dr. Govind does think that parent training is a part of an ABA program. Tr. p.1743.

222.  In coming to his decision regarding the appropriateness of the program, Dr. Gvoind read all of N.G.'s evaluations, but he is not sure what evaluations were used by the IFSP team. Tr. p.1727.

223.  It is "part of the IFSP process" to provide the IFSP team an opportunity to

carefully consider the evaluations in advance of the IFSP meeting. Tr. p. 1728. It would be "beneficial" for those attending the IFSP meeting to have met the child being discussed. Tr. p.1752.

224.   It is "possible" that while working for Dr. Agin (before coming to the Early Intervention Program), Dr. Govind recommended ABA programs between 30 and 40 hours for children he assessed. Tr. p.1724.   Dr. Govind, however, cannot speak to whether any children in Early Intervention have received more than 20 hours of ABA services. Tr. p.1737.

225.   The evaluation process is partly designed to determine what would be appropriate for the child – it is not limited to mere eligibility determinations. Tr. p. 1700.

226.   IFSP programs are reviewed and may be changed every six months. Tr. p. 1703. Otherwise, changes must be approved through the justification process. Tr. p.1704.

**The October 25, 2007 Testimony of Nichole Aiello, M.A.**

227.   Ms. Aiello is a staffing coordinator for TheraCare. Tr. p.1766.

228.   The allotment of 30 hours is the greatest allotment of hours that Ms. Aiello has seen on an IFSP. Tr. p.1822.   Approximately 30 percent allot more than 20 hours. Tr. p. 1824-25.

229.   Ms. Aiello could not explain why the service coordinator's notes refer to a child named Ethan. Tr. p.1829.   Ms. Aiello also cannot explain the two-month gap in the notes, as it is "not [her] job." Tr. p.1833.   Such a gap would not be expected in the ordinary course of business. Tr. p.1834.   In addition, there is a form in the document that does not match the other forms, and there is no explanation for why it in the document.

Tr. p. 1850-51. <u>In Ms. Aiello's opinion, the service coordinator's notes are not in the ordinary course of business. Tr. p.1852.</u>

230.  It is unusual for a child to go through three service coordinators in such a short period of time. Tr. p.1836.  Ms. Aiello testified that the therapists could have started earlier if N.G.'s parents had not been away.  Tr. p.1839.  Ms. Aiello acknowledged, however, that she never inquired about the therapists' availability during the Thanksgiving holiday.  Tr. p.1839.  According to Ms. Aiello, only one of all the therapists employed by TheraCare was available to perform weekend hours. Tr. p.1845.

231.  Ms. Aiello never requested the private therapy schedule. Tr. p.1845.

**Conclusion**

232.  For all the foregoing reasons, the ALJ's Decision should be reversed and this Court should award N.G. and his family the reimbursement relief that the ALJ refused.

<u>*s/ Gary S. Mayerson*</u>

Gary S. Mayerson (GSM8413)

Sworn to before me this

___day of July


_____

Notary Public

 STATE OF NEW YORK
DEPARTMENT OF HEALTH

433 River Street, Suite 303   Troy, New York 12180-2299

Richard F. Daines, M.D.
*Commissioner*

Wendy E. Saunders
*Chief of Staff*

January 16, 2008

**FEDERAL EXPRESS**

Alex and Lisa Grinberg                Gary Mayerson, Esq.
50 Sutton Place South – Apt. 9A       Mayerson & Associates
New York, New York  10022             330 West 38th Street – Suite 600
                                      New York, New York  10018

Katherine A. Clemens, Esq.
New York City Department of Health & Mental Hygiene
Early Intervention Program
125 Worth Street – Room 618
New York, New York  10013

**RE:  In the Matter of Alex & Lisa Grinberg**

Dear Parties:

       Enclosed please find the final Order in the above referenced matter.
Judicial review of this decision is through Article 78 of the CPLR.

Sincerely,

*James F. Horan*

James F. Horan, Acting Director
Bureau of Adjudication

JFH:cah

Enclosure

RECEIVED
JAN 17 2008

STATE OF NEW YORK   :   DEPARTMENT OF HEALTH

| | |
|---|---|
| IN THE MATTER<br><br>OF<br><br>**ALEX AND LISA GRINBERG**<br>**Petitioners**<br><br>**ACTING ON BEHALF OF "NG" INFANT** | **DETERMINATION**<br><br>**AND**<br><br>**ORDER**<br><br> |

On written notice to Petitioners, Alex and Lisa Grinberg, acting on behalf of "NG," a

hearing was held before **KIMBERLY A. O'BRIEN ESQ., ADMINISTRATIVE LAW**

**JUDGE** at the Offices of the New York State Department of Health, 90 Church Street, 4th Floor,

New York New York.

ALEX AND LISA GRINBERG (hereinafter Petitioners or Parents) appeared in person

and by Counsel **GARY S. MAYERSON ESQ.**   The New York City Early Intervention

Program (hereinafter Respondent or NYCEIP) appeared by **KATHERINE A. CLEMENS ESQ.**

Deputy General Counsel, Office of General Counsel for Mental Hygiene. Evidence was received

and argument heard, and transcripts of these proceedings were made.

## PROCEDURAL HISTORY

| | |
|---|---|
| Date of Request for Hearing | May 1, 2007 |
| Notice of Hearing | May 11, 2007 |
| Originally Scheduled Hearing Date | May 25, 2007[1] |
| Date of Request for Adjournment | May 21, 2007 |

---

[1] There being no objection Petitioner was granted an adjournment of the original hearing date from May 25, 2007 to July 16, 2007.

1

| | |
|---|---|
| Hearing Dates | July 16, 2007, July 30, 2007, August 6, 2007, September 24, 2007, October 2, 2007, October 25, 2007 |
| Witnesses for Petitioner | Evelyn Arias, Dr. Deborah Clark, Tamar Frankel, Lisa Grinberg, Marisa Leyden, Dr. Cecelia McCarton, Elizabeth Placido, Margery Rappaport, Panos Rekoutis, and Julie Sandor |
| Witnesses for Respondent | Nichole Aiello, Cheryl Dombrowski, Dr. Jeanette Gong, and Dr. Prashil Govind |
| Final Hearing Transcript Received | November 2, 2007 |
| Final Briefs Submitted | December 4, 2007[2] |

## STATEMENT OF THE CASE

On May 1, 2007, the Petitioners Alex and Lisa Grinberg parents of "NG" exercised their right to an impartial hearing, pursuant to New York State Public Health Law ("PHL") Section 2549 and 10 NYCRR Section 69-4.  At the time of the request for an impartial hearing, "NG" was eligible for early intervention ("EI") services pursuant to PHL Section 2540 *et seq*.   The Early Intervention Program provides each eligible child with specific developmental services as set forth in their own Individualized Family Services Plan ("IFSP"). The impartial hearing officer is required to address whether or not the EI services offered to "NG" were "appropriate" under the Individuals with Disabilities Education Act, 20 U.S.C. Section 1471 *et. seq*. ("IDEA.")  Early Intervention services are defined in PHL Section 2541 and  PHL Section 2545(7) requires that each IFSP include the specific early intervention services necessary to meet the unique needs of

---

[2]  On November 21, 2007 the Petitioners' Counsel requested a one week extension for submission of the final briefs. There being no objection to the request the submission deadline was extended from November 27, 2007 to December 4, 2007.

2

the child and the family. Petitioners requested this hearing and concede that they have the burden of proof in this proceeding, and that they must prove by substantial evidence that "NG's" IFSP is not appropriate. (Tr. 36-7; 10 NYCRR Part 51; SAPA Section 306(1))

## **FINDINGS OF FACT**

The following Findings of Fact were made after a review of the entire record in this matter. Conflicting evidence, if any, was considered and rejected in favor of the cited evidence. Numbers or letters below in parentheses refer to exhibits (denoted by the prefix "Ex.") or transcript page numbers ("Tr."). These citations refer to evidence found persuasive by the Administrative Law Judge in arriving at a particular finding.

1. "NG" was born on December 29, 2004 (Ex. A).

2. On or about October 2006, "NG" underwent a multidisciplinary evaluation and screening with evaluators under contract with the NYCEIP. (Ex. J) The Respondent's Evaluation Report was provided to the Early Intervention Program and to the Petitioners. (Tr. 975)

3. NYCEIP's evaluators found that "N.G." was eligible for the Early Intervention Program, and an IFSP meeting was scheduled for November 13, 2006. (Ex. C)

4. On or about November 2006, the Petitioners obtained Independent Evaluations for "NG" from Dr. Christopher Lucas and Dr. Cecilia McCarton (Ex. G & Ex. H) The Independent Report provides a specific recommendation for the level and frequency of services including thirty hours of ABA therapy over "a full seven day period." (Ex. H p.8)

5. On or about November 13, 2006 an IFSP meeting was held. (Ex. C) Just prior to the start of the IFSP meeting a copy of "NG's" Independent Report was provided to Evelyn Arias, EIOD. (Tr. 346, 348, 900, 1001-2) The IFSP meeting lasted an hour or more, and the required participants were

3

present and had a copy of the Respondent's Evaluation Report. (PHL Section 2545; Tr. 361, 367-69,

901-2) The Petitioners were the only people at the meeting who had personal knowledge about "NG,"

and they described their child and his development, and   discussed goals and objectives for "NG" with

those participating in the IFSP meeting. (Tr. 367-72, 901, 1003)  The  meeting participants talked

about and considered the  substance of the Respondent's Report and the Independent  Report. (Tr. 367-

72,377, 880, 901, 1006-7, 1283-85) The Respondent's Report and the Independent Report identified

similar issues and types of services for "NG" including: twelve month home based program, ABA

Therapy, Speech and Language Therapy, Occupational Therapy, Parent/ Family Training and Team

Meetings. (Ex. G, Ex.H & Ex. J; Tr. 369-71, 985-991, 1004, 1284, 1292, 1296, 1709-10)  At the

conclusion of the IFSP meeting, a determination was made about the type, level and frequency of

developmental services appropriate for  "NG" and this was documented in the IFSP, and "NG" was

also referred for a physical therapy evaluation. (Ex. C; Tr. 320, 361, 367-8)  The Petitioners disagreed

with the level and frequency of services provided for in "NG's" IFSP and noted this in writing directly

on the IFSP. (Tr. 377, 909, 911, 1298-9; Ex. C)

6.      During the IFSP meeting, the Petitioners chose Theracare as the Service Coordinator and

Theracare created a schedule for the implementation of the services as provided for in "NG's"

IFSP and subsequently created a schedule for the speech services accepted by the Petitioners.

(Ex. N & Ex. 4;Tr. 377, 994, 1017, 1021, 1026, 1246-9, 1258, 1772-85, 1840; PHL Section

2543& 2545(5))

7.      Participation in the early intervention program is voluntary,  and it is not unusual for

parents to refuse or limit their child's participation in the program. (Tr. 1586-1588, 1622; PHL

Section 2540 *et. seq.*)

4

8.    In a letter dated November 17, 2006 from the Petitioners to NYCEIP, the Petitioners stated that they accepted the speech and language services offered in the November 13, 2006 IFSP. However, the Petitioners stated that the "remaining services are not adequate or appropriate" for their child and they intended to secure their own services for "NG" and "seek reimbursement for these costs from the 'Department'." (Ex. F)

9.    The Petitioners accepted home based speech and language therapy services from the Respondent until February 2007 and then obtained the same level of private speech services for "NG" outside the home at their own expense. (Tr. 939, 941,944, 947-8)  The Petitioners did not advise the NYCEIP about their dissatisfaction with a provider or scheduling problems. (Tr. 950, 1036, 1038-43, 1059-1, 1812 -1814)

10.    Children participating in the NYCEIP receive ABA services ranging from ten to thirty hours or more per week. (Tr. 379-80,1363, 1371, 1736-37)

11.    "NG" has received "comprehensive and intensive intervention" which includes thirty-five to forty hours of ABA therapy provided seven days a week. (Ex. D)

12.    The Petitioners were advised at the IFSP meeting and throughout the early intervention services application process about how to address questions and concerns about the Early Intervention Program , and  given information about the right to mediation and a fair hearing if they disagree with the level, frequency or type of services provided for in the IFSP. (Tr.377-378, Ex C & Ex. 9C)

13.    Each IFSP is initially reviewed at three months and at least every six months thereafter or sooner if the parents or providers request changes to the level or type of services provided. (Tr.370-1, 1703-4; PHL Section 2545; Ex.9A, Ex. 9B & Ex.9C)

5

14.    A Service Provider may at any time recommend a change, reduction and/or addition to the level and /or type of service to be provided to a child by filling out and submitting a justification letter and/or a "Request for Change in Services Form" stating why the modification is necessary, and these requests are often approved. (Ex. 9A, Ex. 12; Tr. pp. 370-71, 1301-2, 1366,1525,1566-9,1703-4)

15.    The Petitioners were provided with information about mediation and fair hearings requests. (Ex.C, Ex. 9C, Ex. 11& Ex.12; Tr. 1578, 1580-1, 1583, 1593-4)

16.    On May 1, 2007, approximately five months after Petitioners had put intensive services in place for "NG" at their own expense, the Petitioners requested mediation and a fair and impartial hearing. (Ex. A; Tr.1031).

## BACKGROUND

"NG" was referred to the early intervention program and was evaluated by Respondent's evaluators. A written report including a summary and four evaluations of "NG" was issued qualifying "NG" to receive early intervention services ("Respondent's Report.") The Respondent's Report did not contain specific recommendations about the level or frequency of services "NG" should receive. The Petitioners obtained their own Independent Evaluations Report for "NG" (Independent Report) which contains a specific recommendation for the type, level and frequency of services including thirty hours of ABA services provided seven days a week. An IFSP meeting was held on or about November 13, 2007. At the conclusion of the IFSP meeting an IFSP was issued and it provided for among other services twenty hours of ABA therapy provided five times per week. While the Independent Report and the IFSP contained different recommendations for the level and frequency of services, both identified similar

6

services for "NG" including:  ABA, Occupational Therapy, Parent/ Family Training, Team

Meetings, and Speech and Language Therapy. The Petitioners made and signed a written note

on "NG's" IFSP stating that they thought the services set forth in "NG's" IFSP were not

appropriate.  The Petitioners accepted Theracare as the Service Coordinator and Theracare

created a schedule for the provision of services for "NG" as set forth in the IFSP.  A few days

after the IFSP meeting, Petitioners sent a letter dated November 17, 2006 to Respondent stating

that but for speech and language services the Petitioners chose not to avail themselves of the

services provided for by the Respondent in the IFSP. The Petitioners also stated that they would

seek compensation from the Respondent for services they obtained for "NG."  The Petitioners at

their own expense put in place an intensive private developmental service plan for "NG" which

includes but is not limited to thirty-five to forty hours of ABA services provided seven days a

week.  On or about February 2007, the Petitioners terminated the speech and language services

they were receiving from the Respondent and obtained private services for "NG" at their own

expense.  On May 1, 2007, the Petitioners made a request for mediation and a fair hearing and

are seeking reimbursement.  A Notice of Hearing was issued on May 16, 2007.  The Petitioners

requested an adjournment of the first day of hearing, May 25, 2007, and a six-day hearing

commenced on July 16, 2007. The record was closed on December 4, 2007.


## DISCUSSION AND CONCLUSIONS

The following conclusions are based on the above findings of fact, hearing record, law

and regulations. Throughout the hearing the witnesses demonstrated professionalism and a

commitment to the children and families they serve.  By all accounts Petitioners are intelligent

people devoted to their child "NG" and "NG's" wellbeing.  The Petitioners requested this

7

hearing to seek relief from what they allege was an inappropriate IFSP which was the result of a predetermined "standard package" IFSP created without benefit or consideration of "NG's" individual needs and/or Respondent's inability to provide services set forth in the IFSP including speech and language services and/or the conduct of the IFSP meeting was inappropriate and procedurally flawed which ultimately resulted in an inadequate and inappropriate provision of services as set forth in "NG's" IFSP. Specifically, the Petitioners seek reimbursement for all developmental services, attorneys' fees and any other recoverable costs that they obtained for "NG."

### Pre Determination of "NG's" IFSP

The first issue to be decided is whether "NG's" IFSP was pre determined. The Petitioners contend that before the IFSP meeting Respondent decided that "NG" would be provided with a "standard package of services." Petitioner, Lisa Grinberg testified that well before the IFSP meeting was held Elizabeth Placido, Initial Service Coordinator, told her that "NG" would get a "pretty standard package."(Tr. 878, 1084)  Ms. Grinberg said "NG" ultimately received the "standard twenty hours of ABA services" provided for in the NYS Department of Health Early Intervention Guidelines. (Ex 9A)  Ms. Placido does not recall discussing levels or frequency of services with Ms. Grinberg, and she did not participate in "NG's" IFSP meeting. (Tr. 846)

I conclude that "NG's" IFSP was not pre determined. The hearing record contains evidence from multiple sources that varying levels and frequency of ABA and other services are provided to children eligible and participating in the early intervention program and these determinations are made at the child's IFSP meeting. Further, The New York State Department

8

of Health Guidelines ("Guidelines") for the provision of early intervention services are by definition guidelines not rules or mandated requirements. The Guidelines recommend that the level, frequency and type of services provided to a child participating in the early intervention program vary depending on a number of factors including: age, severity of symptoms, rate of progress, a child's health and tolerance for the intervention, and family participation. (Ex. 9A) The Petitioner's interpretation of what she believes she was told by someone who did not participate in the IFSP meeting, and her observation that the Guidelines generally recommend twenty hours of ABA services and "NG's" IFSP provides for twenty hours of ABA services is not sufficient to conclude that "NG's" IFSP was predetermined.

### Scheduling and Provision of Early Intervention Services

Petitioners contend that the Respondent could not provide the services set forth in the IFSP and the speech and language services Petitioner received from the Respondent were inadequate and Respondent failed to provide the speech services as set forth in "NG's" IFSP. Immediately after the IFSP meeting Theracare began to work on scheduling services for "NG." A short time after the IFSP meeting services for "NG" were scheduled and then the Petitioners notified the NYCEIP that they would accept only speech and language services. The speech services were scheduled and provided by Theracare. In February 2007, without notifying NYCEIP that they were unhappy with one of the providers and having difficulty scheduling speech services, the Petitioners terminated the home based speech services provided by Respondent and obtained the same level of speech services for "NG" outside the home setting at their own expense.

I conclude that Respondent could provide the services as set forth in "NG's" IFSP and when Petitioner notified NYCEIP that they would accept only speech and language services

9

these services were scheduled and provided. Any difficulty the Petitioners encountered in obtaining the prescribed number of hours of speech therapy set forth in the IFSP was due to the Petitioners' failure to bring the issue to the NYCEIP's attention and unreasonable requirements that the services be provided to "NG" at very specific times and days that fit within the intensive plan in place for "NG." (Tr. 1036)

### The IFSP Meeting and "NG's" IFSP

The Petitioners further contend that whether or not they could prove at the hearing that the Respondent pre determined "NGs" IFSP or Respondent could not provide the services in the IFSP, the Respondent did not conduct the IFSP meeting in a way that allowed Petitioners to meaningfully participate and provide input in the development of "NG's" IFSP, "NG's" individual needs and the family's needs were not considered, and the resulting IFSP is not appropriate.

I conclude that "NG's" IFSP is appropriate. Dr. Gong and Dr. Govind both testified that the IFSP is appropriate and Petitioner's expert Dr. McCarton could not say that "NG" would not meaningfully benefit from the frequency and level of services set forth in the IFSP. (Tr. 720-2, 727-8, 781, 1589-1592, 1708- 1710)   The IFSP meeting lasted more than an hour and the IFSP was created at the meeting where: the required participants were present; the Petitioners were provided with information about the early intervention program; information about "NG's" individual needs, family's needs and goals was sought from Petitioners; and information was exchanged, discussed and considered including Respondent's Report as well as the substance of Petitioners' Independent Report.

10

### Team "N"

The burden was on the Petitioners to prove that the IFSP was not appropriate. Almost immediately after the IFSP meeting, the Petitioners chose to independently assemble a team of the "best" service providers in the area that they dubbed "Team N."   "NG" receives forty hours a week of home based ABA services provided over a seven-day period and   Petitioners have twenty-four hour access/seven days a week to   "NG's" Team Coordinator. The Petitioner, Lisa Grinberg, provided extensive testimony about her family's commitment to achieving optimal results for "NG."   The Petitioners receive intensive parent training, and Ms. Grinberg testified the Petitioners had a window installed in "NGs" room so that she could observe "NG" and the service providers. (Tr. 921, 940-41)   Ms. Grinberg testified that she thinks the forty hours of ABA services" "NG" is currently receiving is appropriate and she also said the Petitioners would accept reimbursement for thirty hours of ABA services. (Tr. 920-22, 1080 )

While it is understandable that the Petitioners want the very best for "NG," and that "NG" has an intensive plan in place where "NG" has realized significant benefit, the Petitioners have failed to prove by substantial evidence that "NG's" IFSP is not appropriate and that he could not realize meaningful benefits from the level of ABA services and other developmental services provided for in  "NG's" IFSP.   After due and careful consideration of the law, regulations, and hearing record, I have determined that "NG's" IFSP is appropriate.   Petitioners should not be compensated for any services they have obtained for "NG," attorneys fees or related costs.

11

## ORDER

Based on the foregoing, **IT IS HEREBY ORDERED THAT**:

1.      The Petition is **DISMISSED** in all respects;

2.      This **ORDER** shall be effective upon service on the parties by personal service or by

certified or registered mail.

**DATED:** *Troy*, **New York**
        *February 16*, **2008**

-----------------------------------------------------------

**KIMBERLY A. O'BRIEN**
**Administrative Law Judge**


To: Alex and Lisa Grinberg
        50 Sutton Place South Apt 9A
        New York, New York 10022

        Gary Mayerson, Esq.
        Mayerson & Associates
        330 West 38th Street, Suite 600
        New York, New York 10018

        Katharine Clemens, Esq.
        New York City Department of Health and Mental Hygiene
        Early Intervention Program
        125 Worth Street, Room 618
        New York, New York 10013

# MANUAL FOR
# ADMINISTRATIVE LAW JUDGES
# AND
# HEARING OFFICERS



**George E. Pataki**
*Governor*

**2002**

ACKNOWLEDGMENT

The New York State Department of Civil Service wishes to extend their many thanks and deep gratitude to the Government Law Center of Albany Law School for their dedication, commitment and exemplary work. The guidance and legal expertise they provided in the review and drafting of this Manual have resulted in a product that will greatly benefit and enhance the role of administrative law judges in New York State. Their efforts exemplify the very best in public service.

George C. Sinnott, Commissioner
New York State Department of Civil Service
June 2002

The revisions contained in this Manual were jointly funded through the negotiated agreement between the Governor's Office of Employee Relations and the Public Employees Federation, AFL-CIO. Copyright © 2002 by the New York State Department of Civil Service.

**Manual For Administrative Law Judges and Hearing Officers**

*Mode of Proof*

The party who goes first in presenting evidence will present the proof, testimonial and/or non-testimonial, that the party believes is necessary for securing the sought-after relief. The order in which witnesses and exhibits are presented is generally left to the parties themselves.

When presenting testimony, the party will conduct a "direct examination" of the party's called witness, eliciting that witness's relevant knowledge. After direct examination, the other party gets a turn to ask questions, this time by "cross-examination." When cross-examination is finished, the calling party may engage in "redirect examination," questioning the witness on matters brought up on the cross-examination. The other party may then engage in "recross-examination," questioning the witness on matters raised on redirect. The parties may then engage in further similar round(s) of questioning, provided the questioning does not become repetitive.

Upon completion of the examination of the initial witness, the party may then call other witnesses, and the same process is engaged in with such other witnesses.

**Conduct of the Hearing**

When the party has finished calling witnesses and introducing exhibits, the party will "rest."

At that time, the other party may then present evidence, testimonial or non-testimonial, on the issues raised by the initiating party or other relevant issues, to show that the initiating party is not entitled to the relief sought. The witnesses called will be subject to the same manner of examination previously described. Once the party has finished calling witnesses and introducing exhibits, the party will rest.

After both parties have put on their case, the party who went first has a "rebuttal" opportunity. Rebuttal is generally limited to denying some affirmative fact that the other party has attempted to prove. It may not be used simply to put in additional proof that could have been presented during the party's initial presentation of proof. Once a rebuttal case is made, the other party has a similar opportunity. The presentation of witnesses during rebuttal is subject to the previously described mode of examination.

It is important to stress that when a party is presenting the party's case, the other party should not be permitted to interrupt for the presentation of the party's

**Page 92**

**Manual For Administrative Law Judges and Hearing Officers**

case through the calling of witnesses and/or introduction of non-testimonial proof. The other party must wait until the opposing party rests. The only interruption that is permitted is through cross-examination. By not permitting such interruption, other than by cross-examination, the most effective presentation of each party's case should be assured.

*Stipulations*

During the hearing, it may be expedient to obtain from the parties a stipulation that certain facts or events are to be accepted as true or as having occurred. Stipulations are agreements made between parties as to the existence of certain facts or events. They are useful short-cuts. They save time which would be otherwise consumed by repetitive testimony on matters of fact which are not really in dispute, which therefore add nothing but volume to the hearing.

Entering into a stipulation can be initiated by a party, both parties or the ALJ. The ALJ should not suggest the making of a stipulation unless both sides are represented or unless an unrepresented party fully comprehends its significance and effect. The ALJ should be satisfied that

Page 93

**Manual For Administrative Law Judges and Hearing Officers**

will be heard in due course.  The ALJ as well should not interfere with the development of the case by making gratuitous comments or observations, by adverting to collateral and irrelevant matters or by breaking into testimony before an answer is completed.

Frequently, parties or their representatives will request that certain witnesses be excluded from the hearing room while other witnesses are testifying.  The grounds of such request may be to test the credibility of witnesses severally, or to keep confidential a certain witness's testimony.  It is a matter of discretion with the ALJ to grant or deny the request, depending upon the nature of the case and the circumstances giving rise to the request.  Remembering that hearings generally should be open to the public, the ALJ should use sound judgment in passing upon requests to exclude witnesses from the hearing room.

*Cross-Examination*

A reasonable opportunity to test and controvert adverse testimony and evidence is one of the fundamentals of a fair hearing.  Cross-examination of adverse parties and witnesses is a traditional and

**Conduct of the Hearing**

effective means to that end.  Most importantly, as stated in Chapter 3, it is a due process right.

The purposes of cross-examination include the following:

1. It tests the veracity and credibility of the witness.
2. It brings out information left untouched by direct examination.
3. It tests the accuracy of a witness's perception of the matters about which the witness testifies.
4. It tests the extent of the witness's opportunity to observe those matters as to which the witness testifies.
5. It tests the accuracy and reliability of the witness's memory of what the witness observed.
6. It tests the accuracy of the witness's narration of facts and events about which the witness testifies.
7. It tests the basis of an expert's opinion.
8. It may elicit from a witness concessions or admissions which will, in effect, remove certain disputed issues from the case.

A cross-examination which has one of the above purposes as its object must be permitted.

**Manual For Administrative Law Judges and Hearing Officers**

However, the right of cross-examination does not include the right to an unlimited cross-examination. The ALJ has the discretion to prevent cross-examination which is becoming repetitious as well as cross-examination that is delving into irrelevant or collateral matters, provided it does not jeopardize the basic fairness of the hearing. In close cases, it may be preferable to permit the questioned cross-examination, lest the denial or limitation thereof become a significant issue on judicial review.

It must be noted that the right of cross-examination extends only to witnesses at the hearing. The right does not extend to persons who have prepared records or documents when those records or documents are admitted into evidence, or to persons whose statements are testified to by others at the hearing. (*See,* Evidence, Appendix A). Any possible unfairness is ameliorated by SAPA §304(2) which allows parties to request the ALJ to issue a subpoena requiring persons to testify, as discussed in Subpoenas, *supra*.

**Conduct of the Hearing**

*Use of Affidavits*

An affidavit is a sworn statement in writing made by a person under oath wherein the person states facts within the person's personal knowledge. It is in some ways the written equivalent of the person testifying at a hearing or trial.

The fact that the affidavit is sworn to does not make it equal in effect to sworn testimony at a hearing, where all testimony is subject to further examination. Instead, the admission into evidence of an affidavit, in lieu of the person testifying as a witness, raises a basic question of fairness. The opposing party cannot cross-examine a piece of paper. Its admission can deprive the opposing party of the right of cross-examination. Furthermore, it may be totally self-serving and detrimental to the position of the opposing party, without giving that party the right to refute it by cross-examination.

Whether an affidavit in lieu of the person making the affidavit testifying as a witness is admissible is subject to the discretion of the ALJ. The discretion should be exercised on the basis of the affidavit's reliability. (*See,* Evidence, Appendix A). Due concern should be given to its self-serving nature as well as the reason why the

**Page 108**

**Manual For Administrative Law Judges and Hearing Officers**

maker of the affidavit is not present, testifying as a witness.

In some instances, affidavits can be readily admitted. Thus, if the opposing party has no objection to their introduction, they can be accepted as evidence. Also, affidavits can be received as to collateral matters, not affecting the material issues in a case.

*Questioning by the ALJ*

Ordinarily, a case will be presented and developed by the parties' questioning of witnesses. However, consonant with the ALJ's obligation to assure that the hearing is fair to all parties and to develop all facts necessary for a complete and just decision, the ALJ is permitted in the exercise of discretion to question any witness called by the parties.

The discretion to question should be exercised sparingly. It is not a license to take over questioning merely because the ALJ believes the ALJ can do a better job. Questions by the ALJ should be limited to clarifying confusing testimony of a witness which is not clarified by the questioning of a party, or which is confusing as a

**Manual For Administrative Law Judges and Hearing Officers**

case. Before transmission of the file to the next authority, the exhibits should be arranged in order and checked to assure a complete record.

*Evidentiary Objections and Rulings*

When a party wants to keep the opposing party's evidence out, thereby preventing it from becoming part of the hearing record, it is necessary for the party to make an objection. If no objection is made as to a witness's testimony in whole or in part or to an offered exhibit, the testimony or exhibit is received into evidence. The ALJ may then consider such evidence and give to it the weight the ALJ believes it deserves. Additionally, the failure to object may bar the party against whom the evidence was admitted from arguing on judicial review that the evidence should have been kept out by the ALJ.

Under SAPA §306(1), the ALJ must allow the parties an opportunity to object to offered testimony, and the making of the objection must be noted in the record. There is no required form that the objection must take. Generally, the objection, whether in the form of an objection to a question to a witness or to an offered exhibit, *e.g.,* "I object," or in the form of a motion to strike

**Conduct of the Hearing**

a witness's answer or an admitted evidence, *e.g.*, "I move to strike," must be "timely" made. This means that the objection should be made at the time the question is asked or the exhibit offered, or a motion to strike made promptly after the witness blurts out an answer or the ground for objection becomes apparent. Objections made beyond this time frame need not be entertained by the ALJ. Of course, the ALJ can give to that evidence whatever weight it deserves.

Frequently, the party will provide the basis for the objection. Where the basis is not given, and the ALJ is unsure as the possible reason why the evidence should not be admitted, the ALJ may ask the party the basis for the objection. The ALJ also should ask the party who offered the evidence whether it has any responding argument for admissibility.

As the technical rules of evidence do not apply in adjudicatory proceedings, there is no need for the ALJ to become entangled in legal arguments as to the admissibility of evidence. Indeed, the ALJ should discourage the making of legal arguments or lengthy "speeches" wherein the party spews out all the reasons why the evidence is inadmissible or admissible.

**Manual For Administrative Law Judges and Hearing Officers**

Once the objection is made, and the ALJ understands the basis for the objection and the offering party has an opportunity to respond to the objection, the ALJ must rule on the objection. Except in instances where there are compelling reasons to do so, the ALJ must presently rule on the objection and not defer a ruling to later in the hearing. To delay a ruling may jeopardize the orderly progress of the hearing.

Where the ruling is one that keeps out evidence, the ALJ upon request should provide the party who offered the evidence an opportunity to make an offer of proof regarding the excluded evidence. An offer of proof is the means by which the offering party describes in summary fashion the content and nature of the excluded evidence. It is made for purposes of judicial review, so that the appeals court can determine whether the ruling was prejudicial to the party's case. Such offer of proof is recorded in the transcript of the hearing, but cannot form a basis for the ALJ's decision.

For a discussion on ruling on evidentiary objections, see Appendix A: Evidence.