UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x
A.G. and L.G., on behalf of N.G.,

                                                    Plaintiffs,

-against-

Richard F. Daines, as Commissioner of the New York
State Department of Health, and Thomas R. Frieden, As
Commissioner of the New York City Department of Health
& Mental Hygiene,

                                                    Defendants.
------------------------------------------------------------------------ x

**DEFENDANT'S STATEMENT PURSUANT TO LOCAL CIVIL RULE 56.1**

08-Civ.-01576 (LAK)(HBP)

        Defendant, Thomas R. Frieden, As Commissioner of the New York City Department of Health & Mental Hygiene, by his attorney, Michael A. Cardozo, Corporation Counsel of the City of New York, respectfully submits, pursuant to Local Rule 56.1 of the Civil Rules of the Southern District of New York, that the following facts are not subject to genuine dispute:[1]

        1.    A.G. and L.G. ("parent plaintiffs"), bring this action on behalf of N.G. ("infant plaintiff") pursuant the Individuals with Disabilities Education Act, 20 U.S.C. Section 1471 *et. Seq.* ("IDEA"), alleging that defendant, Thomas R. Frieden, the Commissioner of the New York City Department of Health & Mental Hygiene ("DHMH")[2], failed to provide a Free and Appropriate Public Education ("FAPE") to infant plaintiff through its Early Intervention Program ("EIP") by providing for an

---

[1] Unless otherwise indicated, all references to "Exhibits" are to the exhibits annexed to the Declaration of Chevon Andre Brooks ("Brooks Decl."), dated July 30, 2008 and Dwayne Turner ("Turner Decl.") dated July 30, 2008, and the defendant's memorandum of law in support of his summary judgment motion dated July 30, 2008.

[2] By stipulation, all parties agreed to discontinue this action against the New York State Department of Health on June 24, 2008.

inappropriate level of services for infant plaintiff in her Individualized Family Service Plan ("IFSP"). *See* Amended Complaint ("Am. Compl.").

### Statutory Requirements for the EIP and IFSP under the IDEA and New York State Law

2.  Congress enacted the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, to promote the education of children with disabilities.

3.  The IDEA defines a child with a disability as a child "with mental retardation, hearing impairments (including deafness), speech or language impairments, visual impairments (including blindness), serious emotional disturbance (referred to in this title [20 U.S.C. §§ 1400 *et seq.*] as "emotional disturbance"), orthopedic impairments, autism, traumatic brain injury, other health impairments, or specific learning disabilities." *20 U.S.C. § 1401(3)(A)(i).*

4.  Congress enacted the statute as it pertains to infants and toddlers because it found "that there was a substantial and urgent need to enhance the development of infants and toddlers with disabilities, to minimize their potential for developmental delay, and to recognize the significant brain development that occurs during a child's first 3 years of life." *20 U.S.C. § 1431(a)(1).*

5.  Congress determined that infants and toddlers deemed to be "at-risk", are entitled to early intervention services that are to be provided through an individual state's EIP. *20 U.S.C. § 1431.*

6.  In New York City, the State of New York Department of Health ("DOH") and the DHMH, a municipal agency, are jointly responsible for the creation and implementation of the EIP. *N.Y. Pub. Health Law §§ 2541(12), 2551.*

2

7.      The IDEA defines "early intervention services" as developmental services which: (1) are provided at no cost (except where otherwise provided), (2) are designed to meet the developmental needs of an infant or toddler with a disability, (3) meet the standards of the state, (4) are to be provided by qualified personnel, and (5) to the extent appropriate, are provided in natural environments (e.g. home, community settings). *20 U.S.C. § 1432 (4)(B)-(G).*

8.      The IDEA defines an "at-risk infant or toddler" as "an individual under 3 years of age who would be at risk of experiencing a substantial developmental delay if early intervention services were not provided to the individual." *20 U.S.C. § 1432(1).*

9.      The New York Public Health Law defines an "at-risk infant" as children who experience a disability because of medical, biological or environmental factors which may produce developmental delay, as determined by the commissioner through regulation. *N.Y. Pub. Health Law § 2541.*

10.     Children who meet these criteria are entered into the New York State Department of Health Early Intervention Program and under New York law, the New York State Department of Health is responsible for providing early intervention services to them which includes the formulation of an IFSP. *20 U.S.C. § 1436; N.Y. Pub. Health Law §§ 2541(12), 2545.*

11.     An IFSP is a written plan developed by a multidisciplinary team, including the infant's parents, which contains:

> (1) a statement of the infant's or toddler's present levels of physical development, cognitive development, communication development, social or emotional

development, and adaptive development, based on objective criteria;

(2) a statement of the family's resources, priorities, and concerns relating to enhancing the development of the family's infant or toddler with a disability;

(3) a statement of the measurable results or outcomes expected to be achieved for the infant or toddler and the family, including pre-literacy and language skills, as developmentally appropriate for the child, and the criteria, procedures, and timelines used to determine the degree to which progress toward achieving the results or outcomes is being made and whether modifications or revisions of the results or outcomes or services are necessary;

(4) a statement of specific early intervention services based on peer-reviewed research, to the extent practicable, necessary to meet the unique needs of the infant or toddler and the family, including the frequency, intensity, and method of delivering services;

(5) a statement of the natural environments in which early intervention services will appropriately be provided, including a justification of the extent, if any, to which the services will not be provided in a natural environment;

(6) the projected dates for initiation of services and the anticipated length, duration, and frequency of the services;

(7) the identification of the service coordinator from the profession most immediately relevant to the infant's or toddler's or family's needs (or who is otherwise qualified to carry out all applicable responsibilities under this part) who will be responsible for the implementation of the plan and coordination with other agencies and persons, including transition services; and

(8) the steps to be taken to support the transition of the toddler with a disability to preschool or other appropriate services.

*20 U.S.C. §1436(d)(1)-(8).*

12.  New York State, pursuant to N.Y. Pub. Health Law § 2540, *et seq*, has an EIP which provides early intervention services to toddlers and infants diagnosed as at-risk.

13. Every child eligible for early intervention services in New York is evaluated with an assessment of the unique needs of the child and the identification of services appropriate to meet those needs. *N.Y. Pub. Health Law § 2544.*

14. In New York City, DHMH, the municipality, bears the responsibility of ensuring that the early intervention services contained in an IFSP are provided to eligible children and their families who reside in their county and is entitled to contract with approved providers of early intervention services for the purpose of providing early intervention services. *N.Y. Pub. Health Law § 2552.*

15. If the recommendations in the IFSP do not provide the infant with appropriate services, or if a parent disagrees with the recommendations of the IFSP, a parent may make a request in writing for mediation or an impartial hearing to resolve the dispute. *N.Y. Pub. Health Law § 2549.*

16. Impartial hearings are conducted by a hearing officer in accordance with the regulations of the Commissioner, and in New York City, Administrative Law Judges ("ALJ") preside over impartial hearings related to determinations about an infants IFSP. *N.Y. Pub. Health Law § 2549.*

### Infant Plaintiff's Pre-IFSP Meeting Evaluation and Preparation

17. Infant plaintiff, born on December 29, 2004, is diagnosed, with autism spectrum disorder, including speech and motor delays. *See* Transcript of the Administrative Hearing of July 16, 2007, July 30, 2007, August 6, 2007, September 24, 2007, October 2, 2007, and October 25, 2007 ("Tr.") at 773; 1498. In September of 2006, at the age of twenty-one months, infant plaintiff was referred to the EIP by his private health doctors. *See Tr.* at 867-871; 979-991.

18. After receiving an EIP referral for infant plaintiff, a DHMH early initial official, properly designated an initial service coordinator, and Elizabeth Placido established a contact with the family in September of 2006. *See Tr.* at 801-3.

19. Ms. Placido has worked with close to one hundred cases in which she has served as initial service coordinator to children who have been diagnosed with autism spectrum disorder. *See Tr.* at 805.

20. Ms. Placido visited infant plaintiff's home in September of 2006, taking all of his information, obtaining consent forms and referring infant plaintiff for an evaluation. *See Tr.* at 824.

21. These evaluations were conducted by Theracare to determine whether infant plaintiff was a child with a disability under the IDEA and eligible for the EIP. Theracare, an agency with which Defendant contracts to provide needs assessments and evaluations for children in the EIP as well as services, conducted four separate evaluations of infant plaintiff: (1) a bilingual psychological evaluation by Ingrid I. Rose, P.H.D on October 5, 2006; (2) a bilingual developmental evaluation and parent interview by Barbara Shapiro, M.S. on October 9, 2006; (3) a bilingual speech/language evaluation by Madeline Vargas, M.A., CCC-SLP, on October 4, 2006; and (4) a bilingual occupational therapy evaluation by Francio N. Brinto, M.S., OTR/L, on October 11, 2006. *See* Brooks Decl. at ¶ 3; Exh J.

22. Copies of the evaluation results were provided to the EIP and plaintiffs by Barbara Shapiro, M.S. along with a cover summary on October 20, 2006. *See* Brooks Decl. at ¶ 3; Exh J.

**The IFSP Meeting**

23. After infant plaintiff was found eligible for the EIP, an IFSP meeting was scheduled and held on November 13, 2006, in which plaintiffs A.G. and L.G., Evelyn Arias, Early Intervention Official Designee, Cheryl Dombrowski, Theracare Applied Behavioral Analysis ("ABA") Supervisor and Evaluation Site Representative, and Valerie Sans, Initial Service Coordinator from MHRA, sitting in for Initial Service Coordinator Elizabeth Placido, were all in attendance. *See* Brooks Decl. at ¶ 3; Exh C.

24. The IFSP meeting lasted for an hour or more. *See Tr.* at 367.

25. ABA uses scientific principals of behavioral modification to reduce problematic behaviors and promote positive behaviors and learning, by taking tasks and breaking them down into the smallest measurable units and providing highly structured trials to a child, whose responses are reviewed by a therapist who adjusts the learning program accordingly. *See Tr.* at 1682-3.

26. The goal is to enable the child to exhibit the desired behavior spontaneously and generalize the tasks into multiple environments without prompts. *See Tr.* at 1685, 1748.

27. Prior to the IFSP meeting, plaintiffs submitted two evaluations from private evaluators, Dr. Christopher Lucas and Dr. Cecelia McCarton, who are not approved by New York State as qualified personnel to conduct evaluations for the EIP and are not under contract with DHMH. *See Tr.* at 339; *N.Y. Pub. Health Law § 2541*.

28. Although the parents submitted evaluations by unapproved evaluators, their evaluations of the child were read by Evelyn Arias, the Early

Intervention Official Designee prior to the IFSP meeting, (*Tr.* at 340), and then discussed at length at the IFSP meeting. *See Tr.* at 901-2; 1431.

29. At the IFSP meeting, plaintiffs asked questions about services, outcomes, and goals. Additionally, other participants at the IFSP meeting asked the parents questions including, discussing infant plaintiff's problem areas, which were subsequently listed on his IFSP. *See Tr.* at 1294-5, 1458.

30. Based upon the results of the IFSP meeting, on November 13, 2006, an IFSP was formulated for infant plaintiff. The IFSP consisted of several types of services agreed to by all parties. The services included: ABA, speech therapy, occupational therapy, team meetings, family training sessions, and a physical therapy evaluation which would become a part of infant plaintiff's IFSP. *See* Brooks Decl. at ¶ 3; *Exh. C.*

31. Specifically, infant plaintiff's IFSP provided for: (1) a continuous twelve month program at five days per week; (2) twenty hours per week of one-to-one speech instruction; (3) speech therapy of five hours per week; (4) three thirty minute occupational therapy sessions per week; (5) family training for one hour per week with regards to special instruction, family training for two hours per month with regards to speech therapy, and family training for one hour per month with regards to occupational therapy; and (6) an IFSP team meeting for one hour per month. *See* Brooks Decl. at ¶ 3; Exh C.

32. Plaintiffs agreed that the IFSP included the appropriate academic and functional goals, (*Tr.* at 1006), they were happy with the frequency of speech therapy that was offered in the IFSP, (*Tr.* at 897), and were satisfied with the fact the IFSP had a

52 week program. *See Tr.* at 899. A physical therapy evaluation was added to the IFSP to address their concerns about infant plaintiff's physical development. *See Tr.* at 901, 1006-7.

33.     The source of disagreement between the parties stemmed from the number of service hours that were to be provided; plaintiffs wanted an additional 2 days per week of total services, 10 more hours per week of ABA instruction, 3 ½ more hours per week of occupational therapy, and an additional one hour a week of family training and team meetings. *See* Brooks Decl. at 3; Exh C; *Tr.* at 1298-9.

34.     During the IFSP meeting plaintiffs chose Theracare as their service provider, and the schedule for the implementation of speech services with Theracare was subsequently agreed to by plaintiffs. *See Tr.* at 337, 994, 1017, 1021, 1026, 1246-9, 1258, 1772-85, 1840. All of the parties have stipulated that Theracare was a quality provider of special education services. *See Tr.* at 1230.

### Post IFSP Meeting

35.     After the IFSP meeting Nichole Aiello, Theracare's staffing coordinator, created a schedule for infant plaintiff which specifically named ABA therapists and other therapists, all have whom have Master's degrees, are licensed by New York State, (*See* Tr. at 1246-50), and must go through a training process to ensure that their use of the ABA is appropriate and consistent. *See Tr.* at 1481.

36.     The lead ABA teacher who would have been assigned to plaintiffs, Ms. Buckley, was specifically chosen by Theracare to work with infant plaintiff because of her skill in working with parents. *See Tr.* at 1391.

9

37. Unhappy with the amount of services the IFSP afforded infant plaintiff, parent-plaintiffs wrote a letter to the DHMH on November 17, 2006, to express their dissatisfaction with the number of service hours infant plaintiff was receiving in his IFSP and unilaterally chose to purchase private services for everything other than speech services. Plaintiffs later sought reimbursement of their costs for these speech services from the DHMH. *See* Brooks Decl. at 3; Exh F; *Tr.* at 912.

38. On November 17, 2006, plaintiffs also told Jessica Thompson, a service coordinator from Theracare, that they would like to stay with Theracare, (*Tr.* at 1020), and that plaintiffs "had every confidence that the EIP would come back to us with an opportunity to modify the program." *See Tr.* at 1021.

39. DHMH in response to plaintiffs complaint that they would not be receiving weekend ABA therapy, responded that they could have less experienced ABA therapists provide sessions over the weekend under Ms. Dombrowski's supervision, however this accommodation was never responded to by the plaintiffs. *See Tr.* at 1259.

40. A Theracare ABA provider arrived at the plaintiffs' home on November 28, 2006 and was told that her services were not needed and that plaintiffs "were in the process of pulling together a team." *See Tr.* at 1022.

41. Infant plaintiff began receiving speech therapy from defendant on November 29, 2006, from Allison Wilk and Jennifer Rossi, however plaintiffs asked that Ms. Rossi be replaced after observing her techniques through a one-way mirror in their home, leaving only Ms. Wilk to provide services, who subsequently left Theracare for the McCarton Center in February of 2007. *See Tr.* at 941-47.

42. Julie Sandor began providing private speech therapy services to infant plaintiff in late December 2006, and plaintiffs also admitted that they "started sourcing OT" after their November 17, 2006 letter. *See Tr.* at 954-5; 960.

43. While the physical therapy evaluation was conducted and sessions planned under the EIP, as of January 23, 2007, plaintiffs had failed to return numerous calls from the Theracare service coordinator, physical therapist, and speech therapists. *Tr.* at 1043-4. Plaintiffs also never contacted the EIP after November 17, 2006 to advise them of any scheduling problems with Theracare. *See Tr.* at 1060-1.

44. In February of 2007, plaintiffs terminated the home based speech services that DHMH attempted to provide and informed the DHMH they would be seeking private services, (*See* Tr. at 939-948); this without ever having informed DHMH previously that they were dissatisfied with their speech service provider or experiencing scheduling problems. *See Tr.* at 950; 1036-43; 1059-61; 1812-1814.

### The Administrative Hearing

45. Parent-plaintiffs filed a demand for an administrative hearing on May 1, 2007, seeking reimbursement for services provided by their private providers, (*see* Brooks Decl. at ¶ 3; Exh A); after infant plaintiff "was entrenched" in his private program at the McCarton school and plaintiffs "had put intensive services in place for [infant plaintiff] at their own expense." *See Tr.* at 1031; Decision of Administrative Law Judge Kimberly A. O'Brien ("ALJ Dec.") at 6.

46. As infant plaintiff was born on December 29, 2004, he was due to "age out" of the EIP on December 28, 2007; if he had remained in the EIP, plaintiffs

could have opted to have infant plaintiff remain in the EIP until January 2, 2008. *See* 10 NYCRR 6904.1(1)(1) and (2).

47. An Administrative Hearing took place over the course of five days: July 16, 2007, July 30, 2007, August 6, 2007, September 24, 2007, October 2, 2007, and October 25, 2007. A decision was rendered by Administrative Law Judge ("ALJ") Kimberly A. O'Brien on January 16, 2008. *See ALJ Dec.*

48. At the outset of the hearing, the DHMH conceded that the private program selected by plaintiffs was not inappropriate. *See Tr.* at 61.

49. DHMH witnesses Eveyln Arias, Cherly Dombrowski, and Elizabeth Placido testified that they had not pre-determined the level of services that were to be provided to infant plaintiff prior to the IFSP meeting.

50. Evelyn Arias, the Early Intervention Official Designee, testified that she has the discretion to approve as many service hours as deemed appropriate including up to 40 hours of ABA services. *See Tr.* at 380.

51. Cheryl Dombrowski, an ABA Supervisor at Theracare, testified that after the services were provided under the IFSP additional team meetings might be requested if the data from the ABA programs and discussion with the family indicated a need for more frequency. *See Tr.* at 1483.

52. Cheryl Dombrowski also testified that if, during the course of treatment it appeared that more hours of treatment were needed than were provided in the IFSP, a justification form and/or letter are submitted to the EIP, together with a progress report, stating why additional services are necessary as a clinical matter; (Tr. at 1301-2, 1366, 1525), and in Ms. Dombrowski's experience, such requests are approved but if a

request is not approved, parents have due process rights to mediation or hearing. *See Tr.* at 1302-3.

53. Cheryl Dombrowski has a Masters of Arts in Early Childhood Education and Especial Education, and has multiple professional certifications with regards to servicing children with disabilities. *See* Turner Decl. at ¶4; Exh. 2.

54. Dr. Prashil Govind, Medical Director of the EIP, testified that some children in the EIP receive more than 30 hours of instructions and may receive more than 20 hours of ABA, either home or center-based. *See Tr.* at 1736-7.

55. Elizabeth Placido, testified that prior to the IFSP meeting, she did not discuss anticipated levels of services with plaintiffs because she does not make the decisions on how many times per week a child will receive services, each case is different and that decision is made by City officials. *See Tr.* at 844-846.

56. Ms. Dombrowski, Dr. Jeannette Gong, and Dr. Pashil Govind also testified that infant plaintiff's IFSP would confer an educational benefit upon him.

57. According to Cheryl Dombrowski, the ABA is not administered in a "cookie-cutter" manner and the techniques in the ABA practice are individualized to the particular child, (*Tr.* at 1331-3), and infant plaintiff's IFSP was "a good place to start with services considering [infant plaintiff's] age" and adequate for his needs. *See Tr.* at 1299-1300, 1331-3.

58. Dr. Jeannette Gong, the Director of the Manhattan Regional Early Intervention Office, testified that based on her review of infant plaintiff's file including his IFSP, her knowledge and expertise in reviewing IFSPs, and because it is known that

authorization of services is not a precise science the IFSP was sufficient for infant plaintiff to receive an educational benefit. *See* Tr. at 1589; 1610-11.

59. Dr. Pashil Govind, the medical director of the EIP, testified that he has worked with children with autism spectrum disorder/pervasive developmental disability, se*e* (Tr. 1677-78), and based on his review of infant plaintiff's file, the program created for infant plaintiff at the IFSP meeting was reasonably calculated to confer an educational benefit and were appropriate starting points for his interventions based upon infant plaintiff's age and level of severity. *See Tr.* at 1710.

60. Witnesses for plaintiffs testified at the Administrative Hearing that infant plaintiff would receive a greater benefit from the program offered at the McCarton school but did not testify that infant plaintiff would receive no benefit from the DHMH's IFSP. *See* Tr. at 270; 738.

61. Dr. McCarton and Dr. Clark, witnesses for plaintiffs, testified that they relied on a 1987 study known as the "Lovaas study" to determine the appropriate amount of ABA services that should be afforded the infant plaintiff. *See Tr.* at 537; 748-51.

62. The Lovaas study, compared 19 children with 40 hours of ABA to 19 children who received 10-15 hours of treatment that included no ABA and treated the intensive group only five days per week. *See Tr.* at 748-51.

63. Dr. Lovaas' website also confirms very young children typically begin treatment at 10-15 hours per week and should gradually increase to 35-40 hours per week by age three. *See Tr.* at 751.

64. Dr. McCarton testified that she agreed with types of services offered in the IFSP, and with the family trainings and meetings, but she preferred more hours. *See Tr.* at 727.

65. Parent-plaintiff also testified that she came to the IFSP meeting with her mind made up about many aspects of the IFSP. *See* Tr. at 897, 899, 903, 910-912, 1021.

66. Several witnesses for plaintiffs also testified that the McCarton school is considered a top rated program and was referred to in the New York Magazine in October of 2006 as a "gold standard" program. *See Tr.* at 739-740; 290; 307; 493.

### The Determination of the ALJ in Favor of Defendant

67. The ALJ found that plaintiffs had not met their burden of demonstrating that the DHMH's recommended program was inappropriate. *See* ALJ Dec. at 11.

68. The ALJ found that plaintiffs did not meet their burden of demonstrating that the DHMH had improperly pre-determined infant plaintiffs IFSP, (*Id.* at 8-9); the DHMH could provide the services to infant plaintiff as designated in her IFSP, (*Id.* at 9-10); the parents were given a meaningful opportunity to participate, (*Id.* at 10); and that the DHMH's IFSP was appropriate. *Id.* at 10.

69. The ALJ's decision stated that "while it is understandable that the [parent-plaintiffs] want the very best for [infant plaintiff], and that [infant plaintiff] has an intensive plan in place where [infant plaintiff] has realized significant benefit, the [plaintiffs] have failed to prove by substantial evidence that [infant plaintiff]'s IFSP is not appropriate and that he could not realize meaningful benefits from the level of ABA

services and other developmental services provided for in [infant plaintiff]'s IFSP." *Id* at 11.

Dated: New York, New York
    July 30, 2008

                **MICHAEL A. CARDOZO**
                Corporation Counsel of the
                 City of New York
                Attorney for Defendant
                100 Church Street, Room 2-164
                New York, New York 10007
                (212) 788-0874

       By:     /s     
            Chevon Andre Brooks (CB 1616)
            Assistant Corporation Counsel