**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------

A.G. and L.G., on behalf of N.G.,

                    Plaintiffs-Appellants,

          - against -                           **08 Civ. 1576 (LAK)**

Thomas R. Frieden, Commissioner of the
NYC Dept. of Health & Mental Hygiene,

                    Defendant-Appellee.

-----------------------------------------------------------------

**PLAINTIFFS-APPELLANTS' REPLY MEMORANDUM OF LAW IN (A) SUPPORT OF MOTION FOR MODIFIED *DE NOVO* REVIEW AND (B) IN OPPOSITION TO DEFENDANT-APPELLEES' MOTION SEEKING TO AFFIRM THE UNDERLYING ADMINISTRATIVE DECISION**

Mayerson & Associates
Attorneys for Plaintiffs-Appellants
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200

**PRELIMINARY STATEMENT**

This reply memorandum of law is respectfully submitted on behalf of plaintiffs-appellants N.G. and his parents, A.G. and L.G.: (a) in further support of plaintiffs-appellants' request for declaratory and reimbursement relief on their modified *de novo* review from the Administrative Law Judge's January 16, 2008 underlying administrative determination,. and (b) in opposition to defendant-appellee's motion, to the extent that it seeks to affirm the ALJ's determination.[1]

This Court should reject every argument raised by defendant-appellee as erroneous and unsupported by the record.  The underlying administrative determination should be reversed and this Court should award plaintiffs-appellants appropriate reimbursement relief based upon findings that: (a) defendant-appellee failed, procedurally and substantively, to offer N.G. a free and appropriate public education ("FAPE") (Prong I), (b) the intervention services for which reimbursement is sought are appropriate and reimbursable under the controlling Second Circuit standards (Prong II), and (c) there are no compelling equitable considerations (Prong III) that would preclude or diminish the reimbursement relief that is being sought.[2]

**I.    Plaintiffs-Appellants Do Not Intend to File a Rule 56.1 Statement Unless This Court Specifically Rules That A Rule 56.1 Statement Is Required In An IDEIA-Based Modified *De Novo* Review Such As This One**

We have shown in our principal submissions that the applicable standard of review in an IDEA-based appeal is controlled by 20 U.S.C. §1415(i)(2)(B) and Second Circuit precedent, including <u>M.S. v. Yonkers Bd. of Educ.</u>, 231 F.3d 96 (2d Cir. 2000) and <u>Gagliardo v. Arlington Central Sch. Dist.</u>, 489 F.3d 105 (2d Cir. 2007).  Essentially, the district court should conduct an

---

[1] This submission supplements plaintiffs-appellants' prior submissions, two courtesy copies of which were delivered to chambers on July 30, 2008.

[2] Reference is made to the classic three prong <u>Burlington</u>/<u>Carter</u> test.  <u>Florence County Sch. Dist. Four v. Carter</u>, 510 U.S. 7 (1988); <u>Sch. Comm. v Burlington v. Dept. of Educ.</u>, 471 U.S. 359 (1985).

1

independent review of the underlying administrative record and make a determination based on a "preponderance of the evidence," giving due deference to credibility findings of the hearing officer. Plaintiffs-appellants already have submitted a brief and an affidavit providing this Court with citations to the salient portions of the underlying administrative record. Defendant-Appellee filed a brief accompanied by a "Statement Pursuant to Local Civil Rule 56.1."

We respectfully submit there is no authority holding that a Rule 56.1 statement is required or appropriate in a case such as this one. The intent of a Rule 56.1 statement is to ferret out whether or not there are any material issues of disputed fact requiring a trial. That inquiry, we urge, is not pertinent in an IDEIA-based appeal where the parties are not seeking a trial, but rather a review of the underlying administrative decision that was made by the trier of fact. To the extent there is any Second Circuit authority, it strongly suggests that a Rule 56.1 statement is neither required nor appropriate and that while defendant-appellee may characterize its motion as one for "summary judgment," such is not the case.

In Lillbask v. Connecticut Dept. of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005), the Second Circuit noted that "though the parties [in an IDEIA action] may call the procedure a 'motion for summary judgment'...the procedure is in substance an appeal from an administrative determination, not a summary judgment."[3] *See also* Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 n.31 (9th Cir. 1995); Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 508 (E.D.N.Y. 1996) (holding that the court's "inquiry...is not directed to discerning whether there are disputed issue of fact"); C.B. v. New York City Dept. of Educ., 2005 U.S. Dist. LEXIS 15215 (E.D.N.Y. 2005) (denying City's motion to dismiss based on student's "failure" to submit

---

[3] We disclose there is one decision from the district court ruling that a Rule 56.1 Statement is required in an IDEIA-based appeal. *See* T.Y. v. NYC Dept. of Educ., 07 CV 3199 (SJ) E.D.N.Y., July 2, 2008. This lone decision is now on appeal before the Second Circuit. In the case at bar, defendant-appellee has elected to submit a Rule 56.1 Statement, but it has *not* faulted plaintiffs-appellants for not doing so. Ostensibly, defendant-appellee is aware of the above cited authorities.

a Rule 56.1 Statement). The courts are clear that an IDEIA-based appeal action is different from a garden variety motion for summary judgment in that even the existence of disputed issues of fact will *not* defeat the motion. <u>J.R. v. Bd. of Educ.</u>, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004); <u>C.B.</u>, *supra*. Accordingly, any search for "disputed issues of fact remaining for trial" is not a useful exercise and would constitute the judicial equivalent of a "snipe hunt."

In view of the foregoing, we ask this Court to rule as a threshold matter that there is no requirement that plaintiffs-appellants submit a Rule 56.1 Statement, either on their own accord or in "response" to defendant-appellee's Rule 56.1 Statement. To the extent, if at all, that this Court would rule to the contrary (i.e., that it considers a Rule 56.1 Statement as necessary in an action of this type), we ask only that this Court give plaintiffs-appellants a reasonable opportunity to make a supplemental submission consisting of a Rule 56.1 Statement.

## II. This Court Should Reject Defendant-Appellee's Argument That Reimbursement Relief Should Be Denied On The Grounds That There Was An Undue Delay In Filing Plaintiffs-Appellants' Request For Hearing

Defendant-Appellee contends that plaintiffs-appellants' May 1, 2008 request for a hearing was untimely and that this court should deny relief to plaintiffs-appellants on that basis. At the outset, the IDEIA statute provides for a *two year* window in which to file a claim. 34 C.F.R. Part 300.509(e). Plaintiffs-Appellants did not even come close to approaching, much less exceeding, the applicable period of limitations. The record shows that plaintiffs-appellants' May 1, 2008 claim and request for a hearing was entirely timely and appropriate.

Defendant-Appellee's "early intervention" program is a program with a relatively short period of services, inasmuch as a child "ages out" when the child turns three. Even prior to the November 13, 2006 meeting ostensibly convened by defendant-appellee to develop and offer N.G. and his parents an Individualized Family Services Program ("IFSP"), plaintiffs-appellants

had N.G. evaluated and assessed, and they had provided defendant-appellee with comprehensive reports and assessment from renowned autism specialists.  Both Dr. Christopher Lucas of the New York University Child Study Center, and Dr. Cecelia McCarton, a renowned pediatric developmental specialist and founder of the McCarton School for Autism, diagnosed N.G., with "Autistic Disorder" and he made specific recommendations for types and levels of services that would be reasonably calculated to address N.G.'s numerous deficits, including N.G.'s rigidity, stereotypy, echolalia, inattention, perseverative behavior, demonstrable resistance to change, lack of appropriate eye contact, and difficulty with comprehension and the process of "generalization." *See* Exh. F, Exh G.

Prior to, and during, the November 13, 2007 IFSP meeting, N.G.'s parents had shared the foregoing reports and recommendations.  Thus, N.G.'s parents and ostensible defendant-appellee had a decent picture of the kind of comprehensive and intensive program that would be needed to properly address N.G.'s autism deficits. T. 879, 892-95, 896-909, 1009-1015, 1085-86.  N.G.'s parents were advised by a representative of defendant-appellee that N.G.'s service provider agency had already been picked out, and they were told of the service levels they would be receiving. T. 878; *See also* Plaintiffs-Appellants' July 30, 2008 Memorandum of Law at 10.

Although the McCarton and Lucas reports and recommendations had been provided to defendant-appellee, defendant-appellee's administrator, Evelyn Arias, advised N.G.'s parents that it was defendant-appellee's policy to never take such reports into consideration. T. 340-41; *See also* Mayerson Affidavit at 13-14.  During the trial, Ms. Arias took the position that for purposes of determining "eligibility," it was indeed defendant-appellee's policy not to consider outside reports. *Id.*  However, even *after* defendant-appellee resolved the eligibility issue, the McCarton and Lucas reports were never distributed at the IFSP meeting for discussion. T. 340-

41. This may explain why, at the conclusion of the IFSP meeting, without reliance on any reports recommending different service levels, defendant-appellee arrived at a materially lower number of direct ABA service hours, and failed to offer any meaningful level of additional ABA hours for purposes of program and staff supervision, weekly team meetings, and parent training and counseling, as Dr. McCarton had recommended.[4]

N.G.'s parents agreed to proceed on a "without prejudice" basis with *defendant-appellee's* recommendation of speech and language therapy.[5] *See* Ex. C. However, N.G.'s parents knew immediately that defendant-appellee's recommended ABA levels were inadequate for N.G. Accordingly, by letter dated November 17, 2007 – a letter sent just four days after the IFSP meeting – N.G.'s parents put defendant-appellee on notice that they intended to secure appropriate services for N.G., i.e., 1:1 ABA therapy and occupational therapy, and that they intended to look to defendant-appellee for reimbursement. T. 912; *See* Ex. E; Ex. C.

To the extent defendant-appellee had any intention of offering an appropriate and acceptable offer of services, this was the time; however, defendant-appellee did nothing. Accordingly, defendant-appellee is estopped from arguing that any filing delay rendered moot potential modifications that could have been made to the offered IFSP. A special invitation to defendant-appellee is not required to enable defendant-appellee to modify an IFSP. Further, the record shows that even after N.G.'s parents wrote on November 17, 2007 to give notice of an impending reimbursement claim, defendant-appellee took no remedial action. *See* Ex. E.

---

[4] While defendant-appellee argues that the only difference was the *number* of ABA hours, this simplistic approach glosses over the fact that defendant-appellee failed to offer adequate "direct" service hours and then compounded that problem by failing to make any meaningful offer of additional ABA service hours for program and staff supervision, parent training and counseling, and weekly team meetings. These are not fungible hours of services, as a babysitter might provide.

[5] The fact that N.G.'s parents accepted *defendant-appellee's* speech and language services on a "without prejudice" basis is evidence that N.G.'s parents were prepared to accept public services where appropriate, and that they were not insistent upon reaching for some private or otherwise rarified "gold standard."

Thereafter, on May 1, 2008, after running into insurmountable problems trying to work with defendant-appellee's speech and language providers, including "missing paperwork" and missed sessions, N.G.'s parents followed through on their prior November 17, 2007 notice to seek reimbursement from defendant-appellee. *See* Ex. C; Ex. E.   N.G.'s parents also sought mediation, bending over backwards attempting to avoid litigation with defendant-appellee.  *See* Ex. C; Ex. D.  However, N.G.'s parents were not prepared to accept an inappropriate program of services that did not meet N.G.'s needs.

While defendant-appellee contends that the "delay" in filing for a hearing allowed N.G.'s parents to argue that N.G. had become "acclimated in their chosen program," the benefit of "acclimation" was not plaintiffs-appellants' argument.  If N.G. became "acclimated," it was because defendant-appellee did not lift a finger after the IFSP meeting to make appropriate modifications to its original November 13, 2007 IFSP offer.  It would have been premature had N.G.'s parents filed for reimbursement immediately following the November 13, 2007 IFSP meeting.  N.G.'s parents needed to know N.G. would respond positively to the programming and service levels that Dr. Lucas and Dr. McCarton had recommended.  Had N.G. *not* responded positively, ostensibly, N.G.'s parents would not have bothered filing, since they would not have been able to make out Prong II of the classic test for reimbursement.  Under the circumstances, it was not improper or even unusual that N.G.'s parents filed claims on May 1, 2008.

**III.    This Court May And Should Look At And Assess N.G.'s "Subsequent Progress" In His Unilateral Program As Evidence Going To Prong II**

Defendant-Appellee weaves through its papers the notion that this Court should avoid looking at or considering N.G.'s progress in his unilateral (private) program of services, even for purposes of assessing the appropriateness and reimbursability of that program under Prong II.  We do *not* contend that N.G.'s progress in his private program is the relevant inquiry in

determining whether or not, for purposes of Prong I, defendant-appellee's IFSP passes scrutiny from either a procedural or substantive perspective. That contention is defendant-appellee's red herring.

We do contend, based on Second Circuit precedent, that this Court may and should look "retrospectively" to N.G.'s progress within his private program of services as constituting evidence going to the Prong II appropriateness and reimbursability of such private services. In <u>Frank G. v. Bd. of Educ.</u>, 459 F.3d 356, and in <u>Gagliardo</u>, 489 F.3d 105 (2d Cir. 2007), the Court explained: "No one factor is necessarily dispositive in determining whether parents' unilateral placement is [appropriate]. Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the *totality of the circumstances* in determining whether that placement serves a child's individual needs." (emphasis added).

## IV. The Fact That N.G.'s Private Program Was An Excellent And High Quality Program Does Not Disqualify It For Reimbursement Purposes Under Prong II

Defendant-Appellee suggests erroneously that if certain witnesses characterized N.G.'s private program of services as being "the best" or the "gold standard," this means that this Court may not award reimbursement. Such is not the case. We recognize where the local educational agency's offer is appropriate, a parent is not entitled to insist on a "better" program. However, that is not what happened in the case at bar. Here, wholly apart from any procedural violations that resulted in a FAPE deprivation, the IFSP offer (except as to speech services) was rejected because it was substantively inadequate and inappropriate in relation to what Dr. Lucas and Dr. McCarton had recommended for N.G. The record does *not* reflect that defendant-appellee's IFSP was rejected because it failed to offer N.G. an optimal, gold standard program.

Where, as here, the evidence reflects an underlying Prong I FAPE violation, a parent may indeed seek reimbursement for an optimal or gold standard program, although there is no *requirement* that a parent do so.  In <u>Frank G.</u>, the Second Circuit explained: "To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential." 459 F.3d at 356.  *See also* <u>Gagliardo</u>, *supra*.  Here, defendant-appellee fairly acknowledges the efficacy of N.G.'s unilateral program, and N.G.'s excellent progress under that program.  The excellence of N.G.'s unilateral program, however, does not result in disqualification for reimbursement purposes.

Where, as here, there is an underlying Prong I FAPE deprivation, the only recognized limitation on reimbursement is found in the Supreme Court decision in <u>Florence County Sch. District 4 v. Carter</u>, 510 U.S. 7 (1993).  In <u>Carter</u>, Justice O'Connor, writing for a unanimous Court, explained: "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable *level* of reimbursement that should be required.  *Total* reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." (emphasis added).

The evidence at trial showed that the rates of N.G.'s private providers were within the market rates of providers of similar quality and expertise providing similar services in New York City. T. 448; 577-78; *See also* Mayerson Affidavit at 15, 21.  There was no evidence that N.G.'s providers' hourly rates were excessive or unreasonable in relation to those market rates.  Under these circumstances, we submit that there are no grounds to reduce or diminish the reimbursement award that should go to N.G.'s parents, should this Court reverse the underlying administrative determination.  However, even if this Court were to raise *sua sponte* and determine the "excessiveness" issue, and even if this Court were to make an adverse finding in

that regard, the <u>Carter</u> decision strongly suggests that the appropriate remedy would be to scale back the "total" reimbursement "level" to a reduced "level" that is consistent with a finding of "reasonableness."

## V.    N.G.'s Parents' Physical Presence And Other Participation At the IFSP Meeting Was Not Enough

We have already provided this Court with citations to the record and authorities from this Court and other jurisdictions that are supportive of plaintiffs-appellants' contention that defendant-appellee impermissibly "predetermined" N.G.'s IFSP and that defendant-appellee's failure to share, discuss and give meaningful consideration to the Lucas and McCarton reports at N.G.'s IFSP meeting deprived N.G. of a FAPE, and also deprived N.G.'s parents of "meaningful" participation in the IFSP development process. See Plaintiffs-Appellants' Brief at 8-14. Cases such as <u>Deal v. Hamilton County Bd. of Educ.</u>, 392 F.3d 840 (6th Cir. 2004), <u>rehearing <i>en banc</i> denied</u> (2005), <u>cert denied</u> (2005) and <u>Winkelman v. Parma City Sch. Dist.</u>, 127 S.Ct. 1994 (2007) stand for the proposition that parental involvement at the planning meeting must be "meaningful" to count, and merely being present and allowed to ask questions does not necessarily translate to meaningful participation.

Where, as here, defendant-appellee refused to share, discuss and meaningfully consider outside reports and recommendations, defendant-appellee's representative knew and communicated N.G.'s service levels in advance of N.G.'s IFSP meeting, and where defendant-appellee testified that the highest number of hours she had seen offered at seventy IFSP meetings was 20, exactly what was offered to N.G., the evidence strongly suggests impermissible customs and policies which deprived N.G. of a FAPE by precluding any genuine individualization of his IFSP. These same customs and policies also deprived N.G.'s parents of meaningful involvement and participation in the IFSP development process. We urge that the ALJ exalted form over

substance and glossed over the compelling evidence in the record that establishes impermissible predetermination, and failure to meaningfully include N.G.'s parents in the IFSP development process, by perhaps following a rote checklist in concluding that all the procedural requirements ostensibly were met.

## VI.    The ALJ Failed To Comply With The Standards Set Forth In New York State's ALJ Manual

We have urged that the ALJ did not properly apply the applicable decisional law and statutory authority.  We also have shown how the ALJ treated the parties disparately, and how the ALJ failed to comply with the standards set forth in the manual that New York State provides to ALJ's and other hearing officers.  *See* Mayerson Affidavit at 6-9. While we believe that the ALJ revealed bias by the end of the hearing, plaintiffs-appellants' appeal does not turn on any ruling by this Court that the ALJ was biased. We simply ask this Court to reverse upon a finding that the ALJ's determination was in error, based upon this Court's independent review of the administrative record, and its invocation of the applicable authorities.

CONCLUSION

For all of the foregoing reasons, and as shown in plaintiffs-appellants' principal submissions, this Court should reverse the ALJ's January 16, 2008 Decision and award N.G.'s parents the reimbursement relief that the ALJ had refused.

Dated: September 5, 2008
      New York, New York

                                _____
                                Gary S. Mayerson (GSM 8413)
                                Mayerson & Associates
                                Attorneys for Plaintiffs-Appellants
                                330 West 38th Street, Suite 600
                                New York, New York 10018
                                (212) 265-7200

# Mayerson & Associates

330 W. 38t<sup>h</sup> Street, Suite 600
New York, New York 10018

**mayerslaw.com**

GARY S. MAYERSON * ♦
CHRISTINA D. THIVIERGE *
RANDI ROTHBERG

\* ALSO ADMITTED IN NEW JERSEY
♦ ALSO ADMITTED IN FLORIDA

TEL: 212.265.7200
FAX: 212.265.1735
E-MAIL: GARY@MAYERSLAW.COM

May 1, 2007

Richard F. Daines, M.D., Commissioner
Bradley Hutton, M.P.H., Director of EI
New York State Department of Health
Corning Tower Building
Room 287
Empire State Plaza
Albany, New York 12237

Re: **Noah Grinberg D.O.B. 12/29/04**
EI ID # D152987

Dear Commissioner Daines and Mr. Hutton:

We represent Noah Grinberg, a two-year-old boy diagnosed with an autism spectrum disorder who was first processed for an IFSP on November 13, 2006.

**Noah's Request For Mediation**

On behalf of Noah and his parents, Alex and Lisa Grinberg, we respectfully request mediation with a view towards resolving what otherwise would be claims for declaratory, reimbursement and compensatory education that would need to be heard and adjudicated in the context of an impartial hearing.

We sincerely hope that the problems discussed below are resolved via mediation. In the event, however, that mediation is refused by the DOH, or if the parties proceed to mediation and mediation fails to fully resolve the issues between the parties, then we request that a hearing officer be appointed in the ordinary course so that Noah can have his claims adjudicated at an impartial, "due process" hearing. Accordingly, we are conditionally requesting an impartial hearing "in the alternative."

**Noah's Autism Diagnosis And**
**His Unique Individual Needs**

Noah was evaluated by the NYC Early Intervention Program in October of 2006. The evaluations correctly concluded that Noah presents with an autism spectrum disorder, and they generically recommended "ABA therapy," as well as occupational therapy and speech therapy. However, we submit that these initial EI evaluations merely scratched the surface of Noah's issues, and they could have and should have gone further towards better identifying Noah's individual strengths and deficits. Notably, the EI evaluation team did not include a medical doctor who was ready, willing and able to properly diagnose Noah.

In October of 2006, in addition to Noah's EI evaluations, Noah's parents, at their own expense, sought an initial diagnostic evaluation from the New York University Child Study Center. In that regard, Noah was evaluated for diagnostic purposes by Christopher Lucas, M.D., M.P.H. Dr. Lucas' evaluation was based on direct observation, psychiatric interviews, an Autism Diagnostic Observation Schedule, a Life History Questionnaire, and a series of behavior rating scales. Dr. Lucas also considered reports received from the EI evaluation process. Among other areas of deficit, Dr. Lucas' report targets Noah's rigidity, stereotypy, echolalia, inattention, preservative behavior, demonstrable resistance to change, lack of appropriate eye contact, and difficulty with comprehension and the process of generalization. Dr. Lucas diagnosed Noah with "Autistic Disorder," and made it clear in his report that "It is imperative that he receives early and intense intervention, including but not limited to behavioral therapy. Specifically, Dr. Lucas recommended that Noah receive 30 hours per week of direct, 1:1 ABA therapy and 5, 45-minute sessions of speech and language therapy. Dr. Lucas also recommended 5 hours per week of occupational therapy.

In early November of 2006, Noah's parents also had Noah evaluated by The McCarton Center in Manhattan. This evaluation also was at parental expense. Dr. McCarton (a well known, if not renowned pediatric developmental specialist and autism educator) and Dr. Williams (a highly experienced Certified School Psychologist) further evaluated Noah with the Bayley Scales of Infant Development, the Childhood Autism Rating Scale, clinical observations and a parent interview, physical and neurological examinations, play observations, and the Vineland Adaptive Behavior Scales. Drs. McCarton and Williams confirmed that Noah presents as having an autism spectrum disorder. Based on their evaluative work, Drs. McCarton and Williams made recommendations that included:

✓ A continuous, 12-month program of intervention including therapy spread out over the full week

✓ 30 hours per week of direct, 1:1 ABA therapy, subject to adjustment based on Noah's progress, plus appropriate supervision and weekly teaching clinics/team meetings

✓ 5 hours per week of speech and language therapy

✓ 5 hours per week of occupational therapy

2

✓ Parent training and counseling

**The Problem And Proposed Solution**

An IFSP meeting was convened on November 13, 2006. At or before the IFSP meeting, Noah's parents had provided all of the above evaluations. None of the EI participants at the IFSP had ever actually met Noah, and certain attendees were "filling in" for other intended attendees. Prior to the actual meeting, the EI services coordinator advised Noah's parents that she had already selected the appropriate agency to provide all of Noah's services—she also told Noah's parents what to expect in terms of services "based on this type of case." Although Noah's parents provided the private evaluations they had secured from Drs. Lucas and McCarton, Evelyn Arias of NYCDEIP advised "…it is our policy never to take into consideration outside assessments" and dismissed the recommendations made by such assessments. We respectfully urge that Noah's IFSP was infected by impermissible predetermination, and that from the start, Noah's parents were deprived of meaningful participation at Noah's IFSP.

Unfortunately, as to ABA and OT services, and wholly apart from the "predetermination" problem, the EI services offered to Noah were insufficient and inappropriate to meet Noah's individual needs. Noah's parents expressly communicated that concern on the IFSP consent page. There also were scheduling problems from the start even as to the inadequate and inappropriate ABA and OT offered in Noah's IFSP. Thereafter, by letter dated November 17, 2006, Noah's parents wrote to Noah's EI Official Designee to advise that they were willing to accept the speech and language therapy services at the levels being offered in Noah's proposed IFSP, but that they were rejecting the balance of offered services, securing appropriate private services for Noah (relating to ABA and OT), and that they would "look to the Department to reimburse us for our costs." As part of the proposed solution, respondent should reimburse Noah's parents for their costs in securing ABA and OT services and related supports as recommended by Drs. Lucas and McCarton.

Although Noah's parents agreed to proceed with the speech therapy offered in Noah's IFSP on a without prejudice basis, the speech services were not properly implemented and fulfilled. For example, speech therapist Jen Rossi arrived 15-20 minutes late for each of the first three appointments, and informed Noah's parents on each occasion that "I have not received the proper paperwork from TheraCare." Ms. Rossi would then waste session time calling TheraCare to obtain the missing "paperwork." There were other similar problems, with the speech therapist repeatedly arriving unprepared and disorganized. Missed sessions became a significant problem. Worse still, the speech therapist was creating a haphazard and unpredictable learning environment for Noah, and this resulted in unhelpful non-compliance. On this issue, Noah's parents seek an award of compensatory education for speech and language services, based on the evidence adduced at the hearing and including any ongoing failures. Noah's parents also seek an appropriate award of compensatory education for physical therapy, based on similar problems.

In the event that the foregoing issues can be resolved by mediation, Noah's parents waive any claim for attorneys' fees. However, in the event that Noah's parents are compelled to proceed to a full-blown impartial hearing, and they are adjudicated as being a "substantially

3

prevailing party," they would intend to make application before the federal district court to recover attorneys' fees and other recoverable costs.

**Closed Mediation/Impartial Hearing**

Noah's parents seek mediation (or, in the alternative, an impartial hearing) in a setting that is closed to the public.

Sincerely,

Gary S. Mayerson

Cc:  Ms. Evelyn Arias (EI Official Designee)
     Grinberg Family

Rev 11/06

# NEW YORK CITY EARLY INTERVENTION PROGRAM
# REQUEST FOR MEDIATION AND PARENTAL CONSENT
# TO RELEASE INFORMATION

Child's EI ID#: _D152987_    Child's Date of Birth: _12 / 29 / 04_

Child's Name: ___Grinberg___    ___Noah___
                        Last                                First

Address: _50 Sutton Place South_    Apt. No.: _9A_

_New York_                    _NY_        _10022_
        City or Town                    State            Zip Code

Home Phone :(_212_) _421-3758_    Work/Cell Phone: (_917_) _903 6132_

Service Coord: _Elizabeth Placido_    SC Agency: _EISC_

I, __Alex Grinberg__, give the Early Intervention Program permission to release information concerning my mediation request to the mediator. This information shall include, but not be limited to, my name, my address and telephone number, and the nature of my complaint concerning the program.

**Signed:** _Alex Grinberg_    Date:_5 /18 /07_
                Parent/Surrogate Parent

[   ] I will need someone to translate for me at the mediation meeting. (Please specify the language): _____

[ ✓ ] I am complaining about the following issue that I wish to have resolved:_____
_See Attached_

[ ✓ ] Services that I wanted for my child were not included on the IFSP. These services are as follows: ___See Attached___

[ ✓ ] Services that were on my IFSP are not being properly provided to my child. Explain: _see Attached_____

[ ✓ ] There is a problem with the evaluation of my child, explain: _See Attached_.

[   ] Other, explain: _____

Please send this form to Early Intervention Program, attn Mediation Request, Suite 1033, 49-51 Chambers Street, New York, New York 10007, or fax to 212-442-0847.

**New York City Early Intervention Program**
**Request for Mediation and Parental Consent to Release Information**

Child's EI ID No. _D 1 5 2 9 8 7_____    Child's Date of Birth: _12_/ _29_/ _2004_

Child's Name: _Noah Grinberg_____
                                                    Last                                                First

Address: _____50 Sutton Place South_____ Apt. No. _9 A_

_____New York_____, _New York_____ Zip Code: _10022_.
                City or Town                        State

Telephone #: ( _212_ ) _421 - 3758_____

I, ___Alex Grinberg,_____, give the Early Intervention Program permission to release information concerning my mediation to the mediator.    This information shall include, but not be limited to my name, my address and telephone number, and the nature of my complaint concerning the program.


[  ]    I will need someone to translate for me at the mediation meeting.    (Please specify the language)_____ _N/A_____

[X]    I am complaining about the following issue that I wish to have resolved: Please describe: _(See attached Correspondence )_

[X]    Services that I wanted for my child were not included on the IFSP. These services are: _( see attached Correspandeve )_

[X]    Services that are on my child's IFSP are not being properly provided to my child. These services are as follows: _( see attached Correspandeve )_

[X]    There is a problem with the evaluation of my child, as follows: _( see attached Correspandeve )_

[X]    Other, as follows: _( see attached Correspandeve )_

Signed: _____Date:_____/_____/_____

Please send this form to Early Intervention Program,  Suite 1033, 49-51 Chambers St., New York, New York 10007, or fax to 212-442-0847.

## YOUR RIGHTS AS A PARENT IN
## THE EARLY INTERVENTION PROGRAM

Parents have rights under the Early Intervention Program that *you* should know. Your Early Intervention Official is responsible for making sure you know about your rights. These rights include:

1. The right to be told by your Early Intervention Official of any possible changes in your child's evaluation or other early intervention services, before any changes are made.

2. The right to take part-and ask others to take part in all meetings where decisions will be made about changes in your child's evaluation or services.

3. The right to use due process procedures to settle complaints.

Part of your service coordinators job is to explain these rights to you and make sure you understand them and help you carry them out.

### If You And Your Early Intervention Official Disagree
Sometimes, parents and Early Intervention Officials do not agree on what early intervention services should be in the Individualized Family Service Plan (IFSP). For example, you may not agree with your Early Intervention Official on:

1. The kind of services your child and family should get.
2. How often services should be provided.
3. How long services should be provided.
4. What service model is best.
5. Where services should be provided.

Parents have the right to use either *mediation* or an *impartial hearing*-or both, to resolve disagreements with their Early Intervention Official about early intervention services. There is no cost to you for either a mediation or an impartial hearing.

Any early intervention service in the current IFSP that you and your Early Intervention Official agree to can be provided while you take part in either a mediation or impartial hearing.

### What is mediation?
Mediation helps parents and Early Intervention Officials agree to early intervention services in the IFSP. Mediation brings parents and Early Intervention Officials together to talk about their concerns. Mediation is *confidential*-what you talk about with your Early Intervention Official will be kept private.

### What can mediation do?
The main reason for mediation is to help you and your Early Intervention Official reach agreement as easily and quickly as possible. Mediation can:

1. Clear up a misunderstanding or the cause of a problem.
2. Let you and your Early Intervention Official speak your minds with a neutral person listening.
3. Help you and your Early Intervention Official work together to better solve a problem.

### You can ask for mediation
The first step is to send a letter to your Early Intervention Official to ask for mediation. Your service coordinator can help you with this task.

Your Early Intervention Official can also ask you to take part in mediation. Mediation is a *shared decision*. You and your Early Intervention Official must *both* agree to take part in mediation. If you *both* agree, your Early Intervention Official will tell the *Community Dispute Resolution Center* in your county your request. The *Community Dispute Resolution Center* will assign a mediator to work with you and your Early Intervention Official. The mediator may ask you and your Early Intervention Official for more facts before getting started.

A mediator will set up a *mediation meeting* for you and your Early Intervention Official within two (2) weeks of being contacted by you or the Early Intervention Official-unless you ask for more time.

### Who attends the mediation session?
You and your Early Intervention Official (or EIO designee) must both attend the mediation. You can invite others to come with you to the meeting-such as a family member, friend or advocate.

You may bring a lawyer if you let your Early Intervention Official know before the mediation meeting. Your Early Intervention Official may also bring a lawyer and must tell you ahead of time that she or he plans to do so.

### Who are the mediators?
Mediators are trained, certified, and assigned by the Community Dispute Resolution Center in your county. They are skilled in listening to all sides of a problem, and how to be fair. Mediators are *not* experts in early intervention. They *are* expert mediators who know about and understand the Early Intervention Program.

### What takes place at a mediation?
Your mediator meets with you and your Early Intervention Official to discuss the issues involved and help you find answers. Both of you will have the chance to share your concerns about the early intervention services that need to be settled.

The mediation process must be finished in thirty (30) days of the Community Dispute Resolution Center receiving the request from Early Intervention Official. Once mediation is finished, a written agreement is prepared describing what was agreed to and outstanding issues. Your service coordinator will make sure this agreement is added to your IFSP.

### Does mediation cost anything?

There is no cost to you for mediation. All costs are paid for by the New York State Department of Health federal funds under the Individuals With Disabilities Education Act.

### What if no agreement is reached?
If you and your Early Intervention Official cannot agree on your IFSP, you can ask for an impartial hearing.

## What is an impartial hearing?

An impartial hearing is another way for parents to settle disagreements with the Early Intervention Official about services in an IFSP. Parents can also ask for an impartial hearing if their child is found ineligible for services by an evaluator.

You have the right to ask for an impartial hearing to settle these problems, even if you take part in mediation first. You do not have to take part in mediation before getting an impartial hearing. Both options are open to you and your family.

Impartial hearings are carried out by hearing officers who are fair and unbiased. These hearing officers are administrative law judges assigned by the Department of Health. At a hearing, parents and early intervention officials give *testimony* and may use *witnesses* to support their views. Parents may bring a friend, another parent, advocate, or an attorney to the impartial hearing. The hearing officer must reach a decision in thirty (30) days. The hearing officer's decision is final. You or the Early Intervention Official do have the right to ask for a judicial review of the hearing officer's decision.

## If you need to request an impartial hearing

You must write to the Commissioner of Health. You can ask for an impartial hearing at any time. You can ask for an impartial hearing at any time. If your complaint is about your child's eligibility though, your request must be made within six months of the date your child was found ineligible for services.

Like mediation, an impartial hearing must be held at no cost to you.

## If you request an impartial hearing

The Commissioner will assign an administrative law judge to act as a hearing officer.

You will get a written notice of the hearing, that will:

1. Give the date, time, and place of the hearing.
2. Present the issues that will be examined at the hearing.
3. Explain how the hearing will be conducted.
4. Tell you that you can bring any person of your choice to the hearing, which can include an advocate or an attorney.
5. Advise you that interpreter services for the deaf will be provided, if needed.
6. Tell you about your rights at the hearing.

Your Early Intervention Official must tell you if he or she plans to use an attorney at the hearing. You must be told of these plans within three (3) working days of the date your Early Intervention Official is notified of your hearing.

This will give you a chance to find an attorney if you think you need one. Your service coordinator can help you find legal and advocacy services in your area.

## If you go to an impartial hearing

The hearing officer must conduct the hearing in a fair manner. The hearing officer has the power to make decisions about requests made by either you or the Early Intervention Official. You can be represented by an attorney or persons with special knowledge or training about children eligible for early intervention services. You can also have other supportive persons-like relatives or friends come with you to the hearing. Impartial hearings are private unless parents request a public hearing.

## When the hearing is completed

The hearing officer will make the final decision on your case. You will get a copy of the hearing officer's decision in writing. Your service coordinator and Early Intervention Official will also get a written copy of the decision. So will the Commissioner of Health.

Your early intervention official or service coordinator will make certain that your IFSP is changed, based on the hearing officer's decision. Your IFSP must be changed within five working days of the written or oral decision of the hearing officer-whichever is sooner.

## Attorney fees

If you think you may need help or advice from a lawyer, you should know that the fees for legal services can be paid for by your county only under the following conditions:

1. You must take part in and complete mediation. A mediation is completed when:

a. A parent and EIO participate and agree to services to include in your IFSP.

b. A parent and EIO participate but do not reach agreement.

c. An EIO does not agree to take part in mediation.

2. The mediation meeting has not been held within two (2) weeks of the EIO's request to the Community Dispute Resolution Center (unless the parent asks for or agrees to an extension).

3. You request an impartial hearing and substantially prevail in the outcome. Substantially prevail means that the case is decided in your favor on some or most of the important issues in your case.

4. The county was represented by an attorney at the impartial hearing.

2

Alexander Grinberg
50 Sutton Place South, Apt. 9A
New York, New York   10022
Telephone (917) 903-6132

November 17, 2006

Ms. Evelyn Arias, Early Intervention Official Designee
New York City Department of Health
Early Intervention Program
93 Worth Street, Suite 303
New York, New York  10013

Dear Ms. Arias:

My wife, Lisa, and I are disappointed at the level of services provided for in the Individualized Family Service Plan that has been offered for our son, Noah Grinberg (EI ID # D152987).  My wife, Lisa, and I believe that the speech/language therapy services offered in the Plan are adequate and we are willing to accept those services as set forth in the Plan.  However, the remaining services offered in the Plan are not adequate or appropriate for our son in light of his documented needs.

In light of the above, we must put the Department on notice that we intend to proceed to secure appropriate services for Noah in ABA-1:1 therapy and occupational therapy, including consultation, parent-teacher training and team meeting time, and that we intend to look to the Department to reimburse us for our costs.

Sincerely,

Alexander Grinberg

**HP OfficeJet**
Personal Printer/Fax/Copier

**Fax Log Report**

Nov-17-06    06:00 PM

**Last Fax**

| Identification | Result | Pages | Type | Date | Time | Duration | Diagnostic |
|---|---|---|---|---|---|---|---|
| 912122195221 | OK | 01 | Sent | Nov-17 | 05:59P | 00:00:23 | 002582030022 |

7.2.0



**NEW YORK UNIVERSITY
CHILD STUDY CENTER**

215 LEXINGTON AVENUE 13TH FLOOR • NEW YORK NY 10016 • 212 263 3663 PHONE
212 263 3691 FAX • WWW.ABOUTOURKIDS.ORG



**New York University
School of Medicine**

CLINICAL CARE • ADVANCED TRAINING • SCIENTIFIC RESEARCH • EDUCATIONAL OUTREACH • PREVENTION

# INITIAL DIAGNOSTIC EVALUATION

| | |
|---|---|
| Patient Name: | Noah Grinberg |
| Date of Birth: | December 29th 2004 |
| Date of Evaluation: | October 12th, 24th & 31st |
| Evaluation By: | Christopher Lucas, M.D., M.P.H. |

## IDENTIFYING INFORMATION:

Noah Grinberg is a 22-month-old boy who currently resides in Manhattan, NY with his mother, Lisa and his father, Alex. He is cared for at home part-time by a nanny. He has a history of developmental delays, chiefly in the areas of social communication, eye contact and language and has recently been evaluated by NYC Early Intervention services. He currently takes no medications. Noah is raised in a bilingual household with English speaking mother, bilingual father and Spanish speaking nanny.

## REFERRAL SOURCE:

The family was self-referred to the Early Childhood service.

## INFORMANTS:

This evaluation was based on information obtained from direct observation with Noah, psychiatric interviews with the patient's mother and father, an Autism Diagnostic Observation Schedule (ADI-R) with Noah, Life History Questionnaire completed by parents, and behavior rating scales (M-CHAT, SNAP & CBCL) completed by parents, Also available were reports (Pediatrics: Dr Lazarus, Developmental: Barbara Shapiro, Psychology: Dr. Roze, Speech/Language: Madeline Vargas and Occupational Therapy: Francia Brito) from the Early Intervention Program evaluation completed in October 2006.

## HISTORY OF PRESENT ILLNESS:

Noah was brought in by his parents for evaluation due to concern about his lack of eye contact, language delay and to address the concern that he may be autistic. It was reported that Noah had developed some language and social interaction skills that were then lost between 13 and 18 months of age.

## PAST PSYCHIATRIC HISTORY:

At 9 months of age Noah was able to touch the appropriate person (Noah, Mommy, Daddy) when requested and would respond with eye contact to his name being called 30-40% of the time. Babbling mama, dada progressed to, at 13 months of age, having at least five words used regularly. These would be used to comment on the noise of the vacuum cleaner ("cacum") or to make requests for water ("agua") or to go to the park ("parque"). He was able to answer the question "What noise does the [animal] make?" by producing the appropriate sound.

Currently he is generally not using language to communicate his wishes. He will grunt to request but without using eye contact to reference the object or the person, leaving parents to anticipate or guess his needs. At other times he will grab mother's hand as a tool in requesting her to operate a toy or get her to open something for him.

Following 3 weeks of specific effort by parents Noah has been taught to say pretzel or goldfish in choosing between 2 proffered snacks. Since the summer of 2006 Noah has been filling in the gaps or endings of familiar songs, using complete sentences or phrases. He will frequently count out loud, either objects or whilst doing other actions in English or Spanish and will also copy or echo things spoken by parents, heard on TV or from electronic toys. When doing something well he will clap with pleasure and say "Yeah!" When in a cooperative mood he will label items in a familiar book though not in the environment. Although he can say the colors of goldfish crackers he does not appear to be able to recognize colors of other objects.

He uses possibly 80 words in Spanish and 40 words in English, though parents do not think that these are with meaning or understanding, or more importantly used in more than one context. Much of his language appears routinized and scripted or to be echoed. He is starting to use 2 word combinations "I know" or "Agua please" but is not using noun/verb combinations. He will point occasionally and will raise his arms up to be lifted but does not use any other forms of gesture. He will imitate the actions of others, though not in an interactive manner, more as a physical echo. He appears to understand "no" and will comply with requests maybe 25% of the time (e.g. to go and get a specific toy) provided he is in a responsive phase (described by parents as being "checked in"), at most other times, when "checked out", he appears oblivious to the presence and requests of others.

He is intensely interested in music, toys that make noise or have flashing lights and will easily become fixated on repetitive use of these to the exclusion of other activities, with marked distress expressed if prevented from continuing. He will play with the wheels of strollers, turning them over to spin the wheels. He has a fascination for lights, turning them on and off, and fixates on ceiling fans and ceiling illumination. He appears to like lots of noise and music to be on at the same time. He is not easily startled and has been noted to have a relatively high pain threshold when he may injure himself but not show distress. At times he will cover his ears with his hands, though not particularly in response to loud or busy environments. When he is happy or excited he will flap his hands, and in new environments has been noted to spin in circles. He appears very routinized and is distressed if there are minor changes to the time

and/or nature of his activities. He has a dislike for certain sensations, walking barefoot in sand or on grass and does not like gooey or squishy liquids / gels on his body. When playing he appears to enjoy the sensory aspect of play materials, rubbing them on his face.

## DEVELOPMENTAL AND SOCIAL HISTORY:

Noah was the product of a full term pregnancy and was delivered via vaginal delivery at term, weighing 6lb 8oz. He was found to have only 2 vessels in the umbilical cord. APGAR score was 8/9. The neonatal period was uneventful. He was breast fed for 3 months and was started on solid food at 4½ months. He was described as an extremely easy baby, who rapidly established a regular sleep pattern. Motor milestones were met on time. He sat at 5 months, rolled at 7-8 months, crawled at 9 months, was walking at 12 months and running by 13 months. Of note was his high level of motor activity, once mobile.

## MEDICAL HISTORY:

There is no history of seizures or head trauma. He has occasional upper respiratory tract infections. A recent hearing test was equivocal, but there is no clinical suspicion that he has difficulty hearing quiet sounds.

## MEDICATIONS: None.

## ALLERGIES: None reported.

## FAMILY PSYCHIATRIC HISTORY:

There is a strong family history of attention deficit hyperactivity disorder. Paternal grandfather has celiac disease and mother suffers from psoriasis.

## MENTAL STATUS EXAMINATION:

Noah was a large well-nourished child, who appeared to have no stranger anxiety but did not make eye contact. He appeared to be in fairly constant motion and was difficult to engage in any activities, and when left alone would cruise around the room singling to himself in a poorly articulated manner or counting form 1 -10 in English or Spanish. He was willing to interact with mother only in the context of musical songs or games. When the telephone rang unexpectedly he covered his ears and appeared distressed. His curiosity for new toys was limited, but showed an unusually strong interest in a musical electronic toy, which he relinquished only with major reluctance and distress.

Generally he showed poor persistence and little evidence of sustained attention at things other than preoccupations (spinning office chair, wheels on stroller, music and toys with lights and sounds). He played briefly but appropriately with a toy train. He was able to name toy objects (apple, banana). Frustration tolerance was poor. Mood was somewhat irritable and he displayed a narrow range of emotions. When upset he would tend to sit and cry until a parent went to him. Facial expression was restricted and he seemed to enjoy direct play and interactions with his parent only in the context of musical interactions or play with electronic toys. There were no

behaviors suggestive of fears, dissociative states or hallucinations. There were no aggressive behaviors. His play had no symbolic elements; he appeared to have difficulty transferring objects across the midline and did not release objects to 3rd parties. He would eventually be able to feed himself with a few goldfish. Hearing appeared grossly normal though he generally did not respond to voices. Eye contact was poorly integrated with requests that were largely non-verbal. When asking mother to open a toy he moved her hand as a tool to request this.

## PREVIOUS EVALUATIONS
Lead Level – Normal.
Oct 2006: Developmental Assessment of Young Children
Physical 37th %ile, Adaptive 19th %ile, Social/Emotional 2nd %ile
Oct 2006: Psychological (Bilingual)
Bayley (21 months): Cognitive: unable to complete, Receptive: 6-8th month, Expressive 12-14th month.
Vineland: Communication, socialization, daily living significantly below age-expectations.
Note: Imitative play and increased interaction with examiner when playing with toy radio seen as a good prognostic sign.
Oct 2006: Speech/Language (Bilingual)
Rosetti Infant Toddler Language Scale (21 months):  Receptive 12-15 months basal, Expressive 12-15 months basal.
Oct 2006: Occupational Therapy (Bilingual)
Peabody Developmental Motor Scale (21 months): Grasping 8 months 1st %ile, Visual-motor 13 months 2nd %ile. Fine motor quotient 2.6 SD's below norm.

## Autism Diagnostic Observation Schedule (ADOS) Module 1.

This examination was split over two occasions due to the intensity of distress shown when an electronic toy he had become fixated upon during initial free play was removed. Not having phrase speech the ADOS was administered in English but this is not likely to have influenced the validity of the assessment. During free play he smiled in response to an Elmo toy telephone and said "Elmo". He repeated open and closed the flip lid, though never attempted to use it as a phone. He infrequently checked on mother with eye contact, but did not show objects.  He used a toy car appropriately but then turned it over and began flicking at the wheels. He was overly interested in an office chair and had to be prevented from repeatedly spinning it around. He responded to his name being called on the 3rd occasion, but without making eye contact. When playing with a jack in the box he requested mother using "up please" to operate the winder. He closed it by himself and said, "closed". Generally he did not wish to interact with the examiner or mother (unless singing a song with actions). He enjoyed bubbles being blown but did not make any request to continue. To operate the Jack in the box he used the examiners hand to attempt to operate it. After the ADOS was over he said "bye bye" and opened and closed his hand in a wave, without eye contact.

On the Autism Diagnostic Observation Schedule DSM-IV diagnostic ratings he showed definite abnormalities in the following areas: Communication (Frequency of vocalizations, stereotyped use of words/phrases, use of other's body to communicate, pointing), Social (unusual eye contact, facial expressions, shared enjoyment, showing, initiation of / response to joint attention and quality of social interactions) and Play (Functional play, imagination/creativity. Slight difficulties were seen in Communication (Gestures). He showed hyperactivity and inattention, remaining in fairly constant movement when not engaged in stereotyped behaviors (wheels, chairs, electronic toys). Hand/finger mannerisms were noted, flapping and sensory interests in test materials. Negativism was great when prevented form performing repetitive and stereotyped play. ADOS communication and social interaction score was 22 (with the cutoff for Autism being 12).

### DIAGNOSTIC IMPRESSION:

| | |
|---|---|
| Axis I: | Autistic Disorder |
| | Significant Inattentive and Hyperactive behaviors |
| Axis II: | Fine motor delay |
| Axis III: | Equivocal hearing test |
| Axis IV: | Mother currently pregnant |
| Axis V: | 35 |

### RECOMMENDATIONS:

Despite his young age, and the uncertainty that that brings in terms of ultimate prognosis – it seems clear that Noah has an Autistic Disorder – severity as yet unknown. Following initial normal development he experienced regression and now has marked deficiencies in verbal and non-verbal communication, social interaction and is developing some circumscribed interests and hand mannerisms. He has fine motor delay and possible loss of previously acquired motor skills (e.g. pincer grasp).

Despite his previous evaluation noting engagement when playing with a toy radio, most of his interactions are repetitive and focused on his developing restricted interests. His language is perseverative, scripted and is not accompanied by appropriate eye contact. He has significant symptoms of inattention and hyperactivity that may interfere with the provision of adequate therapy.

It is imperative that he receives early and intense intervention that will focus on these areas of delayed development, principally speech therapy, behavioral therapy focusing on social interactions and solitary repetitive behaviors. A neurological evaluation and physical therapy would also be beneficial to remediate his fine motor skill deficits.

**Evaluation of: Noah Grinberg**
**Date of Report: 11/11/2006**
**Evaluation by: Christopher Lucas, M.D.**

As recommended by the Institute of Medicine, Noah should be receiving 30 hours of ABA and 5 x 45 minutes of speech/language per week. In view of fine motor delays noted previously Occupational Therapy provision is also indicated (5 hours / week).

I will continue to monitor his ongoing progress and will endeavor to assist parents in accessing the most appropriate therapies.

Christopher P Lucas MD, MPH
Associate Professor
Director, Early Childhood Evaluation Service
NYU Child Study Center

# The McCarton Center

FOR DEVELOPMENTAL PEDIATRICS    350 East 82nd Street    New York, New York 10028    phone 212.996.9019/9027/9029    fax 212.996.9047

| | |
|---|---|
| Name: | Noah Grinberg |
| DOB: | December 29, 2004 |
| Dates Seen: | November 1 & 9, 2006 |
| Age: | One year, Ten months |

## REASON FOR REFERRAL:

Noah is a 1 year, 10 month old boy, who has come for a comprehensive evaluation, in order to determine his current developmental status and use this information to help better define his educational and therapeutic needs.

## MEDICAL/DEVELOPMENTAL HISTORY:

Noah was a 6 lb., 8 oz. infant of a full-term uncomplicated pregnancy and normal vaginal delivery. He did well after birth and was discharged home from the hospital with his mother following the usual post-partum stay.

Developmentally, Noah's motor milestones have been within normal limits. He sat up at age 5 to 6 months, crawled at age 8 months and walked alone at age 13 months. In respect to language, skills have been delayed. It has only been recently that Noah has begun to say single-words, in order to communicate in a very basic manner. He does have multiple-word utterances, but primarily for singing. Receptively, his skills are limited.

Noah's parents requested that he was evaluated through The Early Intervention Program when he was 18 months old, due to concerns about his delayed communication skills. Noah was evaluated by Thera Care in early October and diagnosed with having an Autistic Spectrum Disorder. Speech/language and occupational therapy were recommended. He has not yet started receiving therapy. Noah attends several classes, including several music classes, a gym class 2x weekly, swimming and a weekly play group.

Behaviorally, Noah is described by his mother as having difficulty interacting and playing with adults or his peers. He frequently does not use toys appropriately to play. His ability to use language to communicate with others is poor.

Medically, Noah is a healthy child. He has had no reported history of medical conditions, significant illnesses or hospitalizations. He lives in New York City with his mother and father and does not have any siblings.

1

# NEURODEVELOPMENTAL EVALUATION
## EVALUATION METHODS:

Noah's evaluation consisted of:

> Bayley Scales of Infant Development-2nd Edition (BSID-II)
> Childhood Autism Rating Scale (CARS)
> Clinical Observations
> Parent Interview
> Physical & Neurological Examinations
> Play Observations
> Vineland Adaptive Behavior Scales-2nd Edition (VABS-II)

My observations (Dr. McCarton) are based on watching a videotape of Noah during the psychological evaluation, observing him during the parent interview, as well as interacting with him during the physical and neurological examination. A detailed description of his cognitive, language, visual/perceptual, adaptive and behavioral skills is documented in this report under the heading **Psychological/Developmental Evaluation**.

## PART I - PHYSICAL/NEUROLOGICAL EVALUATION
### (Dr. Cecelia McCarton – November 9, 2006)

### GENERAL APPEARANCE:
Noah is a handsome boy, whose eye contact is limited.

### DYSMORPHIC FEATURES:
Absent

### FACE:
Symmetrical with normal spontaneous movements.

### HEAD:
| | |
|---|---|
| Shape: | Normocephalic |
| Head Position: | Normal |
| Head Circumference: | 50.25 cm (50-75%) |

### EYES:
| | |
|---|---|
| PERRLA: | EOM's: Full |
| Palpebral Fissures: | Wide and Equal |
| Lid Closure: | Equal and Symmetrical |

### MOUTH:
| | |
|---|---|
| Tongue Position: | Normal |
| Involuntary Movements: | Absent |

**FINE MOTOR SKILLS:**

No dysmetria observed. Noah does not have an index finger point. At the first visit, he demonstrated a raking motion in obtaining small objects.

**GROSS MOTOR SKILLS:**

Noah walked independently. No ataxia was noted. He got in and out of his chair easily; he stooped to recover an object from the floor. At the first visit, he jumped up and down on two feet; he used help in walking up and down the stairs and placed two feet on each step.

**TONE:**

| | |
|---|---|
| Upper Extremities | - Normal |
| Lower Extremities | - Normal |
| Head and Trunk | - Normal |

**REFLEXES:**

| DTR's | | |
|---|---|---|
| | Upper Extremities | - 2+ Right and Left (Normal) |
| | Lower Extremities | - 2+ Right and Left (Normal) |
| | Tremors | - Absent |
| | Primitive Reflexes | - Absent |

**CRANIAL NERVES:**

$C_2 - C_{12}$ - Grossly normal

## PART II - PSYCHOLOGICAL/DEVELOPMENTAL EVALUATION
### (Christine A. Williams, MS – November 1, 2006)

**OBSERVATIONS:**

Noah was accompanied to this session by his mother and babysitter. When the examiner entered the waiting room, he had been playing in the waiting area for some time. He was pushing around a rather large toy fire truck in the hallway outside of the play area. Upon being greeted by the examiner, he made direct eye contact and smiled. When it was time to go the testing room, Noah mildly protested leaving the toy fire truck. His mother remained with him during the session to provide him with comfort and support and to facilitate the testing.

Once in the testing room, Noah was given a few moments to adjust to the testing environment. In a brief time, he approached the testing table, in order to label puzzle pieces that were displayed on top. The examiner and his mother tried to get him to sit down in a small child's chair across from the examiner. However, Noah was very active and his interest in examiner initiated activities was very limited. He had considerable difficulty following directions or participating in structured activities. He never established the rhythm of working on a task or two at the testing table followed by short breaks. Noah was not willing to sit at the testing table to perform tasks. He was very distracted by his own desires, which was generally related to focusing on wheels spinning. It was very difficult to re-direct him from this activity.

3

At the end of the session, Noah's mother concluded that he had interacted with materials in ways that were reasonably characteristic of him and his behavior during the session was typical.

*Socialization* - Noah showed a preferential attachment to his mother. He was comforted by his mother being in the testing room with him and looked to her for support. His rapport with the examiner was tentative and on his own terms. He was distracted by his own desires and did not respond to many of the examiner's social overtures. At times, he did smile responsively and he imitated behaviors with objects when he was interested. He had considerable difficulty following the examiner's lead when he was not interested in the materials and tasks. Noah's eye contact was variable, but there were several occasions when he elicited the attention of others with eye contact and maintained a sustained joint gaze. He had a tendency to ignore the adults when they called him, but he did attend to his mother when she sang him a song.

*Attention/Activity Level* - Noah's focus and attention to tasks was selective. His activity level was high and he often walked over and tripped when moving about the testing room. His tolerance for pain was very high. His overall attention was very weak except during preferred activities. However, it was difficult to get his cooperation and attention during standardized tasks, as Noah either walked away or perseverated on his own activity. He was unable to organize his attention to the multiple testing pieces placed before him and had a problem completing a task, due to significant motor planning and attention deficits. If Noah was interested, he often repeated a behavior over and over again. At other times, he went from one thing to another at a very rapid pace and was always on the go.

*Behavior* - Noah was clear about what he wanted to do, especially what he did not want to do. When he refused a task, it was difficult and sometimes impossible to persuade him to perform that particular task. His activity level was high and when he was interested in an object, he would perseverate on it. At times, he explored toys in an idiosyncratic and repetitive manner, which prevented him from performing a specific task. For example, when presented with anything that has wheels, Noah was intent on spinning them or watching them move.

*Play* - Noah was observed to play at different moments during the session. He was not very curious about the different toys and had a tendency to focus on music cause and effect toys or those with wheels. He did not engage in play.

*Communication* - Noah's verbal and non-verbal communication skills were severely impaired. He did not point or express his needs appropriately. He mostly used emotional expressions, such as, whining or pulling a hand. He labeled objects by himself, but rarely on demand. His receptive language was very limited and affected by his lack of attention and pointing.

## TEST RESULTS:

*Overall Cognitive Test Results* - Noah was presented with the Bayley Scales of Infant Development-2[nd] Edition (BSID-II), a standardized test that is normed for his age. The BSID-II assesses cognitive skills in verbal and non-verbal domains through toy-based tasks and incidental observations. The scales include, items that tap expressive language (vocabulary, length of utterances and contingent responses), receptive language (understanding of verbal concepts, such as, size, quantity, gender and location), perceptual motor skills, fine and gross motor skills, gestural and vocal imitation, use of problem solving strategies involving foresight, planning, discrimination, classification skills and knowledge of pre-academic concepts (counting, color/shape names).

4

Noah's performance on the BSID-II Mental Scale indicated that his overall cognitive skills are within the mildly delayed range for his age. Inspection of his test protocol indicates that he has delayed receptive language skills with passes up to age 11 months. Noah's expressive skills are stronger (passes up to age 20-22 months), but use of language to communicate to others is low. In the non-verbal domain, he had passes up to age 12 months. Given Noah's language delays and behavioral challenges (variable attention, interest and motivation), his overall performance must be considered cautiously as an estimate of cognitive function and not as an indicator of actual potential.

Noah's performance on the BSID-II Motor Scale was also delayed. Many items on the BSID-II Motor Scale require that the child follow the examiner's lead, carry out directions and imitate actions. Based on test observation and report, Noah had gross motor passes up to age 14-16 months. He had fine motor passes up to age 10 months.

*Verbal Skills* - For a child of Noah's age, it is expected that he have a growing understanding of what others say (receptive language) and begin to express his wants and needs through verbalizations (expressive language). Receptive language skills include, attention and responses to language, following directions, the understanding of "yes/no" and some simple social questions in a "wh" format. Expressive language skills include expression of language concepts (content), sentence length and grammar (form), pragmatic use of language for functional and social purposes (use).

Noah's expressive language skills are limited for communicative use. In recent weeks, he has developed a small and consistent vocabulary of single-words that he will use for making requests. He will put words together when repeating them in an echolalic manner. He had a tendency to say words out of context and to himself and he was heard to jabber. Noah can put words together when singing songs. He has a large vocabulary consisting of nouns and he will label objects, shapes and colors to himself. He used "no" appropriately and is reported to use "yes", which was not observed. During the session, Noah did not label objects or pictures at the examiner's request, although many labels were heard incidentally.

Noah's receptive language skills are delayed. He generally did not orient to his name or attend to language that was spoken to him. He was more responsive to singing. He did not listen or carry out requests. He did not point to body parts, pictures or items that he desired out of his reach. Noah did not listen attentively to a book or discriminate common objects, which are expected at his age.

*Non-verbal Skills* - Non-verbal skills for a child of Noah's age include copying block imitations, completing shape puzzles (perceptual-motor), copying crayon strokes (graphomotor), matching pictures, colors and shapes (visual discrimination).

Based on the BSID-II, Noah's non-verbal skills are poor. He did not attend to or make any attempt to place pegs into a board. He identified shapes and colors by himself, but does not complete puzzles (reportedly new materials for him). Noah did not attend to blocks or a writing instrument (crayon or pencil). When he was not interested in materials, it was impossible to obtain his attention.

*Gross Motor Skills* - Noah's motor skills were assessed over the course of the session by incidental observation. He either refused to attend or had difficulty processing demands. He was observed to walk and run with good coordination and jump off the ground with two feet, but not over a short distance. He required support to walk up and down the stairs. He stood up independently by turning over and sitting up and then raised himself to stand.

*Fine Motor Skills* - Noah's fine motor skills are highly delayed. He transferred an object from hand-to-hand and picked up small objects individually, but often by using a raking motion. He did not place puzzle pieces or pegs into a board. He often does not appropriately release a ball when throwing it. He did not show eye/ hand coordination by putting small objects into a bottle.

*Adaptive Behavior Skills* - Based on parent report with the Vineland Adaptive Behavior Scales-2[nd] Edition (VABS-II), Noah's overall adaptive behavior skills are moderately low for his age. Four areas of behavior were assessed: communication, daily living (self-help skills), socialization and motor skills. Adaptive behavior is the performance of the day-to-day activities necessary to take care of oneself and get along with others. It is age-based and defined by the expectations and standards of others. Adaptive behavior represents the typical performance, rather than the potential ability of the person - what a person does as opposed to what a person is capable of doing.

In the communication domain, Noah's expressive and receptive skills are delayed. Expressively, a child of his age is expected to smile responsively, imitate sounds immediately after hearing them, begin to say some single-words and gesture to indicate "yes", "no" and "I want". Noah vocalizes syllables and he has a small one-word vocabulary of words he will use for communication. In contrast, he has a large vocabulary of nouns and he is putting together words and simple sentences that are not communicative. Receptively, a child of Noah's age is expected to demonstrate the meaning of several words and follow some 1-step directions. His attention to language is poor. He listens selectively to only a few words, does not usually orient to his name and does not listen or follow simple 1-step commands. During bed time or when he is in the bath, he will sometimes listen attentively to a story for about five minutes.

In the daily living domain, Noah's skills are delayed. In respect to personal (self-help) skills, he is expected to show some beginning independence in eating and dressing. He is not interested in feeding himself with a spoon or a fork, although, he will self-feed some dry cracker like food. He can sip from an open cup when it is held for him and he refuses to use a straw. Noah requires full assistance to dress. In respect to domestic skills, he does not have an understanding that he should be careful around hot objects. He sometimes helps clear his toys on request and with assistance. Regarding an understanding of community practices, Noah knows about the use of the telephone. He listens to others talk to him on the phone and he will say "Hi grandma" into the phone.

In the socialization domain, Noah's play and interpersonal skills are delayed. At his age, skills in these areas include showing interest in objects (e.g. exploring the physical properties of objects, combining objects together and using objects in functional ways), showing affection to familiar people, showing interest in age peers and playing cooperatively with them and imitating actions. Noah is not interested in exploring toys that do not have music/lights or wheels. He uses only cause and effect toys in a functional way. He does not play "peek-a-boo". He is aware of other children, but does not choose to play with them. He smiles responsively. Noah accepts affection, but he does not initiate it. He can imitate simple movements, as well as more complex actions, such as, pushing a vacuum.

6

Regarding coping skills, Noah has difficulty changing from one at-home activity to another. He changes his behavior depending on how well he knows a person. He will say "Please" when making a request and he sometimes responds by saying "Thank you" when given something.

In the motor domain, Noah's gross motor skills were reported to be adequate. He walks with relative ease and runs with good coordination and walks up and down steps with support (placing both feet on each step). He can just get both feet off the ground when jumping. He has difficulty climbing on adult furniture. In respect to fine motor skills (moderately low range), Noah uses both hands to reach for and hold objects, transfers an object between hands, picks up small objects, but frequently using a palmer grasp and not with his thumb and forefinger. He puts objects in a container and turns pages in a book.

Behavior Rating Scale Result - The Childhood Autism Rating Scale (CARS) provides information on 15 behavior scales suggestive of an Autism Spectrum Disorder. Each behavior is given a rating from 1 to 4 based on specific criteria (1 = within normal limits, 2 = mildly abnormal, 3 = moderately abnormal, 4 = severely abnormal). The overall score may range from a low of 15 to a high of 60. Scores of 30 and above are categorized in the autistic range. The CARS ratings were made from observations during the evaluation and parent report. Noah's overall score of 32 places him above the cutoff for an Autistic Spectrum Disorder. Significant problems were noted in relating to others, adaptation to change, communication, play skills, attention and level of distractibility.

## PART III - SUMMARY OF BOTH NEURODEVELOPMENTAL AND PSYCHOLOGICAL EVALUATIONS (Dr. Cecelia McCarton)

The summary and recommendations are based on Noah's performance and behavior during his visits to The McCarton Center.

Noah is an animated and very self-directed 22 month old boy, who was evaluated at The McCarton Center to help in treatment and educational planning. He has been previously evaluated and diagnosed with having an Autistic Spectrum Disorder.

During this evaluation, Noah was unable to follow commands or attend to others' activities and became very upset when favorite toys were removed. His verbal and non-verbal communication was inadequate. He did not point to objects or follow simple action commands.

Noah's overall developmental level was assessed by the BSID-II and was delayed in the verbal and non-verbal areas. However, his skills were scattered. Expressive skills were generally observed only incidentally and were more developed than receptive skills. Gross motor skills were also observed incidentally and were close to age level. Fine motor skills were inadequate. Additionally, he is not completing puzzles or pegboards or stacking blocks. Overall, Noah's reported adaptive behavior skills are at a moderately low adaptive level for his age.

Noah demonstrated very impaired social skills, rigid behaviors and adjustment difficulties. In addition to his language and communication delay, he exhibited a series of atypical behaviors that are characteristic of a Pervasive Developmental Disorder.

7

Based on this evaluation, the following recommendations are made:

1) Noah should have a continuous 12 month program of intervention. His weekly therapy should be spread out over a full seven day period.

2) Applied Behavioral Analysis (ABA-1:1 discrete trial) therapy for 30 hours weekly at home. This may have to be adjusted depending on Noah's progress. The ABA program should be supervised by a BCBA therapist, who can write the programs and supervise the therapists. His ABA program should be based on his performance on the ABLLS. The supervisor should spend at least 2 hours weekly working directly with Noah, in order to understand how he is mastering the programs and what changes might be needed.

3) Weekly teaching clinics should be scheduled for the ABA supervisor and ABA therapists to review Noah's data and his programs. These meetings are in addition to his ABA hours.

4) Noah's parents should have an additional 2 hours weekly with the ABA supervisor and/or speech/language therapist and/or occupational therapist, so they can learn the techniques necessary to generalize what he is learning in (1:1) sessions to the home and community setting. These parent training hours are in addition to the ABA hours.

5) Speech/language therapy 5x 60 minutes weekly (1:1). These sessions should focus on all aspects of expressive, receptive and pragmatic skills. The speech/language therapist should work closely with the ABA team and guide them in the specific areas to be covered in his ABA program.

6) Occupational therapy 5x 60 minutes weekly (1:1). This should combine sensory integration along with emphasis on fine motor and graphomotor skills.

7) Monthly interdisciplinary meetings with Noah's therapists and parents to review his progress and modify his program (two hour session).

8

**DIAGNOSIS:**

    1.  Pervasive Developmental Disorder-Not Otherwise Specified
    2.  Autistic Spectrum Disorder

**RECOMMENDATIONS:**

    1)  See Summary (numbers 1 to 7).

    2)  Follow-up office visit in January 2007 to review home program.  Noah's parents should contact The McCarton Center to schedule the appointment.

Christine A. Williams, MS
NYS Certified School Psychologist

Cecelia McCarton, MD
Professor of Clinical Pediatrics
Albert Einstein College of Medicine

/wl
11.10.06

9

**Addendum: Test Scores**
**NAME**: Noah Grinberg                           **AGE**: 1 year-10 months-2 days
**DATE OF BIRTH**: 12-29-04                        **DATE OF EVALUATION**: 11-1-06

## BAYLEY SCALES OF INFANT DEVELOPMENT-2ND EDITION (BSID-II)

|  | Developmental Index<br>Standard Score<br>(Mean = 100, standard deviation = 16) | Ability Classification | Developmental Age (Estimate)<br>(Based on total # of passes) |
|---|---|---|---|
| **Mental Scale** | 72 | mildly delayed | 18 months |

Verbal skills -
    Expressive skills - passes up to 20-22 months
    Receptive skills - passes up to 11months

    Non-verbal skills - passes up to 12 months

| **Motor Scale** | 74 | mildly delayed | 17 months |

    Fine motor skills - passes up to 10 months
    Gross motor skills - passes up to 16 months

## VINELAND ADAPTIVE BEHAVIOR SCALES-2ND EDITION (VABS-II)

Adaptive Level (High, moderately high, adequate, moderately low, low)

**Adaptive Behavior Composite**          **moderately low**

**Communication Domain**          **moderately low**
    Receptive                           moderately low
    Expressive                          adequate

**Daily Living Skills Domain**          **moderately low**
    Personal                            moderately low
    Domestic                            moderately low
    Community                           adequate

**Socialization Domain**          **moderately low**
    Interpersonal Relationships         moderately low
    Play and Leisure Time               low
    Coping Skills                       adequate

**Motor Domain**          **moderately low**
    Gross                               adequate
    Fine                                moderately low

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------

A.G. and L.G., on behalf of N.G.,

     Plaintiffs-Appellants,                08 Civ. 1576 (LAK)

    --against--                        **AFFIDAVIT OF
SERVICE**

Thomas R. Frieden, As Commissioner of
the New York City Department  of Health & Mental Hygiene,

         Defendants.

--------------------------------------------------------------------------

I, Jennifer M. Frankola, being duly sworn, deposes and says that I am a law clerk awaiting

admission employed by Mayerson & Associates, counsel for plaintiff, and that I am over the age

of eighteen years; that on the 5th day of September at 330 West 38th Street, in the city of New

York, I timely served copy of Plaintiffs-Appellants' Response Memorandum of Law in Support

of Motion for Modified *De Novo Review* via e-mail and Federal Express on Chevon Andre

Brooks, Esq., to the following address: NYC Law Department, 100 Church Street, New York,

NY 10007 and chbrooks@law.nyc.gov.

                                    _____
                                    Jennifer M. Frankola

Subscribed and sworn to before me
this 5th, day of September, 2008.

_____
Notary Public

GARY S. MAYERSON
NOTARY PUBLIC - STATE OF NEW YORK
No. 02MA6165164
QUALIFIED IN NEW YORK COUNTY
COMMISSION EXPIRES MAY 7, 2011