**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------------

A.G. and L.G., on behalf of N.G.,

               Plaintiffs-Appellants,

      - against -                         **08 Civ. 1576 (LAK)**

Thomas R. Frieden, Commissioner of the
NYC Dept. of Health & Mental Hygiene,

               Defendant-Appellee.

-----------------------------------------------------------------

**PLAINTIFFS-APPELLANTS' REPLY MEMORANDUM OF LAW IN (A) SUPPORT OF MOTION FOR MODIFIED *DE NOVO* REVIEW AND (B) IN OPPOSITION TO DEFENDANT-APPELLEES' MOTION SEEKING TO AFFIRM THE UNDERLYING ADMINISTRATIVE DECISION**

Mayerson & Associates
Attorneys for Plaintiffs-Appellants
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200

**PRELIMINARY STATEMENT**

This reply memorandum of law is respectfully submitted on behalf of plaintiffs-appellants N.G. and his parents, A.G. and L.G.: (a) in further support of plaintiffs-appellants' request for declaratory and reimbursement relief on their modified *de novo* review from the Administrative Law Judge's January 16, 2008 underlying administrative determination,. and (b) in opposition to defendant-appellee's motion, to the extent that it seeks to affirm the ALJ's determination.[1]

This Court should reject every argument raised by defendant-appellee as erroneous and unsupported by the record. The underlying administrative determination should be reversed and this Court should award plaintiffs-appellants appropriate reimbursement relief based upon findings that: (a) defendant-appellee failed, procedurally and substantively, to offer N.G. a free and appropriate public education ("FAPE") (Prong I), (b) the intervention services for which reimbursement is sought are appropriate and reimbursable under the controlling Second Circuit standards (Prong II), and (c) there are no compelling equitable considerations (Prong III) that would preclude or diminish the reimbursement relief that is being sought.[2]

**I.    Plaintiffs-Appellants Do Not Intend to File a Rule 56.1 Statement Unless This Court Specifically Rules That A Rule 56.1 Statement Is Required In An IDEIA-Based Modified *De Novo* Review Such As This One**

We have shown in our principal submissions that the applicable standard of review in an IDEA-based appeal is controlled by 20 U.S.C. §1415(i)(2)(B) and Second Circuit precedent, including M.S. v. Yonkers Bd. of Educ., 231 F.3d 96 (2d Cir. 2000) and Gagliardo v. Arlington Central Sch. Dist., 489 F.3d 105 (2d Cir. 2007). Essentially, the district court should conduct an

---

[1] This submission supplements plaintiffs-appellants' prior submissions, two courtesy copies of which were delivered to chambers on July 30, 2008.

[2] Reference is made to the classic three prong Burlington/Carter test. Florence County Sch. Dist. Four v. Carter, 510 U.S. 7 (1988); Sch. Comm. v Burlington v. Dept. of Educ., 471 U.S. 359 (1985).

independent review of the underlying administrative record and make a determination based on a "preponderance of the evidence," giving due deference to credibility findings of the hearing officer. Plaintiffs-appellants already have submitted a brief and an affidavit providing this Court with citations to the salient portions of the underlying administrative record. Defendant-Appellee filed a brief accompanied by a "Statement Pursuant to Local Civil Rule 56.1."

We respectfully submit there is no authority holding that a Rule 56.1 statement is required or appropriate in a case such as this one. The intent of a Rule 56.1 statement is to ferret out whether or not there are any material issues of disputed fact requiring a trial. That inquiry, we urge, is not pertinent in an IDEIA-based appeal where the parties are not seeking a trial, but rather a review of the underlying administrative decision that was made by the trier of fact. To the extent there is any Second Circuit authority, it strongly suggests that a Rule 56.1 statement is neither required nor appropriate and that while defendant-appellee may characterize its motion as one for "summary judgment," such is not the case.

In Lillbask v. Connecticut Dept. of Educ., 397 F.3d 77, 83 n.3 (2d Cir. 2005), the Second Circuit noted that "though the parties [in an IDEIA action] may call the procedure a 'motion for summary judgment'…the procedure is in substance an appeal from an administrative determination, not a summary judgment."[3] *See also* Capistrano Unified Sch. Dist. v. Wartenberg, 59 F.3d 884, 892 n.31 (9th Cir. 1995); Wall v. Mattituck-Cutchogue Sch. Dist., 945 F. Supp. 501, 508 (E.D.N.Y. 1996) (holding that the court's "inquiry…is not directed to discerning whether there are disputed issue of fact"); C.B. v. New York City Dept. of Educ., 2005 U.S. Dist. LEXIS 15215 (E.D.N.Y. 2005) (denying City's motion to dismiss based on student's "failure" to submit

---

[3] We disclose there is one decision from the district court ruling that a Rule 56.1 Statement is required in an IDEIA-based appeal. *See* T.Y. v. NYC Dept. of Educ., 07 CV 3199 (SJ) E.D.N.Y., July 2, 2008. This lone decision is now on appeal before the Second Circuit. In the case at bar, defendant-appellee has elected to submit a Rule 56.1 Statement, but it has *not* faulted plaintiffs-appellants for not doing so. Ostensibly, defendant-appellee is aware of the above cited authorities.

a Rule 56.1 Statement).  The courts are clear that an IDEIA-based appeal action is different from a garden variety motion for summary judgment in that even the existence of disputed issues of fact will *not* defeat the motion. <u>J.R. v. Bd. of Educ.</u>, 345 F. Supp. 2d 386, 394 (S.D.N.Y. 2004); <u>C.B.</u>, *supra*.  Accordingly, any search for "disputed issues of fact remaining for trial" is not a useful exercise and would constitute the judicial equivalent of a "snipe hunt."

In view of the foregoing, we ask this Court to rule as a threshold matter that there is no requirement that plaintiffs-appellants submit a Rule 56.1 Statement, either on their own accord or in "response" to defendant-appellee's Rule 56.1 Statement.  To the extent, if at all, that this Court would rule to the contrary (i.e., that it considers a Rule 56.1 Statement as necessary in an action of this type), we ask only that this Court give plaintiffs-appellants a reasonable opportunity to make a supplemental submission consisting of a Rule 56.1 Statement.

## II.    This Court Should Reject Defendant-Appellee's Argument That Reimbursement Relief Should Be Denied On The Grounds That There Was An Undue Delay In Filing Plaintiffs-Appellants' Request For Hearing

Defendant-Appellee contends that plaintiffs-appellants' May 1, 2008 request for a hearing was untimely and that this court should deny relief to plaintiffs-appellants on that basis. At the outset, the IDEIA statute provides for a *two year* window in which to file a claim.  34 C.F.R. Part 300.509(e).  Plaintiffs-Appellants did not even come close to approaching, much less exceeding, the applicable period of limitations.  The record shows that plaintiffs-appellants' May 1, 2008 claim and request for a hearing was entirely timely and appropriate.

Defendant-Appellee's "early intervention" program is a program with a relatively short period of services, inasmuch as a child "ages out" when the child turns three.  Even prior to the November 13, 2006 meeting ostensibly convened by defendant-appellee to develop and offer N.G. and his parents an Individualized Family Services Program ("IFSP"), plaintiffs-appellants

had N.G. evaluated and assessed, and they had provided defendant-appellee with comprehensive reports and assessment from renowned autism specialists.  Both Dr. Christopher Lucas of the New York University Child Study Center, and Dr. Cecelia McCarton, a renowned pediatric developmental specialist and founder of the McCarton School for Autism, diagnosed N.G., with "Autistic Disorder" and he made specific recommendations for types and levels of services that would be reasonably calculated to address N.G.'s numerous deficits, including N.G.'s rigidity, stereotypy, echolalia, inattention, perseverative behavior, demonstrable resistance to change, lack of appropriate eye contact, and difficulty with comprehension and the process of "generalization." *See* Exh. F, Exh G.

Prior to, and during, the November 13, 2007 IFSP meeting, N.G.'s parents had shared the foregoing reports and recommendations.  Thus, N.G.'s parents and ostensible defendant-appellee had a decent picture of the kind of comprehensive and intensive program that would be needed to properly address N.G.'s autism deficits. T. 879, 892-95, 896-909, 1009-1015, 1085-86.  N.G.'s parents were advised by a representative of defendant-appellee that N.G.'s service provider agency had already been picked out, and they were told of the service levels they would be receiving. T. 878; *See also* Plaintiffs-Appellants' July 30, 2008 Memorandum of Law at 10.

Although the McCarton and Lucas reports and recommendations had been provided to defendant-appellee, defendant-appellee's administrator, Evelyn Arias, advised N.G.'s parents that it was defendant-appellee's policy to never take such reports into consideration. T. 340-41; *See also* Mayerson Affidavit at 13-14.  During the trial, Ms. Arias took the position that for purposes of determining "eligibility," it was indeed defendant-appellee's policy not to consider outside reports. *Id.*  However, even *after* defendant-appellee resolved the eligibility issue, the McCarton and Lucas reports were never distributed at the IFSP meeting for discussion. T. 340-

41.   This may explain why, at the conclusion of the IFSP meeting, without reliance on any reports recommending different service levels, defendant-appellee arrived at a materially lower number of direct ABA service hours, and failed to offer any meaningful level of additional ABA hours for purposes of program and staff supervision, weekly team meetings, and parent training and counseling, as Dr. McCarton had recommended.[4]

N.G.'s parents agreed to proceed on a "without prejudice" basis with *defendant-appellee's* recommendation of speech and language therapy.[5]  *See* Ex. C.  However, N.G.'s parents knew immediately that defendant-appellee's recommended ABA levels were inadequate for N.G.  Accordingly, by letter dated November 17, 2007 – a letter sent just four days after the IFSP meeting – N.G.'s parents put defendant-appellee on notice that they intended to secure appropriate services for N.G., i.e., 1:1 ABA therapy and occupational therapy, and that they intended to look to defendant-appellee for reimbursement. T. 912; *See* Ex. E; Ex. C.

To the extent defendant-appellee had any intention of offering an appropriate and acceptable offer of services, this was the time; however, defendant-appellee did nothing.  Accordingly, defendant-appellee is estopped from arguing that any filing delay rendered moot potential modifications that could have been made to the offered IFSP.  A special invitation to defendant-appellee is not required to enable defendant-appellee to modify an IFSP.  Further, the record shows that even after N.G.'s parents wrote on November 17, 2007 to give notice of an impending reimbursement claim, defendant-appellee took no remedial action. *See* Ex. E.

---

[4] While defendant-appellee argues that the only difference was the *number* of ABA hours, this simplistic approach glosses over the fact that defendant-appellee failed to offer adequate "direct" service hours and then compounded that problem by failing to make any meaningful offer of additional ABA service hours for program and staff supervision, parent training and counseling, and weekly team meetings.  These are not fungible hours of services, as a babysitter might provide.

[5] The fact that N.G.'s parents accepted *defendant-appellee's* speech and language services on a "without prejudice" basis is evidence that N.G.'s parents were prepared to accept public services where appropriate, and that they were not insistent upon reaching for some private or otherwise rarified "gold standard."

Thereafter, on May 1, 2008, after running into insurmountable problems trying to work with defendant-appellee's speech and language providers, including "missing paperwork" and missed sessions, N.G.'s parents followed through on their prior November 17, 2007 notice to seek reimbursement from defendant-appellee. *See* Ex. C; Ex. E.  N.G.'s parents also sought mediation, bending over backwards attempting to avoid litigation with defendant-appellee.  *See* Ex. C; Ex. D.  However, N.G.'s parents were not prepared to accept an inappropriate program of services that did not meet N.G.'s needs.

While defendant-appellee contends that the "delay" in filing for a hearing allowed N.G.'s parents to argue that N.G. had become "acclimated in their chosen program," the benefit of "acclimation" was not plaintiffs-appellants' argument.  If N.G. became "acclimated," it was because defendant-appellee did not lift a finger after the IFSP meeting to make appropriate modifications to its original November 13, 2007 IFSP offer.  It would have been premature had N.G.'s parents filed for reimbursement immediately following the November 13, 2007 IFSP meeting.  N.G.'s parents needed to know N.G. would respond positively to the programming and service levels that Dr. Lucas and Dr. McCarton had recommended.  Had N.G. *not* responded positively, ostensibly, N.G.'s parents would not have bothered filing, since they would not have been able to make out Prong II of the classic test for reimbursement.  Under the circumstances, it was not improper or even unusual that N.G.'s parents filed claims on May 1, 2008.

## III.    This Court May And Should Look At And Assess N.G.'s "Subsequent Progress" In His Unilateral Program As Evidence Going To Prong II

Defendant-Appellee weaves through its papers the notion that this Court should avoid looking at or considering N.G.'s progress in his unilateral (private) program of services, even for purposes of assessing the appropriateness and reimbursability of that program under Prong II. We do *not* contend that N.G.'s progress in his private program is the relevant inquiry in

determining whether or not, for purposes of Prong I, defendant-appellee's IFSP passes scrutiny from either a procedural or substantive perspective.  That contention is defendant-appellee's red herring.

We do contend, based on Second Circuit precedent, that this Court may and should look "retrospectively" to N.G.'s progress within his private program of services as constituting evidence going to the Prong II appropriateness and reimbursability of such private services.  In Frank G. v. Bd. of Educ., 459 F.3d 356, and in Gagliardo, 489 F.3d 105 (2d Cir. 2007), the Court explained: "No one factor is necessarily dispositive in determining whether parents' unilateral placement is [appropriate].  Grades, test scores, and regular advancement may constitute evidence that a child is receiving educational benefit, but courts assessing the propriety of a unilateral placement consider the *totality of the circumstances* in determining whether that placement serves a child's individual needs." (emphasis added).

## IV. The Fact That N.G.'s Private Program Was An Excellent And High Quality Program Does Not Disqualify It For Reimbursement Purposes Under Prong II

Defendant-Appellee suggests erroneously that if certain witnesses characterized N.G.'s private program of services as being "the best" or the "gold standard," this means that this Court may not award reimbursement.  Such is not the case.  We recognize where the local educational agency's offer is appropriate, a parent is not entitled to insist on a "better" program.  However, that is not what happened in the case at bar.  Here, wholly apart from any procedural violations that resulted in a FAPE deprivation, the IFSP offer (except as to speech services) was rejected because it was substantively inadequate and inappropriate in relation to what Dr. Lucas and Dr. McCarton had recommended for N.G.  The record does *not* reflect that defendant-appellee's IFSP was rejected because it failed to offer N.G. an optimal, gold standard program.

Where, as here, the evidence reflects an underlying Prong I FAPE violation, a parent may indeed seek reimbursement for an optimal or gold standard program, although there is no *requirement* that a parent do so. In <u>Frank G.</u>, the Second Circuit explained: "To qualify for reimbursement under the IDEA, parents need not show that a private placement furnishes every special service necessary to maximize their child's potential." 459 F.3d at 356. *See also* <u>Gagliardo</u>, *supra*. Here, defendant-appellee fairly acknowledges the efficacy of N.G.'s unilateral program, and N.G.'s excellent progress under that program. The excellence of N.G.'s unilateral program, however, does not result in disqualification for reimbursement purposes.

Where, as here, there is an underlying Prong I FAPE deprivation, the only recognized limitation on reimbursement is found in the Supreme Court decision in <u>Florence County Sch. District 4 v. Carter</u>, 510 U.S. 7 (1993). In <u>Carter</u>, Justice O'Connor, writing for a unanimous Court, explained: "Courts fashioning discretionary equitable relief under IDEA must consider all relevant factors, including the appropriate and reasonable *level* of reimbursement that should be required. *Total* reimbursement will not be appropriate if the court determines that the cost of the private education was unreasonable." (emphasis added).

The evidence at trial showed that the rates of N.G.'s private providers were within the market rates of providers of similar quality and expertise providing similar services in New York City. T. 448; 577-78; *See also* Mayerson Affidavit at 15, 21. There was no evidence that N.G.'s providers' hourly rates were excessive or unreasonable in relation to those market rates. Under these circumstances, we submit that there are no grounds to reduce or diminish the reimbursement award that should go to N.G.'s parents, should this Court reverse the underlying administrative determination. However, even if this Court were to raise *sua sponte* and determine the "excessiveness" issue, and even if this Court were to make an adverse finding in

that regard, the <u>Carter</u> decision strongly suggests that the appropriate remedy would be to scale back the "total" reimbursement "level" to a reduced "level" that is consistent with a finding of "reasonableness."

## V.    N.G.'s Parents' Physical Presence And Other Participation At the IFSP Meeting Was Not Enough

We have already provided this Court with citations to the record and authorities from this Court and other jurisdictions that are supportive of plaintiffs-appellants' contention that defendant-appellee impermissibly "predetermined" N.G.'s IFSP and that defendant-appellee's failure to share, discuss and give meaningful consideration to the Lucas and McCarton reports at N.G.'s IFSP meeting deprived N.G. of a FAPE, and also deprived N.G.'s parents of "meaningful" participation in the IFSP development process.  See Plaintiffs-Appellants' Brief at 8-14.  Cases such as <u>Deal v. Hamilton County Bd. of Educ.,</u> 392 F.3d 840 (6th Cir. 2004), <u>rehearing <i>en banc</i> denied</u> (2005), <u>cert denied</u> (2005) and <u>Winkelman v. Parma City Sch. Dist.,</u> 127 S.Ct. 1994 (2007) stand for the proposition that parental involvement at the planning meeting must be "meaningful" to count, and merely being present and allowed to ask questions does not necessarily translate to meaningful participation.

Where, as here, defendant-appellee refused to share, discuss and meaningfully consider outside reports and recommendations, defendant-appellee's representative knew and communicated N.G.'s service levels in advance of N.G.'s IFSP meeting, and where defendant-appellee testified that the highest number of hours she had seen offered at seventy IFSP meetings was 20, exactly what was offered to N.G., the evidence strongly suggests impermissible customs and policies which deprived N.G. of a FAPE by precluding any genuine individualization of his IFSP.  These same customs and policies also deprived N.G.'s parents of meaningful involvement and participation in the IFSP development process.  We urge that the ALJ exalted form over

substance and glossed over the compelling evidence in the record that establishes impermissible predetermination, and failure to meaningfully include N.G.'s parents in the IFSP development process, by perhaps following a rote checklist in concluding that all the procedural requirements ostensibly were met.

## VI.    The ALJ Failed To Comply With The Standards Set Forth In New York State's ALJ Manual

We have urged that the ALJ did not properly apply the applicable decisional law and statutory authority. We also have shown how the ALJ treated the parties disparately, and how the ALJ failed to comply with the standards set forth in the manual that New York State provides to ALJ's and other hearing officers. *See* Mayerson Affidavit at 6-9. While we believe that the ALJ revealed bias by the end of the hearing, plaintiffs-appellants' appeal does not turn on any ruling by this Court that the ALJ was biased. We simply ask this Court to reverse upon a finding that the ALJ's determination was in error, based upon this Court's independent review of the administrative record, and its invocation of the applicable authorities.

CONCLUSION

For all of the foregoing reasons, and as shown in plaintiffs-appellants' principal submissions, this Court should reverse the ALJ's January 16, 2008 Decision and award N.G.'s parents the reimbursement relief that the ALJ had refused.

Dated: September 5, 2008
       New York, New York

Gary S. Mayerson (GSM 8413)
Mayerson & Associates
Attorneys for Plaintiffs-Appellants
330 West 38th Street, Suite 600
New York, New York 10018
(212) 265-7200

10