UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
A.G. and L.G., on behalf of N.G.,

                Plaintiffs,

           -against-                       08 Civ. 1576 (LAK)

THOMAS R. FRIEDEN, New York City
Department of Health and Mental Hygiene,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OPINION**

      Appearances:

                    Gary S. Mayerson
                    MAYERSON & ASSOCIATES
                    *Attorney for Plaintiff*

                    Chevon Andre Brooks
                    Assistant Corporation Counsel
                    MICAHEL A. CARDOZO
                    CORPORATION COUNSEL OF THE CITY OF NEW YORK
                    *Attorney for Defendant*

LEWIS A. KAPLAN, *District Judge.*

        Plaintiffs, the parents of the infant N.G., commenced this action pursuant to the

Individuals with Disabilities Education Act ("IDEA"), as amended by the Individuals with

Disabilities Education Improvement Act,[1] seeking review of a decision by Administrative Law Judge Kimberly A. O'Brien of the New York State Department of Health, which denied their application for reimbursement of the expenses they incurred in providing early intervention therapies for N.G.

Plaintiffs and defendant both have moved for summary judgment.  For the reasons set forth below, defendant's motion for summary judgment dismissing the complaint is granted, and plaintiffs' motion is denied.

*Facts*

*Statutory Background*

In order to put the facts in context, it is helpful to outline the statutory program that gives rise to this action.

The IDEA has been described as "the most recent Congressional enactment in 'an ambitious federal effort to promote the education of handicapped children.'"[2]  Under the IDEA, states receiving federal education funds are required to provide "all children with disabilities" a "free appropriate public education."[3]

---

[1]    20 U.S.C. §§ 1400 *et seq.*

[2]    *Walczak v. Florida Union Free Sch. Dist.*, 142 F.3d 119, 122 (2d Cir. 1998), quoting Bd. *of Educ. v. Rowley*, 458 U.S. 176, 179 (1982)*; accord Gagliardo v. Arligton Cent. Sch. Dist.*, 489 F.3d 105, 107 (2d Cir. 2007); *Student X v. New York City Dep't of Educ.*, No. 07-CV-2316 (NGG)(RER), 2008 WL 4890440 at *1 (E.D.N.Y. Oct. 30, 2008).

[3]    20 U.S.C. § 1412(a)(1)(A).

This action arises out of Subchapter III of the IDEA,[4] which addresses the educational needs of disabled children in the first three years of their lives.  Sections 1433 and 1434 make funds available to states that adopt a policy providing "appropriate early intervention services . . . to all infants and toddlers with disabilities in the State and their families . . ." and comply with certain statutory requirements concerning the administration of such programs.[5]

New York State has adopted an Early Intervention Program and participates in the program outlined in Subchapter III of the IDEA.[6]  The program is available to infants and toddlers with a disability.[7]  The parents of a child who seek benefits under the program first must have their child evaluated.[8]  A meeting then is held among the interested parties to formulate an Individualized Family Service Plan ("IFSP") for the child.  The meeting is to be attended by a parent, an "early intervention official," the evaluator, if available,[9] the initial service coordinator

----

[4]

    20 U.S.C. §§ 1431-45

[5]

    20 U.S.C. § 1434.

[6]

    N.Y. PUB. HEALTH LAW §§ 2540-59-b; 10 N.Y. COMP. CODES R. & REGS. Subpt. 69-4.

[7]

    A "disability" is defined as

        "(a) a developmental delay; or

        (b) a diagnosed physical or mental condition that has a high probability of resulting in developmental delay, such as Down syndrome or other chromosomal abnormalities, sensory impairments, inborn errors of metabolism or fetal alcohol syndrome." N.Y. PUB. HEALTH LAW § 2541(5).  This definition closely parallels the definition set forth in 20 U.S.C. § 1432(5).

[8]

    N.Y. PUB. HEALTH LAW § 2544; 10 N.Y. COMP. CODES R. & REGS. § 69-4.8.

[9]

    New York's regulations do not mandate the attendance of the evaluator:

    "[I]f the evaluator is unable to attend the meeting, arrangements must be made for the

and such other persons as the parents may invite.[10]   The IFSP formulated at the meeting must be in writing and must contain at least the following:

> "(1) a statement of the infant's or toddler's present levels of physical development, cognitive development, communication development, social or emotional development, and adaptive development, based on objective criteria;
>
> "(2) a statement of the family's resources, priorities, and concerns relating to enhancing the development of the family's infant or toddler with a disability;
>
> "(3) a statement of the measurable results or outcomes expected to be achieved for the infant or toddler and the family, including pre-literacy and language skills, as developmentally appropriate for the child, and the criteria, procedures, and timeliness used to determine the degree to which progress toward achieving the results or outcomes is being made and whether modifications or revisions of the results or outcomes or services are necessary;
>
> "(4) a statement of specific early intervention services based on peer-reviewed research, to the extent practicable, necessary to meet the unique needs of the infant or toddler and the family, including the frequency, intensity, and method of delivering services;
>
> "(5) a statement of the natural environments in which early intervention services will appropriately be provided, including a justification of the extent, if any, to which the services will not be provided in a natural environment;
>
> "(6) the projected dates for initiation of services and the anticipated length, duration, and frequency of the services;
>
> "(7) the identification of the service coordinator from the profession most immediately relevant to the infant's or toddler's or family's needs (or who is otherwise qualified to carry out all applicable responsibilities under this subchapter) who will be responsible for the implementation of the plan and

---

evaluator's involvement in the meeting, by participating in a telephone conference call, having a knowledgeable authorized representative attend the meeting, or making pertinent records available at the meeting . . . ."  10 N.Y. COMP. CODES R. & REGS. § 69-4.11(a)(2)(iii)(a).

[10]   N.Y. PUB. HEALTH LAW § 2545(1).

coordination with other agencies and persons, including transition services; and

"(8) the steps to be taken to support the transition of the toddler with a disability to preschool or other appropriate services."[11]

Other requirements of the IFSP are discussed in Section III(A) below.  IFSPs must be reviewed at least every six moths to determine if modifications are appropriate.[12]

Within the City of New York, the Early Intervention Program is administered by the New York City Department of Health and Mental Hygiene.[13]  If a parent is dissatisfied with the IFSP formulated for his or her child, the parent may seek mediation or an impartial hearing before an administrative law judge.[14]  A parent dissatisfied with the results of these state proceedings can bring an action for review in federal court.[15]  A parent who rejects an IFSP and implements his or her own treatment program may be reimbursed for the cost of such program if the parent establishes that the IFSP is inadequate, the parents' treatment program is adequate, and reimbursement would not be inequitable.[16]

---

[11]

20 U.S.C. § 1436(d)(1)-(8); *see also* N.Y. PUB. HEALTH LAW § 2545(2); 10 N.Y. COMP. CODES R. & REGS. § 69-4.11(a)(10).

[12]

20 U.S.C. § 1436(b); N.Y. Pub. Health Law § 2545(7); 10 N.Y. Comp. Codes R. & Regs. § 69-4.11(b).

[13]

*See* N.Y. PUB. HEALTH LAW § 2552.

[14]

N.Y. PUB HEALTH LAW § 2549; 10 N.Y. COMP. CODES R. & REGS. § 69-4.17(g), (h).

[15]

20 U.S.C. § 1439(a)(1).

[16]

*Sch. Comm. of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370 (1985); *Bucks County Dep't of Mental Health/Mental Retardation v. Pennsylvania*, 379 F.3d 61, 67 (3rd Cir. 2004).

*N.G. and His IFSP*

N.G., a resident of New York County, was born on December 29, 2004.[17] Between his first and second birthday, N.G. and his mother participated in a number of "mommy-and-me" activities, and his mother began to notice that N.G. could not sit still or pay attention at these activities.[18]  His mother observed also that N.G. failed to make regular eye contact.[19]  In September 2006, N.G.'s pediatrician diagnosed N.G. as suffering from autism.[20]

Shortly after this diagnosis, N.G.'s mother contacted New York City's Early Intervention Program which assigned Elizabeth Placido to N.G.'s case.[21]  Placido visited N.G.'s residence, conferred with his mother, and arranged for N.G. to be evaluated by Theracare, a service provider that contracts with New York City to conduct such evaluations and to provide treatment for autistic children.[22]  Between October 4 and 11, 2006, Theracare conducted four

---

[17]

ALJ Dec. 3; Tr. 865.  "ALJ Dec" refers to the decision of ALJ Kimberly A. O'Brien, dated January 16, 2008, which is annexed as Exhibit A to Defendant's Memorandum of Law in Support of his Motion for Summary Judgment, dated July 30, 2008 (DI 35) ("Def.'s Mem."). "Tr." refers to the transcript of the hearing before ALJ O'Brien, which has been submitted by defendant but not docketed.  "PX" refers to plaintiffs' exhibits submitted at the hearing before ALJ O'Brien.

[18]

Tr. 865-66.

[19]

*Id.* 867

[20]

*Id.* 868.

[21]

*Id.* 811-12.

[22]

*Id.* 824-25.

7

separate evaluations:  (1) a psychological evaluation, by Ingrid I. Rose, Ph.D., (2) a

developmental evaluation and parent interview by Barbara Shapiro, M.S., (3) a speech/language

evaluation, conducted by Madeline Vargas, M.A. and (4) an occupational therapy evaluation by

Francia Brito, M.S.[23]  The resulting evaluation confirmed the diagnosis of N.G.'s pediatrician and

recommended that N.G. be provided with applied behavioral analysis ("ABA"), speech and

occupational therapy.[24]  The Theracare evaluation did not recommend a specific number of hours

for any of these three modes of therapy.

　　　　　In October and November 2006, N.G.'s parents arranged for evaluations by two

privately retained physicians.  Christopher Lucas, M.D., M.P.H., of New York University's Child

Study Center, evaluated N.G on October 12, 24 and 31, 2006.  He diagnosed N.G. as suffering

from "Autistic Disorder - severity yet unknown"[25] and recommended that N.G. receive thirty

hours of ABA therapy per week, five 45-minute sessions of speech therapy per week, and five

hours of occupational therapy per week.[26]

　　　　　Cecelia McCarton, M.D., and Christine A. Williams, M.S.  evaluated N.G. on

November 1 and 9, 2006.  They confirmed the diagnosis of autism and recommended thirty hours

of ABA therapy per week, five one-hour sessions of speech therapy per week and five one-hour

---

[23]　　　　PX J.

[24]　　　　*Id.* at 2.

[25]　　　　PX G at 5.

[26]　　　　*Id.* at 6.

sessions of occupational therapy per week.[27]  They further recommended that the therapies be
provided over a seven-day week, that there be weekly meetings among N.G.'s therapists, and that
N.G.'s parents be provided with at least two hours of instruction per week concerning ABA
therapy.[28]

   A meeting to discuss and formulate the IFSP to be provided to N.G. was
scheduled for November 13, 2006.[29]  On an unspecified date prior to the meeting, N.G.'s mother
claimed to have had a telephone conversation with an official of the Early Intervention Program
during which she was told how many hours of treatment would be provided to N.G.  N.G.'s
mother described the alleged conversation as follows:

> "I had spoken with Miss Asaria[30] [sic], and she called to confirm the IFSP
> meeting.  She told me at the time that she had, she had secured an agency
> that was available to provide all of the services that NG would have.  And
> of course, you know, I asked her what the services would be.
>
> "She took me through the ABA, the speech and the OT.  And I asked her
> how much we would be getting.  And at the time she said we'd be getting
> about twenty hours of ABA and about five of speech and some OT; that it
> was a pretty standard package; that she already had secured an agency to
> provide, and she needed to make sure they sort of had the availability or

---

[27]  PX H at 7-8.

[28]  PX H at 8.

[29]  ALJ Dec. at 3; PX C at 1.

[30]  The Court presumes that N.G.'s mother intended to refer to Evelyn Arias, an official with
New York City's Early Intervention Program and a witness at the hearing.  Later on in her
testimony, however, N.G.'s mother stated that the pre-meeting telephone conversation was
with Ms. Placido.  Tr. 1084.  Without explanation, plaintiffs' brief states the conversation
was with Ms. Placido.  Plaintiffs-Appellants' Memorandum of Law in Support of Motion
for Modified *de novo* Review, dated July 30, 2008 (Docket Item 32) ("Pls. Mem.") at 10.

capacity to provide what he would need."[31]

Ms. Placido denied any recollection of such a conversation.[32]  Ms. Arias was not asked about the conversation.

The IFSP meeting was held as scheduled on November 13.  The meeting was attended by both of N.G.'s parents, Valerie Sans (Initial Service Coordinator from the Medical & Health Research Association), Cheryl Dombrowski (Service Coordinator from Theracare) and Evelyn Arias (Early Intervention Program representative) and lasted approximately one and one-half hours.[33]  Scheduling conflicts prevented the Theracare evaluators from attending the meeting, but their report had been provided to the attendees.[34]  In addition, Ms. Dombrowksi had discussed N.G.'s case with the evaluators.[35]  Prior to the meeting, N.G.'s parents provided Ms. Arias with copies of the evaluations prepared by Drs. Lucas and McCarton.[36]  Ms. Arias testified that she read and considered the evaluations of Drs. Lucas and McCarton, although she indicated that she was not permitted to consider the frequencies for the services because that was a matter

---

[31]     Tr. 877-78.

[32]     Tr. 844.

[33]     PX C at 1, Tr. 317-18, 367, 1001.

[34]     Tr. 361, 367-69, 901-02, 1237.

[35]     *Id.* 1237-38.

[36]     *Id*. 339-40.

determined in formulating the IFSP.[37]  Their evaluations, however, were not discussed at length at the meeting.[38]  N.G.'s parents were the only attendees at the meeting who had actually met N.G., and they described N.G., his development and their goals for him.[39]  Although N.G.'s mother testified that she that felt her opinions and the Lucas and McCarton evaluations were ignored,[40] Ms. Arias characterized the discussion at the meeting as an "open exchange."[41]  Although N.G.'s parents dispute whether their comments were given any weight, they do not claim they were prohibited from offering comments or asking questions; everyone present at the meeting was given the chance to speak.[42]

At the conclusion of the meeting, an IFSP was formulated for N.G. which provided for a twelve-month program of twenty hours of ABA therapy per week, five hours of speech therapy per week, three thirty-minute sessions of occupational therapy per week, family training of one hour per week with respect to ABA therapy and a one-hour team meeting once per month.[43]  The IFSP further provided that N.G. would undergo an evaluation for physical

---

[37]
       *Id.* 340, 368, 1002.

[38]
       *Id.* at 1425.

[39]
       *Id.* at 367, 1003, 1294-95.

[40]
       *Id.* at 1006.

[41]
       *Id.* at 361.

[42]
       *Id.* at 1295.

[43]
       PX C.

therapy.  This element was added as a result of comments made at the meeting by N.G.'s mother.[44]

At the conclusion of the IFSP meeting, N.G.'s parents rejected all aspects of the IFSP except the speech therapy.  On the last page of the IFSP they endorsed:  "Developmental pediatrician recommendation [sic] for additional services; current early intervention services are insufficient to meet [N.G.'s] needs."[45]  Thus, N.G.'s parents decided they would formulate their own treatment program for their son immediately after the IFSP meeting.[46]

Four days later, on November 17, 2006, N.G.'s father wrote to New York City's Early Intervention Program, stating that, other than the speech therapy component of the IFSP, the services offered were "not adequate or appropriate for [N.G.] in light of his documented needs."[47]  The letter further stated that N.G.'s parents intended to secure appropriate services for N.G. on their own and would seek reimbursement from the New York City Department of Health.[48]

N.G.'s parents initially accepted the speech therapy offered by defendant. However, they grew dissatisfied with one of the individuals providing speech therapy to N.G. because her attendance was irregular and she frequently appeared without appropriate

---

[44]     Tr. 1006-07.

[45]     PX C at 6.

[46]     Tr. 1014.

[47]     PX F at 1.

[48]     *Id.*

paperwork.[49]  By February 2007, N.G.'s parents terminated the speech therapy being provided by the Early Intervention Program.[50]

Accordingly, by February 2007, N.G. was not receiving any services pursuant to the Early Intervention Program.  Instead, he was receiving in excess of forty hours of therapy per week, all of which had been arranged privately by his parents.

*The Hearing and Decision*

After an unsuccessful attempt at mediation, N.G.'s parents sought and were granted a hearing to review the IFSP.  As a result of requests for adjournments by both sides, the hearing was held on six different dates between July 16 and October 25, 2007.  N.G.'s parents were represented by counsel and called a total of nine witnesses.  The transcript is over 1,800 pages long.

ALJ O'Brien issued her decision and dismissed the petition for review on January 16, 2008.  She rejected plaintiffs' claim that the level of services N.G. would receive was predetermined before the IFSP meeting[51] and found that (1) the Early Intervention Program could have provided the services specified in the IFSP,[52] (2) N.G.'s parents were granted the right to

---

[49]

Tr. 942-44, 968.

[50]

*Id.* 939-48, 1813-14.

[51]

ALJ Dec. 8-9.

[52]

*Id.* at 9-10.

participate in the IFSP meeting in a meaningful way,[53] and (3) the IFSP was appropriate.[54]

*Plaintiffs' Claims*

Plaintiffs attack the ALJ's decision on both substantive and procedural grounds, arguing (1) the IFSP was predetermined; (2) the IFSP was substantively deficient; (3) the evaluations of Drs. Lucas and McCarton were improperly excluded; (4) N.G.'s parents were denied meaningful participation in the preparation of the IFSP; (5) the evaluation performed by Theracare did not assess N.G.'s gross motor skills and did not contain a functional behavioral analysis; (6) the ALJ improperly precluded plaintiffs from posing leading questions during the cross-examination of one of defendant's witness, and (7) the ALJ improperly precluded plaintiffs from offering rebuttal evidence.

*Discussion*

I.    *Applicable Legal Standards*

The Court of Appeals recently has reviewed the "circumscribed" role of the federal courts in reviewing decisions of state education agencies in IDEA reimbursement

---

[53]      *Id.* at 10.

[54]      *Id.* at 11.

actions.[55]

> "'[T]he role of the federal courts in reviewing state educational decisions under the IDEA is circumscribed.'  *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (internal quotation marks omitted). While the district court must base its decision 'on the preponderance of the evidence,' 20 U.S.C. § 1415(i)(2)(C)(iii), it 'must give "due weight" to [the administrative] proceedings, mindful that the judiciary generally "lack[s] the specialized knowledge and experience necessary to resolve persistent and difficult questions of educational policy.'"  *Gagliardo*, 489 F.3d at 113 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206, 208, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). Thus, district courts may not 'substitute their own notions of sound educational policy for those of the school authorities which they review.'"[56]

 "The deference paid to administrative proceedings is particularly warranted where, as here, the district court's decision was based solely on the administrative record."[57]

When reviewing the denial of a reimbursement claim, a federal court engages in a three-step process.  It asks whether (1) the state complied with the appropriate procedural requirements; (2) the IFSP complied with the substantive requirements of the IDEA and, if the

---

[55]

The vast majority of cases addressing reimbursement claims brought under the IDEA involve challenges to Individual Education Plans, or IEPs, which are the plans the IDEA requires for disabled students in primary and secondary schools.  Both sides' briefs assume that the same standards apply to challenges to IFSPs.  Because the parties have effectively stipulated that IFSPs are evaluated by the same standards that apply to IEPs, and the IDEA does not provide for a different standard, the Court concludes that cases addressing IEPs are directly applicable to this case.

[56]

*T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (quoting *Rowley*, 458 U.S. at 206); *accord M.H. ex rel. L.H. v. Monroe-Woodbury Cent. Sch. Dist.*, 296 Fed. Appx. 126, 127-28 (2d Cir. 2008); *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 191-92 (2d Cir. 2005); *M.M. ex rel. A.M. v. New York City Dep't of Educ.*, 583 F. Supp.2d 498, 504 (S.D.N.Y. 2008).

[57]

*A.C. ex rel. M.C. v. Bd. of Educ. of the Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009).

IFSP fails under one of the first two steps, (3) the program for which reimbursement is sought is appropriate to the child's needs.[58]

The principal aspect of the procedural inquiry is whether the parents "'had an adequate opportunity to participate in the development of [the] [IFSP].'"[59]  Procedural errors , however, are subject to analysis for harmlessness.  "[I]t does not follow that every procedural error in the development of an [IFSP] renders that [IFSP] legally inadequate under the IDEA."[60]

> "Only procedural inadequacies that cause substantive harm to the child or his parents -- meaning that they individually or cumulatively result in the loss of educational opportunity or seriously infringe on a parent's participation in the creation or formulation of the [IFSP] -- constitute a denial of a [free and appropriate public education]."[61]

The substantive standard that an IFSP must meet is not a demanding one.

> "'[A] school district fulfills its substantive obligations under the IDEA if it provides an IEP that is likely to produce progress, not regression, and if the IEP affords the student with an opportunity greater than mere trivial advancement.' *Cerra*, 427 F.3d at 195 (internal quotation marks omitted). School districts are not required to furnish 'every special service necessary

---

[58]  *Mamaroneck Union Free Sch. Dist.*, 554 F.3d at 252; *Chappaqua Cent. Sch. Dist.*, 553 F.3d at 171; *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d at 111-12; *Pawling Cent. Sch. Dist.*, 427 F.3d at 192.

[59]  *Mamaroneck Union Free Sch. Dist.*, 554 F.3d at 253 (quoting *Pawling Cent. Sch. Dist.*, 427 F.3d at 192).

[60]  *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 381 (2d Cir. 2003); *accord Chappaqua Cent. Sch. Dist.*, 553 F.3d at 173; *Tarlowe v. New York City Bd. of Educ.*, No. 07 Civ. 7936 (GEL), 2008 WL 27360279 at *5 (S.D.N.Y. July 3, 2008).

[61]  *Matrejek v. Brewster Cent. Sch. Dist.*, 471 F. Supp.2d 415, 419 (S.D.N.Y. 2007), aff'd, 293 Fed. Appx. 20 (2d Cir. 2008), *citing Rhinebeck,* 346 F.3d at 383; *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 766 (6th Cir. 2001).

to maximize each handicapped child's potential.'"[62]
"School districts are . . . not required to give services that would enable handicapped children to maximize their potential 'commensurate with the opportunity provided other children.' . . . Instead, the IDEA requires that the educational plan be reasonably calculated to enable the child to receive 'meaningful' educational benefits."[63]

       Although the Court concludes that it is not necessary to reach the adequacy of the treatment program implemented by N.G.'s parents, defendant has stipulated that the parents' program is adequate and appropriate.[64]

       As the party challenging the decision of the state agency, the parents bear the burden of proving, by a preponderance of the evidence, that the IFSP is either procedurally or substantively defective and that the parents' plan is adequate.[65]

       Finally, although IDEA reimbursement claims most frequently are resolved by summary judgment motions, the traditional summary-judgment standards are not strictly applicable.

---

[62] *Chappaqua Cent. Sch. Dist.*, 553 F.3d at 173 (quoting *Rowley*, 458 U.S. at 199).; *accord Mamaroneck Union Free Sch. Dist.*, 554 F.3d at 254; *M.M. ex rel. A.M.*, 583 F. Supp.2d at 507; *P.K. ex rel. P.K. v. Bedford Cent. Sch. Dist.*, 569 F. Supp.2d 371, 384 (S.D.N.Y. 2008); *Tarlowe*, 2008 WL 2736027 at *5; *Jennifer D. ex rel. Travis D. v. New York City Dep't of Educ.*, 550 F. Supp.2d 420, 430 (S.D.N.Y. Mar. 31, 2008).

[63] *Monroe-Woodbury Cent. Sch. Dist.*, 296 Fed. Appx. at 128 (quoting *Rowley*, 458 U.S. at 192, 198).

[64] Def.'s Mem. at 21.

[65] *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 57-58 (2005); *Mamaroneck Union Free Sch. Dist.* 554 F.3d at 252; *Chappaqua Cent. Sch. Dist.,* 553 F.3d at 171-72; *Gagliardo,* 489 F.3d at 112.

> "As courts in this circuit have observed, a motion for summary judgment in an IDEA case often triggers more than an inquiry into possible disputed issues of fact.  Rather, the motion serves as a 'pragmatic procedural mechanism' for reviewing a state's compliance with the procedures set forth in IDEA and determining whether the challenged [IFSP] is reasonably calculated to enable the child to receive educational benefits. *Warton v. New Fairfield Board of Educ.*, 217 F. Supp.2d 261, 270 (D. Conn. 2002); *see Wall v. Mattituck-Cutchogue Sch. Dist.*, 945 F. Supp. 501, 508 & n.6 (E.D.N.Y. 1996) (analogizing the role Rule 56 motions play in allowing courts to review administrative determinations in IDEA cases to the role Rule 12(c) motions play in allowing administrative review of Social Security determinations); *see also Capistrano Unified Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995) ("Though the parties [in an IDEA action] may call the procedure 'a motion for summary judgment' . . . , the procedure is in substance an appeal from an administrative determination, not a summary judgment.")."[66]

Thus, a number of decisions have noted that a genuine issue of fact need not defeat a motion for summary judgment in an IDEA reimbursement action.[67]

II.     *Plaintiffs' Procedural Challenges to the IFSP*

---

[66]

*Lillback ex rel. Mauclaire v. Conn. Dep't of Educ.*, 397 F.3d 77, 83 n.3 (2d Cir. 2005).

[67]

*Reg'l Sch. Dist. No. 9 v. Mr. & Mrs. P.*, No. 3:06 CV 01278 (CFD), 2009 WL 103376 at *2 (D. Conn. Jan. 12, 2009); *Student X*, 2008 WL 4890440 at *11; *Bedford Cent. Sch. Dist.*, 569 F. Supp.2d at 382; *Tarlowe*, 2008 WL 2736027 at *4; *J.R. ex rel. S.R. v. Bd. of Educ. of the City of Rye Sch. Dist.*, 345 F. Supp.2d 386, 394 (S.D.N.Y. 2004).

The parties dispute whether Statements of Undisputed Facts pursuant to Local Civil Rule 56.1 are required in connection with the present motions.  Defendant has submitted such a statement and contends that plaintiffs' failure to submit a counter statement requires that defendant's statement of facts be taken as true.  Plaintiffs contend that a Rule 56.1 Statement is not required given the nature of summary judgment in IDEA reimbursement cases.  The cases addressing the issue are divided. *Compare Student X*, 2008 WL 4890440 at *11 (finding Rule 56.1 Statement unnecessary in IDEA reimbursement case) *with K.Y. ex rel. T.Y. v. New York City Dep't of Educ.*, No. 07 Civ. 3199 (SJ)(KAM), 2008 U.S. Dist. LEXIS 89827 at *15 n.3 (E.D.N.Y. July 2, 2008) (reaching the opposite result).  Because defendant is clearly entitled to prevail even if the facts in his Rule 56.1 Statement are not assumed to be true, it is not necessary to resolve this procedural dispute.

Plaintiffs assert six procedural objections to the IFSP and the hearing before the ALJ:  (1) the IFSP was predetermined; (2) the evaluations of Drs. Lucas and McCarton were improperly excluded; (3) N.G.'s parents were denied meaningful participation in the preparation of the IFSP; (4) N.G.'s gross motor skills were not evaluated prior to the meeting nor was a functional behavioral analysis performed as part of N.G.'s assessment; (5) the ALJ improperly precluded plaintiffs from posing leading questions during their cross-examination of one of defendant's witnesses and (6) the ALJ improperly precluded plaintiffs from offering rebuttal evidence.[68]  None is meritorious.

### A.    Predetermination

Plaintiffs' predetermination claim is based on the conversation N.G.'s mother claims she had with either Ms. "Asaria" or Ms. Placido prior to the IFSP meeting.  She claims that the specific levels of therapy N.G. would receive were described during this conversation.[69] Ms. Placido denied any recollection of such a conversation.[70]

The ALJ did not make a factual finding as to whether the conversation described by N.G.'s mother actually occurred.  Nevertheless, even if the conversation occurred in the

---

[68]

      Although plaintiffs do not specifically raise it as a procedural defect, their papers repeatedly refer to the fact that the evaluators were not present at the IFSP meeting.  As indicated at note 9 above, New York's regulations do not mandate the presence of the evaluators, and plaintiffs cite no legal authority that requires the presence of the evaluators.  Thus, although the absence of the evaluators was, no doubt, undesirable, there is no legal authority that would justify elevating their absence to the level of a procedural defect.

[69]

      Tr. 877-78.

[70]

      *Id* at 844.

manner described by N.G.'s mother, it would not have constituted a procedural deficiency sufficient to invalidate the IFSP.

The Court of Appeals recently rejected a predetermination claim arising out of similar facts.  In *T.P. ex rel. S.P. v. Mamaroneck Union Free School District*,[71] the school district's consultant  reviewed the report prepared by the parents' consultant prior to the meeting to formulate an IEP, and prepared a two-column chart listing the recommendation from the parents' evaluator and the "School Respon."[72]  The IEP that actually was formulated substantially followed the program set forth under the "School Respon." heading in the consultant's pre-meeting chart, and the district court found that the school district improperly had predetermined the elements of the IEP.  But the Court of Appeals reversed, holding that there was nothing inappropriate in the preparation of a proposed program prior to the meeting:

> "First, Mamaroneck's consideration of educational programs for S.P. before the July Committee meeting did not violate the procedural requirements of the IDEA. The parents contend that the Committee chairperson repeated Young's premeeting recommendations at the meeting and therefore must have discussed them with Young before the meeting. Even if there was such discussion, this does not mean the parents were denied meaningful participation at the meeting.  IDEA regulations allow school districts to engage in 'preparatory activities . . . to develop a proposal or response to a parent proposal that will be discussed at a later meeting' without affording the parents an opportunity to participate.  *See* 34 C.F.R. §§ 300.501(a)(2) & (b)(3).  Mamaroneck's conduct was consistent with these regulations."[73]

---

[71]

554 F.3d 247 (2d Cir. 2009).

[72]

*Id.*at 250.

[73]

*Id.* at 253 (footnote omitted).  *See also M.M. ex rel. A.M.,* 583 F. Supp.2d at 506; *Rye City Sch. Dist.,* 454 F. Supp.2d at 147-48; *Brennan v. Reg'l Sch. Dist. No. 1 Bd. of Educ.,* 531 F. Supp.2d 245, 274-75 (D. Conn. 2008); *see also Nack ex rel. Nack v. Orange City Sch. Dist.,*

Thus, even if the conversation between N.G.'s mother and Ms. Placido occurred in the manner described by N.G.'s mother, it would not have constituted improper predetermination.

B.      *Alleged Exclusion of the Evaluations of Drs. Lucas and McCarton*

Plaintiffs next claim that the evaluations of their consultants were not considered.

Other than the fact that the IFSP formulated for N.G. provided for approximately two-thirds of the treatment hours recommended by plaintiffs' evaluators and provided for less parent training and less frequent team meetings, there is no evidence to support this claim.   Ms. Arias testified that she considered the evaluations of Drs. Lucas and McCarton other than the frequencies for services , which she indicated she was not permitted to consider.[74]  Plaintiffs offer no evidence contradicting this testimony.   Ms. Arias' disregard of the specific hours recommended by Drs. Lucas and McCarton was consistent with the applicable New York State regulations, which instruct evaluators to avoid recommending specific levels of service.[75]

---

454 F.3d 604, 611 (6th Cir. 2006) ("'[S]chool evaluators may prepare reports and come with pre-formed opinions regarding the best course of action for the child as long as they are willing to listen to the parents and parents have the opportunity to make objections and suggestions.'").

[74]   Tr. 340.

[75]   10 N.Y. COMP. CODES R. & REGS. § 69-4.8(a)(4)(iv) provides, in pertinent part, that "[t]he evaluator should avoid making recommendations regarding frequency and duration of specific services until such time as the family's total priorities, concerns and resources have been assessed and the total plan for services under the IFSP is under discussion . . . ."

Although plaintiffs argue that the application of this regulation to preclude consideration of the hours recommended  by Drs. Lucas and McCarton violated their right to participate in the IFSP meeting in a meaningful way (Pls.' Mem. at 13), their argument is misguided.  It appears that the purpose of the regulation is to prevent any evaluators from assuming the function of the IFSP meeting and *de facto* establishing the level of services to be provided

The Court is mindful of the fact that direct evidence of mental processes -- such as the consideration given to a specific report or document -- almost never is available and that N.G.'s parents have no way of looking into Ms. Arias' mind.  Nevertheless, as the parties bearing the burden of proof, it was incumbent upon N.G.'s parents to offer some evidence to support their contention.[76]  "The fact that the [defendants] ultimately disagreed with the opinions of plaintiffs and their outside professionals does not mean that plaintiffs were denied the opportunity to participate in the development of the [IFSP], or that the outcome[] of the . . . meeting[] [was] pre-determined."[77]

C.      *Alleged Denial of Meaningful  Participation in the Meeting*

Plaintiffs' third alleged procedural error fails for much the same reason -- other than their disagreement with the IFSP that was ultimately adopted, they offered no evidence that their comments were disregarded.  To the extent objective evidence exists, it establishes the contrary.  At least one element of the IFSP -- an evaluation of N.G. for physical therapy -- was

_____

to a child.  The fact that no specific recommendations from *any* evaluator were considered at N.G.'s IFSP meeting ensured that meeting served its intended purpose.

[76]     Circumstantial evidence that Ms. Arias did not consider the evaluations of Drs. Lucas and McCarton might consist of testimony that Ms. Arias did not spend any time with the reports of Drs. Lucas and McCarton or that the discussion at the meeting revealed that Ms. Arias was unfamiliar with the recommendations of Drs. Lucas and McCarton.  Plaintiffs offered no such testimony nor other circumstantial evidence bearing on the issue.

[77]     *Bedford Cent. Sch. Dist*. 569 F. Supp.2d at 383; *see also Orange City Sch. Dist*., 454 F.3d at 614 ("In any event, the fact that the IEP team chose not to adopt all of Martin's recommendations hardly compels the conclusion that the IEP itself was lacking.").

added as a result of the comments of N.G.'s mother.[78]

      The ALJ's findings of fact concerning the meeting sharply contradict plaintiffs'

contention that they were denied meaningful participation.

> "On or about November 13, 2006 an IFSP meeting was held.  (Ex. C).
> Just prior to the start of the IFSP meeting a copy of 'NG's' Independent
> Report was provided to Evelyn Arias [Early Intervention Official
> Designee].  (Tr. 346, 348, 900, 1001-2).  The IFSP meeting lasted an hour
> or more, and the required participants were present and had a copy of the
> Respondent's Evaluation Report.  (PHL Section 2545; Tr. 361, 367-69,
> 901-02).  The Petitioners were the only people at the meeting who had
> personal knowledge about 'NG,' and they described their child and his
> development, and discussed goals and objectives for "NG" with those
> participating in the IFSP meeting.  (Tr. 367-72, 901, 1003).  The meeting
> participants talked about and considered the substance of the Respondent's
> Report and the Independent Report.  (Tr. 367-72, 377, 880, 901, 1006-7,
> 1283-85).  The Respondent's Report and the Independent Report identified
> similar issues and types of services for 'NG' including:  twelve month
> home based program, ABA Therapy, Speech and Language Therapy,
> Occupational Therapy, Parent/Family Training and Team Meetings.  (Ex.
> G, Ex. H & Ex. J; Tr. 369-71, 985-991, 1004, 1284, 1292, 1296, 1709-10).
> At the conclusion of the IFSP meeting, a determination was made about
> the type, level and frequency of developmental services appropriate for
> "NG" and this was documented in the IFSP, and NG was also referred for
> a physical therapy evaluation.  (Ex. C; Tr. 320, 361, 367-8)."[79]

      Giving these findings the "due weight" to which they are entitled,[80] and mindful of

the fact that plaintiffs bear the burden of proof, plaintiffs' unsupported belief that their statements

were not considered[81] is insufficient to sustain their burden of proof.

---

[78]    Tr. 1007.

[79]    ALJ Dec. 3-4.

[80]    *Rowley*, 458 U.S. at 206.

[81]    *See* Tr. 1006.

D.    *Absence of an Evaluation of N.G.'s Gross Motor Skills and a Functional Behavioral Analysis Prior to the Meeting*

Plaintiffs next assert that the IFSP was defective because no evaluation of N.G.'s gross motor skills and no functional behavioral analysis[82] were performed prior to the IFSP meeting.[83]   Plaintiffs do not explain why these evaluations were necessary or appropriate except to cite a general statement from a Theracare representative that the absence of a functional behavioral analysis could result in an inappropriate plan.[84]   Plaintiffs cite no evidence that the absence of such analyses here actually had an adverse effect on the IFSP nor do plaintiffs cite any regulation or statute suggesting that such analyses are essential to evaluating an autistic child. Plaintiffs did not adduce any testimony from their expert -- Dr. McCarton -- suggesting that an evaluation of gross motor skills or a functional behavior analysis were essential to a valid evaluation.

With respect to the need for an evaluation of N.G.'s gross motor skills, plaintiffs overlook their own evidence.  Dr. McCarton's evaluation addressed N.G.'s gross motor skills and noted that they were "close to age level."[85]   Thus, evidence of N.G.'s gross motor skills was presented at the IFSP meeting and that evidence indicated that those skills were  "close" to

---

[82]
    A functional behavioral analysis "is a type of assessment that's done to determine what is the function of a specific behavior or otherwise why is a specific behavior happening."  Tr. 1529.

[83]
    Pls. Mem. at 15.

[84]
    *Id.*

[85]
    PX H at 7.

normal.[86]

With respect to the need for a functional behavioral analysis, Theracare's supervisor of ABA therapy and education testified that a functional behavioral analysis could have been undertaken at the start of N.G.'s ABA therapy had Theracare been permitted to undertake such therapy.[87]  Since Theracare never actually provided ABA therapy to N.G., the analysis was never performed.

Given the evidence that a functional behavioral analysis could have been performed had the Early Intervention Program's provider of ABA therapy been allowed to start that course of treatment, and the lack of evidence that the omission of any such analysis had an adverse effect on the IFSP, any error concerning the functional behavioral analysis was harmless. Thus, even if the Court were to assume that the failure to perform such an analysis would have constituted a procedural error, the error would have been harmless.

E.       *Inability to Ask Leading Questions and Prohibition of Rebuttal Evidence*

The last two procedural issues relate to the conduct of proceedings before the ALJ rather than the conduct of the IFSP meeting.

Plaintiffs object first to the ALJ's sustaining an objection to a leading question posed by plaintiffs' counsel during his cross-examination of one of defendant's witnesses,  Prashil

---

[86]

*See* also PX H at 6-7.

[87]

Tr. 1529-30.

H. Govind, M.D., the medical director of New York City's Early Intervention Program.[88]

> "Q Do you think, do you think before coming up to the IFSP, it would have been, would have been important for you that everyone at the meeting have an opportunity to look at all the evaluations and give them due consideration?
>
> "A I think that's part of the IFSP process.
>
> "Q Has anybody ever told you that there's been some evidence at this hearing that decisions were made by some members of the early intervention staff who did not -- either did not consider or not share certain reports at NG's IFSP with other team members before the IFSP was generated?
>
> "MS. CLEMONS:  Objection.
>
> "Misstatement and mischaracterization of the testimony.
>
> "JUDGE O'BRIEN:  Ask the witness -- sustained.  Ask the witness what he knows about the information available at the IFSP meeting.
>
> "MR. MAYERSON:  Can I rephrase it in a different way?
>
> "JUDGE O'BRIEN:  You cannot rephrase it by testifying or feeding the witness a yes/no answer.  Ask him what he knows about what reports were available at the IFSP meeting.
>
> "MR. MAYERSON:  Judge, can I just be heard on this issue for one moment?  I beg you to let me make my --
>
> "JUDGE O'BRIEN:  Move on.
>
> "MR. MAYERSON:  On cross examination?  I can't do this on cross?
>
> "JUDGE O'BRIEN:  You have been given a lot of latitude here.  Ask him what he knows.  Don't tell him what he knows.
>
> "MR. MAYERSON:  I believe I'm entitled to lead on cross examination, with all due respect.

---

[88] Dr. Govind did not participate in the IFSP meeting, nor did he have any role in approving the IFSP formulated for N.G.

"JUDGE O'BRIEN:  I'm directing you what to do.

"MR. MAYERSON:  Okay.  I'll do it.

"BY MR. MAYERSON:

"Q     What were you told about the sharing of reports at NG's IFSP, if anything?

"A     I was not told anything about it."[89]

To the extent the ALJ was prohibiting plaintiffs' counsel from asking leading questions on cross-examination, she appears to have erred.  Nevertheless, given the question and answer that followed the colloquy, any error was harmless.  Dr. Govind did not know who saw what reports at N.G.'s IFSP meeting.  In addition, given that Dr. Govind did not attend the meeting, his belief as to who saw what was of little consequence in light of the fact that the record contained testimony from three of the four attendees at the meeting.

Plaintiffs' second claim of error concerning the hearing arises out of plaintiffs' attempt to offer rebuttal evidence after the testimony of Nichole Aiello, the Early Intervention Staffing Coordinator at Theracare.  During Ms. Aiello's testimony, defendant offered a document purporting to be a log reflecting telephone calls between Theracare and N.G.'s mother concerning the availability of N.G. to commence therapy between November 14 and November 28, 2006.  The gist of defendant's testimony was that there was a two-week delay in starting N.G.'s speech therapy due to his family's pre-existing vacation plans.  Plaintiffs claim that the ALJ improperly precluded them from calling N.G.'s mother to rebut this evidence.

The availability or unavailability of N.G. for treatment between November 14 and

---

[89]   Tr. 1727-29.

November 28, 2008 played no part in the ALJ's decision and plays no part in this Court's decision.  Again, if there was any error in precluding the rebuttal evidence, it was harmless.

Plaintiffs seek also to use these two instances of alleged error to suggest that the ALJ was biased.  The transcript of the hearing belies this claim.  The ALJ afforded plaintiffs considerable leeway at the hearing.  In order to be entitled to any remedy, plaintiffs had to establish that defendant's IFSP was inadequate, i.e., not reasonably calculated to confer any benefit on N.G.  As explained in the following section, both defendant's and  plaintiffs' witnesses confirmed that defendant's IFSP would have benefitted N.G.  Only one witness -- Dr. Clark -- testified to the contrary and she later recanted that testimony.  Despite the failure of plaintiffs' proof, the ALJ allowed them to call nine witnesses whose testimony frequently was far afield from the core issue.  For example, there was substantial testimony concerning N.G.'s progress and treatment pursuant to the program his parents had instituted.  However, in the absence of a showing that the IFSP was inadequate, the benefits of the program his parents had formulated were immaterial.  The ALJ  was exceptionally patient throughout this testimony and went to great lengths to accommodate both counsel with respect to the scheduling of additional hearing days.  Given the entirety of the testimony, plaintiffs have established, at most, two isolated and harmless errors in the course of an 1,800 page transcript relating to factual issues that played no part in the ALJ's decision.  Plaintiffs' attempt to transform these inconsequential errors into a claim of bias is frivolous.[90]

---

[90]
    *See generally United States v. Carlton*, 534 F.3d 97, 100 (2d Cir. 2008) ("[A] judge's comments during a proceeding that are 'critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge' [unless the comments] demonstrate 'such a high degree of favoritism or antagonism as to make fair judgment impossible.'") (quoting *Liteky v. United States*, 510 U.S. 540, 555

III.     *Substantive Adequacy of the IFSP*

Plaintiffs challenge also the adequacy of the IFSP.  As explained above, an IFSP is adequate in the context of the IDEA if it is reasonably calculated to provide some non-trivial educational benefit.  It need not maximize the recipient's potential nor need it be the best program possible.[91]

Defendant called three witnesses, each of whom confirmed that the treatment plan in the IFSP would benefit N.G.

Cheryl Dombrowski, Theracare's ABA and Educational Supervisor, testified that the treatment plan set forth in the IFSP was an appropriate starting point for N.G.'s treatment and that the plan was adequate.[92]  Ms. Dombrowski holds a master's degree in early childhood and special education from NYU.[93]

Jeanette Gong, the director of the Manhattan Regional Office of New York City's Early Intervention program testified that the treatment plan set forth in the IFSP would provide benefits to N.G.[94]  Dr. Gong holds two master's degrees, one in psychology and one in

---

[91] (1994)).

*Rowley,* 458 U.S. at 189-97; *Lunceford v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1583 (D.C. Cir. 1984) (Ginsburg, J.) ("But resources are not infinite, and many other demands compete for limited public funds.  The [IDEA] does not secure the best education money can buy; it calls upon government, more modestly, to provide an *appropriate* education for each child." (emphasis in original)).

[92] Tr. 1299-1300.

[93] *Id.* at 1218.

[94] *Id.* at  1589.

philosophy, and a Ph.D. in experimental psychology, with emphasis on cognition and development from the City University of New York.[95]

Prashil M. Govind, M.D., the medical director of New York City's Early Intervention Program, testified that the IFSP treatment plan would provide educational benefits to N.G.[96]  Dr. Govind's subspecialty is behavioral pediatrics.[97]

In addition, every witness who was called by plaintiffs and who was asked about the treatment plan set forth in the IFSP confirmed that it would provide some benefit to N.G.

Tamar Frankel, an ABA therapist hired by N.G.'s parents who holds a master's degree in special education and applied behavior analysis from Columbia University, testified that forty hours of ABA therapy is not essential for progress, that some experts believe fifteen to twenty hours of ABA therapy is an appropriate level and that even a program of ABA therapy that did not provide for weekend hours would benefit N.G.[98]

Dr. Deborah Clark, who holds a Ph.D. in cognitive psychology from Columbia University and who was hired by N.G.'s parents to oversee N.G.'s treatment, initially testified that at least forty hours of ABA therapy per week was essential for N.G. to make progress.[99] However, on cross-examination she recanted that testimony and admitted that twenty hours per

---

[95]      *Id.* at 1537-38.

[96]      *Id.* at 1589, 1710.

[97]      *Id.* at 1661-62.

[98]       *Id.* at 246, 251, 270.

[99]      *Id.* at 537, 542-43; *see* Tr. 608, 619.

week of ABA therapy would provide some benefit to N.G.:

> "Q     In other words, if he had had 20 hours of ABA, you're testifying that in your clinical opinion there would have been no effect at all from that 20 hours?

> "A     No, that is not what I am saying whatsoever.  I think he would have had remarkably and rather dramatically less gains had he only had 20 hours. And if you just go back to the research, every single research study, outcome research, long-term research, follow-up research, is based on the idea of intensive, as close to 40 hours as you can get."[100]

Finally, Dr. Cecelia McCarton testified that N.G. would make some progress with the levels of treatment provided in the IFSP.[101]  She holds an M.D. degree from Albert Einstein College of Medicine and is a developmental pediatrician.[102]  She also heads the McCarton School and operates the McCarton Center which specialize in the education and treatment of children with autism.[103]

Although plaintiffs' witnesses all believed that twenty hours of ABA therapy per week would neither be the optimal treatment level for N.G. nor maximize his development and that more hours were desirable, none testified that twenty hours of ABA therapy per week would provide no or only trivial benefit.  In fact, other than Dr. Clark, who recanted her testimony on cross-examination, no witness testified that twenty hours of ABA therapy per week would provide no benefit or only trivial benefit to N.G.

---

[100]     Tr. 619-20.

[101]     *Id.* at 687, 722, 737-38.

[102]     *Id.* at 654.

[103]     *Id.* at 654-56.

*Conclusion*

As the ALJ noted in her decision, the record in this case clearly and unmistakably shows that plaintiffs are loving and dedicated parents who are striving to provide the best therapy possible for their son.  However, the IDEA simply does not require states to provide this level of therapy.  Plaintiffs have not shown any material procedural error in the state administrative proceedings.  Nor have they shown that the program of therapy set forth in the IFSP will provide no benefit or only trivial benefit.  Thus, the Court concludes that the ALJ's decision must be affirmed.

Accordingly, defendants motion for summary judgment dismissing the complaint [Docket Item 34] is granted in all respects.  Plaintiffs' motion [Docket Item 31] is denied in all respects.  The clerk shall close the case.

SO ORDERED.

Dated:          March 25, 2009

_____
Lewis A. Kaplan
United States District Judge

(The manuscript signature above is not an image of the signature on the original document in the Court file.)